1               **UNITED STATES DISTRICT COURT**

2             **CENTRAL DISTRICT OF CALIFORNIA**

3                **WESTERN DIVISION**

4                    **- - -**

5  **HONORABLE MAAME EWUSI-MENSAH FRIMPONG, DISTRICT JUDGE PRESIDING**

6

7     **UNITED STATES OF AMERICA,**     )
                                )

8           **Plaintiffs,**       )
                                )

9                               )
                                )

10         **vs.**               ) **No. 23-00059-MEMF**
                                )

11                               )
                                )

12     **CAROLINE J. HERRLING,**      )
                                )

13           **Defendant.**        )
    _____)

14

15

16         **REPORTER'S TRANSCRIPT OF PROCEEDINGS**

17               *SENTENCING [79]*

18           **LOS ANGELES, CALIFORNIA**

19          **FRIDAY, MARCH 15,2024**

20  _____

21             **MARIA R. BUSTILLOS**
           **OFFICIAL COURT REPORTER**

22              **C.S.R. 12254**
          **UNITED STATES COURTHOUSE**

23          **350 WEST 1ST STREET**
               **SUITE 4455**

24     **LOS ANGELES, CALIFORNIA 90012**
           **(213) 894-2739**

25

```
 1                    A P P E A R A N C E S

 2


 3


 4       ON BEHALF OF THE PLAINTIFFS,
         UNITED STATES OF AMERICA:      OFFICE OF THE UNITED STATES
 5                                      ATTORNEY
                                        BY:  ANDREW BROWN
 6                                      312 NORTH SPRING STREET
                                        ELEVENTH FLOOR
 7                                      LOS ANGELES, CA 90012
                                        (213)894-6269
 8


 9
         ON BEHALF OF THE DEFENDANT,
10       CAROLINE J. HERRLING:          LAW OFFICES OF ALEX R.
                                        KESSEL
11                                      BY:  ALEX R. KESSEL
                                        15910 VENTURA BOULEVARD
12                                      SUITE 1030
                                        ENCINO, CA 91436
13                                      (818)994-1422

14

15

16

17

18

19

20

21

22

23

24

25
```

1                           **I N D E X**

2                                                              <u>PAGE</u>
    SENTENCING HEARING [79]:                                     4
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | LOS ANGELES, CALIFORNIA; FRIDAY, MARCH 15, 2024 |
| 2 | -o0o- |
| 3 | (COURT IN SESSION AT 2:07 P.M.) |
| 4 | THE COURTROOM DEPUTY:  Calling item two, |
| 5 | LA CR 23-00059-MEMF:  *United States of America v.* |
| 6 | *Caroline Joanne Herrling*. |
| 7 | Counsel, please stand and state your |
| 8 | appearances, please. |
| 9 | MR. BROWN:  Good afternoon, Your Honor. |
| 10 | Andrew Brown for the Government.  With me at counsel |
| 11 | table are the two case agents, LAPD Detective |
| 12 | Mark O'Donald and Postal Inspector Lyndon Versoza. |
| 13 | MR. KESSEL:  Good afternoon, Your Honor. |
| 14 | Attorney Alex Kessel.  I'm present with my client, |
| 15 | Ms. Herrling. |
| 16 | THE COURT:  Good afternoon to counsel. |
| 17 | Good afternoon, Ms. Kessel -- Ms. Herrling.  Good to see |
| 18 | you.  Good afternoon to the agents.  Could I see counsel |
| 19 | briefly at sidebar off the record? |
| 20 | (Sidebar off the record.) |
| 21 | THE COURT:  Okay.  We are on the record.  And |
| 22 | we're here for the sentencing in this matter.  And I |
| 23 | understand that we have one individual, |
| 24 | Miracle Williams, who will joining us via Zoom.  The |
| 25 | clerk will advise me as soon as she's on the Zoom.  To |

 1    my understanding, we don't have anybody on the Zoom

 2    right now.

 3          Okay.  So with that, Ms. Herrling, I appreciate

 4    this is probably a difficult day for you.  Let me

 5    explain what's going to happen:  I'm going to go over

 6    everything that I've reviewed.  There's a lot of

 7    material I've reviewed in this case.  And I'm going to

 8    hear from both parties regarding the guidelines

 9    calculation and regarding the sentence.  And then I'll

10    make my sentencing guidelines calculation.  I'll resolve

11    a number of the disputes that the parties have about the

12    guidelines calculation.  And while I'm hearing from the

13    parties, I'll hear from you, as well, if you wish to be

14    heard.  And after I make the sentencing guidelines

15    calculation, I'll take probably a 10- to 15-minute

16    recess to make sure I've considered what everything has

17    said this afternoon with respect to the sentence, and

18    then I'll return to announce the sentence.

19          If at any point, you need a break or you need

20    to speak privately with Mr. Kessel, then please

21    interrupt me or ask Mr. Kessel to interrupt me,

22    understood?

23              THE DEFENDANT:  Yes.

24              THE COURT:  Okay.  Thank you.  Okay.  So,

25    Counsel, I have read and considered the following, which

1    includes the position papers filed by the parties and

2    any other documents provided -- just a moment -- so I

3    have considered the presentence report, which is found

4    at ECF 37; the revised presentence report found at

5    ECF 55; the addendum to the presentence report found at

6    ECF 56; probation's recommendation found at ECF 36.  I'm

7    going to need to close the courtroom at this moment to

8    discuss confidential material.  So I'm going to ask that

9    the clerk close the Zoom, and also close the courtroom.

10   And I am going to ask that any members of the public

11   that are present, exit the courtroom, and we'll reopen

12   the courtroom when we are no longer in the sealed

13   proceeding.

14              (Sealed proceeding filed separately.)

15              (Whereupon, the record is unsealed:)

16        Okay.  Mr. Kessel, have you had enough time to

17   read all of these documents and review them with your

18   client?

19        MR. KESSEL:  I have, Your Honor.

20        THE COURT:  Did you explain their contents to

21   her?

22        MR. KESSEL:  We went over the documents, yes.

23        THE COURT:  Okay.  And let me just ask you to

24   speak into the microphone.  If you want to remain seated

25   for these preliminary questions, that's fine.

```
1              MR. KESSEL:  It's just a habit, Your Honor.

2              THE COURT:  Yeah, no, it's fine.  I will --

3              MR. KESSEL:  I have reviewed all the documents

4    with my client.

5              THE COURT:  Okay.  And you explained them to

6    her?

7              MR. KESSEL:  Yes.

8              THE COURT:  Okay.  Do you have any concerns

9    about her ability to understand them?

10             MR. KESSEL:  None whatsoever.

11             THE COURT:  Okay.  And then, Counsel, if you

12   could pull the microphone -- the -- in front of

13   Ms. Herrling, if you can pull that towards her.  She can

14   pull it, thank you.  Ms. Herrling, did you receive all

15   of those documents that I mentioned?

16             THE DEFENDANT:  Yes.

17             THE COURT:  And did you read them?

18             THE DEFENDANT:  Yes.

19             THE COURT:  Do you need anymore time to read

20   them?

21             THE DEFENDANT:  No.

22             THE COURT:  Did your attorney explain them to

23   you?

24             THE DEFENDANT:  Yes, he did.

25             THE COURT:  Did you understand them?
```

1          THE DEFENDANT:  Yes, I did.

2          THE COURT:  Okay.  Turning to Defense counsel,

3     and maybe you want to take the podium at this time...

4          Yes.  The portion of the transcript from when I

5     reopened the courtroom is unsealed.

6          Thank you.

7          Okay.  So, Mr. Kessel, normally, I would ask if

8     there is anything you want to change or contest in the

9     presentence report, and I do understand that you have a

10    number of objections.  As I indicated at sidebar, I do

11    have a list of what I think the various objections and

12    issues are.  If it's all right with you, I will walk

13    through the list unless you would prefer to go through

14    it in whatever order you'd prefer you.

15         MR. KESSEL:  No, Your Honor, that's fine.

16         THE COURT:  Okay.  Let me start with -- I think

17    one of the preliminary questions or overarching issues,

18    one thing I just want to make clear:  I identified for

19    the parties all the things that I reviewed.  One of the

20    objections that the Defense had to the Government's

21    position paper was the Government's discussion of how

22    much time a defendant sentenced to a given sentence is

23    likely to serve.  And I just wanted to make it clear to

24    the parties that I will not be considering that.  I

25    don't think it's appropriate to do so for reasons I can

 1    explain at length, the simplest explanation is the

 2    Court's understanding is that most of the items that the

 3    Government has identified, the Court understands are

 4    Congress' determinations as to good time credit that

 5    defendant should receive.  So, to this Court, it appears

 6    inappropriate for the Court to subvert Congress' intent

 7    in giving defendants credit for doing certain things and

 8    taking that into account and increasing the sentence on

 9    that basis.  So I just want it to be clear that the

10    Court is not going to be considering that information.

11            The next sort of overarching issue I think that

12    we need to address is the standard of proof.  And before

13    I move on, I trust the Government doesn't need to be

14    heard on the issue of the -- the time served.

15            MR. BROWN:  No, Your Honor.

16            THE COURT:  Okay.  So turning to the issue of

17    the standard of proof:  In your papers, Mr. Kessel, you

18    indicate that the standard is clear and convincing.  And

19    you cite to a case on that.  The Government indicates by

20    citation to various cases and the sentencing guidelines

21    that it should be a preponderance of the evidence

22    standard.  Based upon my review, it does appear that it

23    should be a preponderance of the evidence standard, but

24    I did want to give you the opportunity to be heard on

25    that.

```
1          MR. KESSEL:  I agree in this sense, Your Honor,
2     that having done many, many sentencings, I believe
3     preponderance of the evidence is the normal standard.
4     There is, as I indicated, a Ninth Circuit case that
5     talks about a higher standard of proof when -- when a
6     substantial increase in adjustments, which I think is
7     applicable here, comes into play.  That was -- that was
8     the reason I -- I referenced, but I would agree as to a
9     particular adjustment, my main concern was the overall
10    adjustments and their effect on an ultimate sentence,
11    Your Honor, as to standard of proof, and also the
12    argument about the lack of proof to substantiate some of
13    the factual basis that the Government uses to support
14    and, obviously, adopted by Probation, would support some
15    of the adjustments.
16          THE COURT:  Understood.  Okay.  And I -- thank
17    you for the case law that you provided.  The Court's
18    reading of that case law is that where conduct is used,
19    that -- let's get the language of the case:  And the
20    case that you cited to was U.S. v. Mezas, M-E-Z-A-S De
21    Jesus, 217 F.3d 638, and just reading from the case, as
22    a general rule at sentencing, due process does not
23    require higher standard of proof than preponderance of
24    the evidence to protect a convicted defendant's liberty
25    interest in the accurate application of the guidelines.
```

```
 1              However, when a sentencing factor has an
 2     extremely disproportionate effect on the sentence,
 3     relative to the offense of conviction, a higher standard
 4     of proof may be required.  And the facts of that case,
 5     obviously, involved a relatively minor crime and then
 6     there was an uncharged kidnapping that was added.  So in
 7     the Court's view, that is not the case here where the
 8     sentencing factors have an extremely disproportionate
 9     affect on the sentence relative to the offense of
10     conviction within the nature of the offense of
11     conviction and the sentencing factors.  So it does
12     appear to the Court that the preponderance of the
13     evidence standard should apply.
14              Turning to -- I would also just state in case
15     the parties need to be heard on this:  At various
16     points, counsel points to the lack of evidence on
17     certain -- of the factors that Probation considered.
18     For clarification, I wasn't sure if you were -- your
19     objection was that the PSR doesn't refer to the evidence
20     or the evidence itself is insufficient.
21              MR. KESSEL:  The latter, Your Honor.
22              THE COURT:  Okay, okay.  And I will just say at
23     the outset, I think the parties would agree to me the --
24     agree with me that at sentencing, hearsay was an indicia
25     of reliability is admissible.  Would you agree with
```

1    that?

2             MR. KESSEL:  Yes.

3             THE COURT:  Okay.  Okay.  So then let's turn to

4    what I understand to be the first substantive objection,

5    which is that Ms. Herrling should be granted the

6    Zero-Point Offender reduction.  So let me hear from you

7    on that.

8             MR. KESSEL:  Well, the -- it's a new -- it's a

9    new change, and there's, obviously, some prerequisites

10   that need to be in play and --

11            THE COURT:  Sorry, Mr. Kessel.  Just one

12   moment.

13            Thank you.  So, Mr. Kessel, it appears that the

14   witness that we anticipated is now on the Zoom.  We can

15   proceed or if -- if you're okay with us taking a break

16   to hear from her and then she can leave the Zoom.  It's

17   up to you.

18            MR. KESSEL:  Yes, thank you for inquiring, and

19   I don't have an objection, other than, obviously, later

20   argue the weight of what she's saying, but as to her

21   ability and to address Court, no objection and to her --

22   to address the Court now, I have no objection.

23            THE COURT:  Okay.  Thank you for that.  Okay.

24            So the clerk will get her on the line.

25            THE COURTROOM DEPUTY:  Ms. Williams, can you

```
 1    hear me?  This is Sheila English, the courtroom Deputy

 2    Clerk.  Unmute your phone.  You need to unmute your

 3    phone in order for us to hear you.

 4              I think we lost her.

 5              THE COURT:  Okay.

 6              THE COURTROOM DEPUTY:  We lost her.

 7              THE COURT:  Okay.  So we're having some

 8    technical difficulties.  Thank you for your patience.

 9    We'll have you resume, Mr. Kessel, and we'll wait until

10    there is another appropriate break.  I think you were

11    addressing the Court's question about the Government has

12    indicated -- Probation has indicated that the Zero-Point

13    Offender reduction should not apply, because

14    Ms. Herrling does have criminal history points and, in

15    addition, she is subject to the leader points as well as

16    the -- the crime purportedly caused a death.  I think

17    those are their basis.  So let me let you be heard.

18              MR. KESSEL:  As far as the prior criminal

19    history, Your Honor, I think the Court has always the

20    option to find that the criminal history, which, as

21    reported, was a trespass for one point back some time

22    ago, Your Honor.  And that was at least the criminal

23    history we're asking you to set that aside.  It appeared

24    to be a relatively very minor charge and, again, it's

25    remote in time to the events in question here.
```

```
 1              As far as the -- I would agree that -- but if
 2    you look at the statute or the amendment, it has in
 3    there, if there's a leadership role and evidence of a
 4    continuing criminal enterprise, I believe is the
 5    language, which requires a finding that the defendant is
 6    a leader, organizer, or had an aggravating role, which
 7    we contest here.  So that has to be determined by the
 8    Court, but there's no indication of a continuing
 9    criminal enterprise.  And I looked at that yesterday.
10    And I think it's in the conjunctive, Your Honor, so both
11    prerequisites to excluding a defendant has to be proven
12    at the time.  I didn't address the cause -- the -- a
13    person's death, because I don't think that's the issue
14    here at all with my client.  I know this issue of a
15    decedent, Mr. Wilding's body, is relevant to -- and, at
16    least, is involved in a lot of the issues here,
17    including an appropriate sentence, but there's never
18    been an allegation at all and no evidence to suggest
19    that my client caused any death of -- of Mr. Wilding.
20              THE COURT:  And so just for clarification, with
21    respect to the not engage in a continuing criminal
22    enterprise, what is your understanding of why that would
23    not apply?
24              MR. KESSEL:  Are you asking me?
25              THE COURT:  Yes.
```

1          MR. KESSEL:  Well, because continuing criminal

2     enterprise, it has a particular meaning, one I would

3     first argue, due process.  We have never been at all

4     apprised of the Government's theory that this is a

5     continuing criminal enterprise.  Typically, that you see

6     a lot of times in drug offenses with multiple persons

7     charged.  You see that, again, to RICO, R-I-C-O,

8     investigations, and indictments, but I have never

9     thought of this, Your Honor, in any sense of a -- of a

10     continuing criminal enterprise.  You may see it

11     differently.  I'm telling you the lack of notice and,

12     more importantly, I didn't address that in my moving

13     papers, Your Honor.  You may find that it is a

14     continuing criminal enterprise, but I want the Defense's

15     objections to be clear both on due process, lack of

16     notice, and any evidence to support a continuing

17     criminal enterprise, as that's defined in the law and I

18     believe under the appropriate statute, which has a

19     separate provision for continuing criminal enterprise.

20          THE COURT:  Thank you.

21          And then the death cause -- I think the

22     Government's position is that the death cause is that of

23     Mr. Tascon.

24          MR. KESSEL:  Right.  Well, I have a lot of

25     concerns with that allegations.  I don't think there's

```
 1    any evidence to suggest that my client directly caused
 2    the death as I viewed that as the crime of murder,
 3    homicide, in any way, Your Honor.
 4             As you know, Mr. Tascon apparently, and I've
 5    received some of the reports from the state of Texas, I
 6    believe, that surround his death.  It was deemed to be
 7    suicide and as I indicated in our -- I want to get the
 8    correct document, Your Honor.  It was a reply to one of
 9    the Government's papers where they raised, obviously, as
10    an aggravating circumstance, my client's purported
11    causation, if you will, of Mr. Tascon's unfortunate
12    death.  I supplied the Court with the police reports
13    from the Texas authorities, as well as some other
14    individuals who were contacted, and bottom line is with
15    respect to countering the idea that my client had
16    anything to do with that, Mr. Tascon apparently had a
17    history of mental illness.  He, apparently, by his own
18    lawyer's admissions to the police -- as listed, again,
19    in the police report, and, Your Honor, it just talked
20    about hearsay being competent at least if it's accurate
21    and at least has indicia of reliability.  These police
22    reports were provided to me by the Government.  So I
23    have no reason to suggest that they're inaccurate to any
24    degree that the Court can't rely on them, but a couple
25    of things that came out of there, Your Honor, is that --
```

     1    and no disrespect to Ms. Williams, this is the purported

     2    wife.  And apparently, as an aside, I learned that

     3    Mr. Tascon was also the subject of a restraining order

     4    by another woman, who claimed she was his wife and lived

     5    in the Tascon residence here in the Central District of

     6    California and sought a restraining order against

     7    Mr. Tascon, or the other way around.  The point being

     8    that I don't know Ms. Williams' purported status to

     9    Mr. Tascon, but my point is the day he was found shot,

    10    she was nowhere in sight.  She had left, apparently, out

    11    of the jurisdiction.  One, he had a mental illness that

    12    developed long before the house in California was

    13    fraudulently sold, and I want to use that word

    14    fraudulently sold, because that's uncontested, but more

    15    importantly, Mr. Tascon had previously attempted suicide

    16    apparently by, according to police reports, at one

    17    point, jumping into a river or a creek that was

    18    unsuccessful.  And, then, again, in the police reports,

    19    Your Honor, so this is coming -- nothing, but from law

    20    enforcement, the day they interviewed --

    21         THE COURT:  Sorry, Counsel, just for the

    22    record, if you can point to which of your filings has

    23    that police report attached.

    24         MR. KESSEL:  Yes, Your Honor.  It's -- I'm

    25    sorry.  I want to get you to the document -- it was

```
1    filed under seal, Your Honor.  So it doesn't have a
2    number.  It was filed March 7th, 2024, and it was
3    entitled, Defendant's Reply to Government's Sentencing
4    Position and Recommendations.  I hope that's a
5    sufficient reference, Your Honor.
6              THE COURT:  Yes.
7              MR. KESSEL:  And it was --
8              THE COURT:  Exhibit C?
9              MR. KESSEL:  Correct.  And -- and the police
10   report in question is Exhibit C, Your Honor.
11             THE COURT:  Thank you.
12             MR. KESSEL:  And that's a series of reports.
13   And at least what I gleaned from that -- and --
14             THE COURT:  And, Counsel, just so that the
15   record is clear, given what we are discussing right now,
16   even though this portion was filed under seal, you --
17   it's acceptable to discuss this in open court?
18             MR. KESSEL:  This particular subject matter, I
19   have no objections.
20             THE COURT:  Okay.  Please proceed.
21             MR. KESSEL:  Thank you, Your Honor.
22             THE COURT:  And so I see that it's ECF -- the
23   exhibit is ECF 72.
24             MR. KESSEL:  Thank you, Your Honor.
25             And the upshot, which I think is going to come
```

```
 1    up again, because Mr. Tascon's death and his connection
 2    to my client, I think there's a big disconnect,
 3    Your Honor, how unfortunate it is.
 4          The other thing that the -- that came out of
 5    those police reports by interviews of Mr. Tascon's own
 6    lawyers or representatives in Texas is that he had an
 7    estate that was worth at least $9,000,000.  I say that
 8    only because the Government has indicated and
 9    speculated, and I think a lot of it is speculation,
10    because we never know why -- if it is suicide, we never
11    know why somebody kills themselves, unless -- I don't
12    know -- I haven't been given in evidence any suicide
13    note where he laid out his state of mind and mental
14    state at the time he took his life enough that we can
15    have some meaning into his intent, but be that as it
16    may, the point is the Government tried to infer that he
17    killed himself, because he lost his only pride
18    possession, which was his house here in California.  And
19    I don't think that's necessarily true, because by his
20    own attorney's accounts, Mr. Tascon had a very, very
21    well-funded trust account that he lived off of.  And I,
22    again, Mr. Tascon's personal life would probably never
23    come up if the Government -- I'm not saying and
24    rightfully, but they did -- they raised the issue about
25    the nexus between my client and Mr. Tascon's death.  So
```

```
1    these are the reasons why with respect to going back to
2    our initial conversation about exclusions from zero
3    criminal history and the defendant causing another's
4    death, Mr. Tascon, I don't believe is supported by the
5    evidence, Your Honor.
6            THE COURT:  Okay.  And just -- just so I want
7    to give you an opportunity to respond to this, because I
8    understood the Government to be arguing -- leaving
9    aside -- well, you've mentioned that he had a $9 million
10   estate.  You've also mentioned that Mr. Tascon was
11   living off of a trust.  What I understood the argument
12   to be -- what the Government's argument to be was that
13   the only possession that he had to leave to his wife,
14   Ms. Williams, was this house, and that's what caused him
15   so much distress.  That's how I understood it.
16           And so when you indicate that the estate was
17   $9 million, you're indicating that that would controvert
18   the idea that he only had the house to leave to her?
19           MR. KESSEL:  I would -- in regard of what the
20   Government's saying, I've never seen -- and I don't know
21   what Mr. Tascon left to Ms. Williams and whether she was
22   even entitled to the house and whether there were, as I
23   indicated, I understood Mr. Tascon might have been
24   married to another woman, first name Olivia, last name I
25   will put in the record K., but -- and who made claims as
```

1    well to Mr. Tascon's property, Your Honor.  So I -- I

2    can't speak beyond that.  I'm only indicating -- and I'm

3    trying to address the issue pertinent to my client is

4    Ms. Herrling's causation, if you will, of causing

5    Mr. Tascon's death.

6            THE COURT:  Understood.  And I think maybe

7    Ms. Herrling wanted to address you briefly.

8            MR. KESSEL:  I think she wanted to send me a

9    note here.

10            Thank you, Your Honor.

11            THE COURT:  Thank you.

12            MR. KESSEL:  And another issue -- and, again, I

13    can't verify this, but apparently, the house -- the

14    Tascon house that's the subject of this criminal action

15    was also part of Mr. Tascon's estate.  So I'm not quite

16    sure who would inherit what.  I'm just trying to contest

17    and disconnect any connection of my client to the death

18    of Mr. Tascon.

19            THE COURT:  Understood.  Okay.  The next

20    objection I understand is the enhancement for position

21    of trust.  And I understood your argument to be that

22    Ms. Herrling didn't actually have any relationship

23    with -- for instance, Mr. Wilding, Mr. Tascon, and so

24    the position of trust enhancement cannot apply.

25            MR. KESSEL:  That's right, and I state that in

1  my moving papers.

2         THE COURT:  Okay.  And then I did want to give

3  you an opportunity to respond to Note -- Application

4  Note 3 of 3B1.3, which addresses -- excuse me -- excuse

5  me -- addresses the issue of -- I'll just read it:  This

6  adjustment also applies in a case in which the defendant

7  provides sufficient indicia to the victim that the

8  defendant legitimately holds a position of private or

9  public trust when, in fact, the defendant does not.

10        MR. KESSEL:  I -- I heard that Application Note

11  and I've read that Application Note.  I don't think

12  there's evidence to support that, Your Honor.

13        THE COURT:  Okay.  Because -- if you could

14  tease that out for the Court.

15        MR. KESSEL:  That's indicating -- and I think

16  where I've seen that is, obviously, that adjustment is

17  for a breach of confidentiality or a breach of a

18  relationship that a defendant had with an actual person,

19  Your Honor.  And I know of no facts that indicate that

20  Mr. -- Ms. Herrling was in any position to represent

21  anything to Mr. Herrling or Mr. Tascon where they relied

22  on her, where they, obviously, trusted her advice,

23  which, you know, a lot of fiduciary relationships, that

24  type of characteristics are very common and naturally

25  can be breached.  I don't see that here.

 1            THE COURT:  Okay.  And so your contention would

 2    be even if the -- the actual enhancement doesn't

 3    necessarily -- the actual enhancement doesn't

 4    necessarily require a relationship between the defendant

 5    and the victim, let me just read what the actual

 6    enhancement reads -- give me just one moment.  If the

 7    defendant abused a position of public or private trust

 8    or used a special skill in a manner that significantly

 9    facilitated the commission or concealment of the offense

10    increased by two levels.  So as the Court reads it, the

11    actual enhancement doesn't require a relationship

12    between the defendant and the victim.  Although that

13    Application Note, I see what you're saying about that

14    particular Application Note, but your contention would

15    be, because she never represented herself to be -- to

16    Mr. Tascon or Mr. Wilding that this could not apply?

17            MR. KESSEL:  Correct, Your Honor.

18            THE COURT:  Okay.  Understood.

19            Okay.  Turning to the -- the loss amount, and

20    whether and how the Lowenstein estate should be

21    considered.

22            MR. KESSEL:  Yes.  Your Honor, I think I'm

23    quite aware of loss calculations under the guidelines,

24    and I'm speaking of actual losses out-of-pocket that can

25    be directly attributed to the defendant's conduct when

```
 1    intended loss.  Intended is, obviously, a lot more
 2    ambiguous and a lot less to -- to define.  In some
 3    places, it's very easy.  And, in fact, in some places,
 4    the law in credit card fraud provides for a dollar
 5    amount that the court should use.  Here I'm -- I'm
 6    indicating with respect to Lowenstein, I don't believe
 7    there was any intended loss, because that property -- at
 8    least, there is no evidence, was not ever indicating
 9    going to the defendant unlike Tascon where there was a
10    sale and proceeds.  That property was going through a
11    proper legal channel, albeit there's claims that the
12    Will of Ms. Lowenstein was changed, but as far as that
13    property, it was in the hands of the Court.  It was in
14    the hands of a proper fiduciary to the Court that
15    ultimately sold that property for a greater value than
16    what it was worth.
17          THE COURT:  Mr. Kessel, if I could just
18    interrupt you.  So I understood your arguments that it
19    was never fraudulently sold.  I thought the contention
20    was, because the intention was to fraudulently transfer
21    it to the defendant or other members of the conspiracy,
22    that's why the intended loss is the fair market value
23    when it was sold lawfully.  So I wanted to give you a
24    chance to respond to that.
25          MR. KESSEL:  Yes, and I would agree that the
```

1   intended loss could come about from the fact that the

2   defendant, and I think she's admitted her involvement

3   with the Lowenstein property, but I guess the dollar

4   amount that was used doesn't reflect, obviously, a

5   market value that indicates what would be sold at the

6   time the defendant was going to obtain the property,

7   Your Honor.  And we know real estate values change at

8   any given time in the market and that's where it's hard,

9   and the guidelines speak to this, the Court has to,

10  obviously, look at objects like real estate that values

11  go up and down, although real estate has been strong for

12  many, many years and soft for the last year or so in

13  somebody's eyes.  So my main concern was, one, using the

14  property at all, and it sounds like the Court is more

15  inclined to find that it is a consideration for an

16  intended loss.  But, then, again, the Court has to look

17  at what the value is, because, obviously, the value

18  leads to the dollar amount, which then has a nexus to

19  the loss adjustments under the fraud section,

20  Your Honor.

21           THE COURT:  Thank you.  Why wouldn't I -- I

22  haven't made any decisions here -- why would I not

23  consider this property?  Because of the fact that it was

24  never fraudulently sold?

25           MR. KESSEL:  That was -- that was the Defense's

1    argument.

2            THE COURT:  I see.  I see.  And then just so I

3    understand, the sale, the value argument that -- well,

4    we do have its fair market value at the time that it was

5    sold, but that's a different time from when the intended

6    loss was supposed to happen and so we don't know the

7    Delta.  It may have been worth less at that time.

8            MR. KESSEL:  Correct, Your Honor.

9            THE COURT:  Okay.  Thank you so much.

10           And then turning to -- and you can advise -- I

11   think that we now have -- I was going to talk about

12   something that I think we'll need to seal the courtroom

13   for, and I understand from the clerk that Ms. Williams

14   is back on.

15           MR. KESSEL:  Okay.

16           THE COURT:  So perhaps this is a good time to

17   hear from Ms. Williams and then we can close the

18   courtroom.  So I'll have the clerk bring Ms. Williams.

19           THE COURTROOM DEPUTY:  Ms. Williams, if you are

20   there, could you unmute your video and phone.

21           MS. WILLIAMS:  Hello.

22           THE COURT:  Hello.  Can you hear me?

23           THE COURTROOM DEPUTY:  Okay, there she is.

24           THE COURT:  Ms. Williams?

25           THE WITNESS:  [Inaudible.]

```
 1              THE COURTROOM DEPUTY:  We can't hear you yet.
 2   It's not clear.
 3              MS. WILLIAMS:  Can you hear me?
 4              THE COURTROOM DEPUTY:  Okay, yes, we can hear
 5   you now.
 6              THE COURT:  Okay.  Okay.
 7              THE COURTROOM DEPUTY:  Should I swear her in,
 8   Your Honor?
 9              THE COURT:  Let me inquire of the Government.
10   Should we place her under oath for her statement?
11              MR. BROWN:  No, Your Honor.  Because the
12   victim, who is allocuting --
13              THE COURT:  Okay.
14              MR. BROWN:  -- cross-examination, there's no
15   perjury, there's no nothing.
16              THE COURT:  Okay.  That's fine.  Understood.
17              Okay, Ms. Williams, good afternoon.  Can you
18   hear us?
19              MS. WILLIAMS:  Hello.
20              THE COURT:  Hello.  Can you hear me?
21              MS. WILLIAMS:  Okay.  I can hear you now.
22              THE COURT:  Okay.  Wonderful.  Good afternoon.
23              MS. WILLIAMS:  Good afternoon.
24              THE COURT:  Okay.  And thank you for joining us
25   via Zoom.  We are here for the sentencing hearing of
```

```
 1   Caroline Joanne Herrling and the Government counsel,

 2   Mr. Andrew Brown, has indicated that you wish to be

 3   heard.  So please -- please go ahead.  If you can first

 4   start by stating and spelling your name, that would be

 5   appreciated.

 6             MS. WILLIAMS:  My name?

 7             THE COURT:  Yes.

 8             MS. WILLIAMS:  It is going in and out.  State

 9   and spell what?

10             THE COURT:  Spell your name.

11             MS. WILLIAMS:  My name is Miracle Markesha

12   Williams, M-I-R-A-C-L-E.  M-A-R-K-E-S-H-A.  Williams,

13   W-I-L-L-I-A-M-S.

14             THE COURT:  Thank you.

15             Okay.  Please go ahead.  So, Ms. Williams, I

16   understood that you wanted to be heard in this

17   sentencing hearing regarding some information you think

18   the Court should consider in sentencing Ms. Herrling?

19             MS. WILLIAMS:  Yes, ma'am.

20             THE COURT:  Okay.  So please go ahead.  We're

21   all listening.

22             MS. WILLIAMS:  It's going in and out.

23             THE COURT:  Okay.  Go ahead.  We're listening.

24             MS. WILLIAMS:  Okay.  So I just wanted to let

25   y'all know like how this whole process like affected
```

```
 1    Robert, Emmy, you know, Robert, he wasn't like just the
 2    most like -- he was like mentally fragile, but like --
 3    well, I want to start off with like how we loved each
 4    other -- and this is Robert, because everybody -- I just
 5    want to put a face with him first.  This is Robert.
 6    That's him.
 7              THE COURT:  Thank you.
 8              MS. WILLIAMS:  And he was my best friend.
 9    Like, this whole stuff, the way I seen it like to take
10    somebody down like mentally and just like really affects
11    somebody and like, you know, him trying to help me and
12    all this going on and I, you know, it made me felt
13    helpless, because I don't know what to do, you know.
14    All I knew is when we came to Texas to hire, you know,
15    hire an attorney and stuff and, you know, he was going
16    through his mental stuff, and we kept on having to like
17    use more money to stay in this case so that we can find
18    out who stole his house.  So -- because we were trying
19    to sell it so that we can, you know, start our lives
20    over out here in Texas.  And once that happened, it was
21    like the cherry on top of the cupcake for the whole
22    situation like going back and forth.  I think we were
23    going back and forth for like a year and a half maybe
24    until I found out it was sold.  And it's just like I'm
25    having flashbacks -- I'm sorry.
```

1          THE COURT:  I'm sorry.  You said you were

2     having flashbacks?  We didn't hear you.

3          THE WITNESS:  He -- it just made him feel -- he

4     just felt helpless in the situation.  The situation made

5     him feel helpless.  It was mentally like who is -- not

6     knowing like why, but who -- like with your personal

7     information and stuff, do they know where we're at, you

8     know what I mean?  Like it was just a whole bunch of

9     like paranoia.  It was just a lot for him.  It was just

10    so, so much.  And then when it came to the day where --

11    when he passed away and everything, I was -- I was in

12    Wichita.  I was at a birthday party, and I was -- I had

13    had a weird mood to that whole day.  Like it was just --

14    I don't know.  Like I was happy to be there, but I

15    really wasn't.  Rob stayed at the house with the dogs,

16    because we had had a new litter and everything.  He

17    wanted to make sure the pups, you know, got fed and

18    everything -- if they needed anything.  My friend, she

19    walked in the room, because I was asleep mostly.  And my

20    friend, she had walked in the room, because she had took

21    her nieces downstairs to go get them something to eat

22    and stuff.  And when she came back in the room, she was

23    like, Miracle, wake up.  I have to tell you something.

24    And you need to wake up right now.  I was like, okay,

25    and she was like, she was like Robert, Robert killed

```
 1    himself, and I jumped up and I was like what, I was
 2    like, no, like, what do you mean?  I was like, how?  And
 3    then so my dad was the one who found him.  When I had --
 4    I had came back like they had told me like, Miracle,
 5    when you come back home, when you get back in town, like
 6    don't go straight to the house.  We don't want you to be
 7    by yourself.  We don't want you to stay --
 8            THE COURT:  Ms. Williams, I'm so sorry to
 9    interrupt you.  We're having a little bit of
10    difficulty -- we're having a little difficulty
11    understanding you when you -- when you're sort of far
12    from the phone.  So if you could continue from -- you
13    indicated that your dad was the person who found
14    Mr. Tascon, and then we didn't hear anything after that.
15    Go ahead.
16            MS. WILLIAMS:  Okay.  And when I had came back
17    in town, you know, I spoke with Mr. Travis, I spoke to
18    my dad, and everything [inaudible] and they told me not
19    to come back to town.  We don't want you to see that.
20    I'm --
21            THE COURT:  I'm so sorry.  Ms. Williams?
22            MS. WILLIAMS:  -- until I get there and --
23                        (Inaudible.)
24            THE COURT:  Ms. Williams?  Ms. Williams?
25            MS. WILLIAMS:  Can you hear me?
```

```
 1              THE COURT:  It is going in and out.
 2              MS. WILLIAMS:  Can you hear me?
 3              THE COURT:  It is going in and out.  I'm
 4     wondering if -- yeah, if you can stay closer to the
 5     phone.  If you could start again.  You indicated that --
 6     not from the beginning, you spoke with your father and
 7     with Mr. Travis.
 8              MS. WILLIAMS:  Yeah.
 9              THE COURT:  Okay.  And then we sort of missed
10     what you said.
11              MS. WILLIAMS:  You want me to start from there?
12              THE COURT:  Yes, please.
13              MS. WILLIAMS:  Okay.  I spoke with my dad and
14     Mr. Travis, and they told me, you don't go to the house
15     by myself, to call someone.  They didn't want me to be
16     there by myself.  They didn't want me to stay by myself,
17     and so I said, okay.  So when I had got back in town,
18     you know, I got home.  I called my dad.
19              THE COURT:  I'm sorry.  Ms. Williams.  I'm so
20     sorry to interrupt you.  We are really struggling to
21     hear you.  It keeps breaking up.  I don't know if --
22              MS. WILLIAMS:  It's [inaudible] --
23              THE COURT:  I -- I do wonder if -- if we can
24     try something else besides the Zoom.  Perhaps she could
25     just call into the Court's number.  I don't know if you
```

1   have a lot more to say.

2           MS. WILLIAMS:  [Inaudible.]

3           THE COURT:  Okay.  Yeah, we're not able to hear

4   you.  So we will let Mr. Brown contact you to let you

5   know -- we'll have to hear from you a little bit later

6   in the hearing.

7           MS. WILLIAMS:  Okay.

8           THE COURT:  Okay.  Thank you.  And I apologize

9   for that whole thing.  Okay.  So, Mr. Brown --

10          MS. WILLIAMS:  Can you hear me?

11          THE COURT:  Okay.  So we're going to end the

12  Zoom right now.  And, then, Mr. Brown, at some point a

13  little bit later, we'll -- we'll take a recess to figure

14  out if she can get a better Zoom or if she can call in.

15  I feel badly for continuing to interrupt Mr. Kessel's

16  presentation.  So we won't do that again.  And we'll

17  just have to hear from her at a later time.  I

18  understand that she wanted to be heard first.  But the

19  technology is not cooperating.

20          Okay.  So, Mr. Kessel, if you wouldn't mind, we

21  will return to you.  We had just addressed the issue of

22  the Lowenstein estate, and then I indicated that I was

23  going to go into an issue that I think involves some of

24  the sealed material.  So I'm going to ask the courtroom

25  clerk at this time to make sure that the Zoom is closed

1    and to seal the courtroom.  And I will advise the court

2    reporter that this portion of the transcript should be

3    sealed for the reasons stated earlier.

4            (Sealed proceeding filed separately.)

5            (Whereupon, the record is unsealed.)

6            MR. BROWN:  Yes, Your Honor.  So, first,

7    there's nothing in 4C1.1 that says, Your Honor, can

8    simply ignore a criminal history point.  The actual

9    quote is, the defendant did not receive any criminal

10   history points from Chapter four, part A.  It doesn't

11   say that the Court felt were meritorious or relatively

12   recent or anything.  It's --

13           THE COURT:  And let me just interrupt you.  I

14   guess what I thought Mr. Kessel was referring to was --

15   and you'll have to help me with this:  That in -- did

16   the Court have some discretion with respect to criminal

17   history --

18           MR. BROWN:  Yes.

19           THE COURT:  -- in determining that some of what

20   Probation has included under criminal history should not

21   be included?

22           MR. BROWN:  Not in terms of 4C1.1.

23           THE COURT:  And so that's -- I understand that

24   that's the distinction that you're making.

25           MR. BROWN:  Yes.

1        THE COURT:  But that the idea that Court has

2   the discretion for purposes of criminal history --

3        MR. BROWN:  Correct.

4        THE COURT:  -- is true?  But you're saying that

5   that doesn't say anything about the Zero-Point Offender?

6        MR. BROWN:  Correct.

7        THE COURT:  Got it.

8        MR. BROWN:  Okay.  You could always give

9   somebody a downward departure or downward variance, you

10  could move them from criminal history Category 1 to 3.

11  That's all within your discretion, but it doesn't say

12  here that the criminal history they end up with is in a

13  particular one or the Court believes that it's correctly

14  indicative of the defendant's criminality.  It just

15  says, did they receive a criminal history point.

16        THE COURT:  Okay.  Thank you.

17        MR. BROWN:  Sure.

18        THE COURT:  I don't think I need anything

19  further on that.  I also don't think I need anything

20  further on the position of trust.  I understand the

21  Government's arguments and I am inclined to adopt them.

22  I don't think I need to hear anything further on the

23  Lowenstein Estate as I -- I understand that the

24  defendant's arguments about the sale -- that the Court

25  should not treat the final sale value as the fair market

```
 1    value and because it was not officially fraudulently
 2    sold, it shouldn't be treated as intended loss.  And I'm
 3    inclined to agree with the Government's position on
 4    that.  I did want to give you the opportunity to respond
 5    with respect to the ten victims.  And you heard Defense
 6    counsel's responses with respect to the different
 7    categories that the Government had identified.  And so I
 8    just wanted the record to be clear about what your
 9    response is, starting, I guess, with victim number 5.
10            MR. BROWN:  Yeah, so, Your Honor, the big
11    problem with the number of victims as far as the Defense
12    is concerned, is he has ignored what the guidelines
13    actually say.  It is true that in many cases, the term
14    victim includes any person who has sustained any part of
15    the actual loss; however, 2B1.1, Application Note 1,
16    says --
17            THE COURT:  Give me just a moment, Counsel.
18            MR. BROWN:  And, actually, I misspoke.  It's
19    2B1.1 Application Note 4E as in Edward.
20            The COURT:  Sorry.  You said 2B?
21            MR. BROWN:  1.1, Application Note 4, E as in
22    Edward.  And I can read it for Your Honor, if that would
23    be helpful.
24            THE COURT:  No, it's probably easier for me to
25    read it to myself.  Give me just a moment.
```

1            Okay.  So that victim includes any individual

2     whose means of identification was used unlawfully or

3     without authority?

4            MR. BROWN:  Right.

5            THE COURT:  And as you would indicate, without

6     regard to whether they experienced any loss?

7            MR. BROWN:  Exactly, Your Honor.

8            THE COURT:  Okay.  Go ahead.  And then with

9     respects to 9 through 13?

10           MR. BROWN:  Yes, Your Honor.  So moving back to

11    page eight of the Pacer or page three of the

12    Government's brief, Document 47, it quotes

13    *United States v. Santarelli* in which the defendant had

14    argued that the only victim was the decedent's estate.

15    And the Third Circuit affirmed the District Court's

16    counting as victims all the beneficiaries in the Will,

17    because they received nothing due to the fraud and they

18    numbered more than 10.  So for the victims numbered 5

19    through 8, they get counted, because their identities

20    were misused and, actually, that's also true of victim

21    17, whose name was put on the forged will.  And then

22    Miracle Williams, Lawrence Eckert, Pamela Sockel,

23    Susan Smith, and Christine Nealy were all beneficiaries

24    of wills, who did not get their inheritance because of

25    the defendant's fraud.

```
1              THE COURT:  And what's your response to
2    Mr. Kessel's argument that they're -- they're not
3    definitive takers and there are some disputes regarding
4    those Wills?
5              MR. BROWN:  That actually troubled me,
6    Your Honor.  What he literally said was, I don't know.
7    I don't know if they're going to get it.  I don't know
8    if these people are the real takers.  But that's not the
9    question, Your Honor.  It's not up to Mr. Kessel's
10   satisfaction in that he can simply play ostrich and
11   ignore the evidence.  The way that it works is the
12   presentence report submits information.  The parties --
13             THE COURT:  And I'm just going to stop you
14   right there just for the sake of efficiency.  So my
15   understanding is that with respect to these individuals,
16   9 through 13, you're relying on the -- the Meza
17   declaration and these other exhibits.  Mr. Kessel is
18   indicating that he has knowledge that these
19   individuals -- that these various Wills are contested.
20   As I understand it, he has not put evidence in the
21   record of that.  And so I think your conclusion is then
22   he's -- he's not -- the Government has shown by a
23   preponderance of the evidence that these are heirs;
24   correct?
25             MR. BROWN:  It's not even that he says that
```

1    it's contested.  He just said he didn't know.

2          THE COURT:  Well, I think he did say that he is

3    aware.  But I think that is neither here nor there.

4          MR. BROWN:  So if he wanted to go out and look

5    and see, that's the way the sentencing process is

6    supposed to work, and then he can come back with some

7    exhibit explaining how they had been disinherited or

8    whatever it was, and then Your Honor could resolve it.

9    But what cannot happen --

10          THE COURT:  And just, again, for the sake of

11    efficiency, I understand your point.  Turning to 14

12    through 16, the companies.

13          MR. BROWN:  Yeah, so, Your Honor, charges have

14    been put onto Mr. Wilding's credit cards.  I think

15    Mr. Kessel talked about how he thought these were

16    lenders for a home and that they were going to get more

17    money back than was owed so it would all be fine.

18    That's not the case.  The case is when they looted

19    Mr. Wilding's home, they got his credit cards and they

20    kept using them.  And they charged up a storm and, of

21    course, nobody ever paid that.  And so Wells Fargo Bank

22    and Citibank are out-of-pocket from the credit card

23    fraud that the conspiracy caused and then, similarly,

24    Fidelity National Title Insurance Company submitted a

25    report, which is attached as an exhibit, indicating that

1    they are out-of-pocket over $613,000 for the lawsuit

2    over the Robert Tascon property.  So just in the

3    Government's pleading, there are 17 victims, which fully

4    warrants the Plus Two, but even if it didn't, even if

5    everything I said was wrong, it would still apply,

6    because there is also a Plus Two if you cause

7    substantial financial harm to any individual.  And, you

8    know, perhaps you'd say, well, you didn't cause harm to

9    Mr. Wilding, if we assume that he was dead before the

10   fraud began.  But you can't say that for Robert Tascon.

11   He had one property, and he lost it.  His whole house.

12   That was his only asset that he could control.  It's

13   certainly true that he got a monthly stipend so that he

14   was not going to be out on the street or hungry without

15   that house.  But that was the only money he had to start

16   over, which is one of the reasons he was so upset when

17   he lost it.  So that enhancement applies both, because

18   there are well over 10 victims, and because the

19   defendant caused substantial financial harm to

20   Mr. Tascon.

21           THE COURT:  Thank you.  Okay.  With respect to

22   the leader or organizer, and you can let me know if you

23   think that the courtroom needs to be closed to discuss

24   this -- Mr. Kessel made the argument regarding the idea

25   that Ms. Herrling was actually an equal participant with

1    Mr. Kroth.

2        MR. KESSEL:  It was Mr. Kantor.

3        THE COURT:  Kantor.  Thank you.  And in the

4    Court's view, that, I guess, is neither here nor there.

5    If there were overall five people, which the Government

6    has pointed to Wilkins, Salinas, and Shtolzberg, and so

7    I wanted -- if there was anything that you wanted to add

8    or clarify with respect to the Government's position on

9    that, if we put to one side whether she was equal

10   participants with Kroth and Kantor, if these other

11   individuals were led by the organizers, would this

12   enhancement still apply?

13       MR. BROWN:  It absolutely would, Your Honor.

14   And at ECF Document 47, page 21, it quotes, the

15   defendant explaining to Mr. Kroth how she doesn't find

16   him reliable.  He doesn't get things done.  And so she's

17   going to use her own team, Hadley, James, Randy, and

18   Jonathan.  Right there, she's listing four persons with,

19   with herself, that's five participants.  That, by

20   itself, would do it.  But, Your Honor, I don't want to

21   let slide the Defense's comment or claim rather that

22   Kroth and Kantor are equal to Ms. Herrling.  They

23   certainly are not.  When the deal was struck initially,

24   they did agree on an even split, one-third each.  And

25   Mr. Kroth found the body.  That was his contribution.

1    Mr. Kantor had experience with trusts and Wills, and his

2    providing that expertise was his contribution.  And the

3    defendant is very intelligence, very organized, very

4    poised, and she was going to be the face of the

5    organization.  She was going to deal with the courts and

6    the attorneys.  She was going to deal with probate.  And

7    she was going to administer the thing.  But, Your Honor,

8    it didn't turn out that way.  And, it's quite clear even

9    from what the defendants themselves said that she became

10   the leader.  As Your Honor noted, one of the main

11   indications that somebody is a leader is that they get a

12   larger share of the proceeds.  Well, Mr. Kantor was

13   certainly upset.  He got, according to Mr. Versoza's

14   money laundering tracing, $64,000, and we think, based

15   on some other evidence, it might have been a few

16   thousand dollars more than that.  It just wasn't in the

17   bank records.  So he was very upset, and that is the

18   context in which he is puffing about his great

19   contributions and why he should be given more money.

20   But even he -- and this is ECF 47 at Pacer page 18,

21   brief page 13, he says, you're saying that we don't

22   deserve our compensation.  Not only are you being a bad

23   leader and a bad partner, and then he berates her and

24   tries to get things made.  So he acknowledges in his own

25   words that she's the leader, and she gets the money.

```
 1    She uses it to buy a house.  Mr. Kantor doesn't get
 2    anything like that.  And, similarly, Mr. Kroth had a
 3    similar interaction with her where he felt he was being
 4    cut out much like the quote that I previously offered
 5    where she explained how he wasn't getting things done
 6    and she was going to use her own team.  And he said,
 7    your role has gotten bigger and bigger and all this and
 8    you're taking on more and more of a role and
 9    responsibility and stepped up to the plate.  And to be
10    honest with you, I am amazed at you, but then he goes on
11    to say, but don't forget, I was the one who found the
12    body so give me my third.  But, again, the very
13    people the defendant is claiming were her equals, in
14    their own words say that she is running the show and
15    they are begging her for money and they understand
16    whether they receive it or not, it's in her discretion.
17    So, certainly, Your Honor could impose the plus four for
18    leader and role without determining whether or not she
19    was at the same level or higher than Kroth and Kantor,
20    but she definitely was at a higher role.  She was the
21    leader and organizer.  And she well-deserves more than
22    plus four, because there were far more than five
23    participants in this conspiracy.
24            THE COURT:  Understood.
25            Turning to the obstruction of justice, and I
```

 1    want to be careful in case we need to go into the sealed

 2    portion, am I correct that one of the basis that

 3    Government asserts for an obstruction of justice

 4    enhancement is the actual disposal of the body?

 5            MR. BROWN:  Absolutely.

 6            THE COURT:  Okay.  I don't think, and I

 7    understand Mr. Kessel has explained why there's no

 8    independent evidence of that.  I don't think in the open

 9    proceeding, we need to go into that further.  I don't

10    see that there is -- that is a consideration of the

11    Court.  If the Court finds that it happened by a

12    preponderance of the evidence, and the Court finds that

13    that constitutes obstruction, then this enhancement can

14    apply.

15            And then with respect to the acceptance of

16    responsibility, I heard Mr. Kessel is saying that it's

17    very unusual to deny acceptance of responsibility and,

18    typically, it only happens when the defendant has

19    undermined the factual basis and maybe recanted or --

20    or, you know, at the sentencing, indicated I didn't

21    really do what I said I did.  I understand the

22    Government's argument to be here, that's not the

23    situation, but the situation is that Ms. Herrling has

24    engaged in conduct inconsistent with the acceptance of

25    responsibility.  Part of that is sealed material.

1    But -- but part of that is -- is -- is, for instance,

2    the -- the attempts regarding the -- the house and the

3    forfeiture.

4            MR. BROWN:  That's right, Your Honor.  And

5    there are other things that are in the open record, too.

6            THE COURT:  Okay.

7            MR. BROWN:  Not only did she ask her mother to

8    take the house explicitly so that it wouldn't be sealed,

9    but she also calls --

10           THE COURT:  And where -- I'm sorry.  If you can

11   just point the Court to -- that is in -- which

12   declaration is that in?

13           So in ECF 47, there's reference made to the

14   PSR, paragraph 97.  But I wasn't sure --

15           MR. BROWN:  I did find it, Your Honor.

16           THE COURT:  Oh, great.

17           MR. BROWN:  It's ECF Document 62, Pacer page

18   two, brief page two.  And the defendant says to her

19   mother:  Okay, got a couple of things for you guys, can

20   I -- can I give you guys my house?  That's the first

21   one.

22           Defendant's mother:  And then they'll throw us

23   in jail, too.

24           Defendant:  No, no, they won't.  Nope.  Not at

25   all.  Can I give you my house so it doesn't get seized?

1          And then on top of that, Your Honor, there is

2     another call where she -- and this is from the PSR,

3     where she calls her then boyfriend, a Samuel Shtolzberg,

4     and asks him to falsely tell the Government that the

5     identity -- the counterfeit identity document of

6     Robert Tascon came from Kroth when it did not.  So in

7     open documents that are not sealed, she has twice, from

8     prison, tried to obstruct justice just in those two.

9     And that's not -- and, I mean, there are many, many,

10    many more examples that we're not going to discuss with

11    the courtroom open.  But I really -- well, I've said

12    enough.

13          THE COURT:  Yeah, okay.  Thank you.  Okay.

14    That's all I had in terms of my questions.  I don't know

15    if you needed to address anything further with respect

16    to the death of Mr. Tascon with the evidence that's in

17    the record and the statement of Ms. Williams.  I -- I do

18    think that there's enough to find that the -- that the

19    death was a suicide and that it was caused at least in

20    part by the loss of this home.  I don't think anyone

21    disputes that Mr. Tascon, as his wife indicated, was

22    mentally fragile, but I don't understand that to be --

23    the fact that he was mentally fragile doesn't mean that

24    this didn't cause the suicide.

25          Okay.  So that's all I have in terms of my

1    questions.  Anything else that you want to share with

2    the Court and then at that point, we'll take our break.

3    We'll see if the, if the clerk can get the --

4    Ms. Williams back and I can briefly hear from her as

5    well if she had anything further.

6           MR. BROWN:  Thank you, Your Honor.

7           I wanted to address the defendant's lack of

8    criminal history, which I see as could be seen as the

9    most mitigating factor, but I don't think it is in this

10   case.  The Defense argues that she should be shown

11   leniency, because she has almost no criminal history and

12   has not yet had drug treatment.  And while she doesn't

13   have many convictions, only the one, that's not the same

14   as not having been involved in crime in the past.  She

15   has acknowledged that she has been a daily

16   methamphetamine user for the last 18 years, smoking it,

17   eight to nine times per day.  And she wants this Court

18   to believe that during those 18 years, she was a high

19   performing and otherwise honest entrepreneur, who ran a

20   business from her home that provided litigation

21   consulting, notwithstanding that she only has a high

22   school degree, and by her own admission, has only had

23   about 77 days of sobriety as an adult.

24          She told Probation that she earned $150,000 per

25   year legitimately as a litigation consultant from 2014

1    to 2022, the nine years before her arrest.

2           In paragraph 149 of the PSR, they report that

3    Herrling says, she was the owner of her own litigation

4    consulting firm, Nexus Consulting, she reported earning

5    $150,000 a year.  And then they checked the California

6    Secretary of State website and saw that her business was

7    inactive, and that another business with the same name

8    was, again, opened, but this owner was Caroline Phoenix,

9    which is her AKA and the alias she used when committing

10   the Robert Tascon fraud.  Now, if she had really been a

11   high performing business person during that period, it

12   would definitely be mitigating, because it would tend to

13   show that she could return to working honestly and

14   paying taxes like the rest of us.  But the evidence is

15   to the contrary, you know.  Putting aside that her

16   business is inactive, we subpoenaed her tax records from

17   2015 through 2022, and this is at the complaint

18   affidavit, at paragraph 77.  She did not file tax

19   returns at all from 2016 to 2022, despite her claim that

20   she earned $155,000 per year then.  She did file a tax

21   return for 2015, but it showed that she had a business

22   loss, not the $150,000 that she claims she made.

23          And, of course, we may infer that her Nexus

24   Consulting was fraudulent by the fact that she put it

25   under the name Caroline Phoenix.  In fact, Caroline

 1    Phoenix received a cease and desist letter from the

 2    California State Bar for the unauthorized practice of

 3    law.  That's at the complaint affidavit, paragraph 76.

 4    So how has she been paying for her living expenses and

 5    her drug addiction this whole time?  She does not have

 6    any verifiable employment.  The only evidence of income

 7    in the record is from her scams, Nexus Consulting,

 8    scammed consumers out of money while the defendant acted

 9    as an attorney, which she clearly was not.  And, of

10    course, the evidence from this case shows that she has

11    made a great deal of money from identity theft.  So

12    while she has almost no convictions, she has supported

13    herself and her addiction for 26 years and there is no

14    evidence that she had legitimate income during that

15    time.

16         One of the most aggravating parts about her

17    history is how incorrigible she is.  A normal person in

18    her situation would be scared from all the police

19    contact she had and would drop crime and go straight.

20    The defendant has a long record of every time she is

21    caught or close to being caught, she responds with lies,

22    obstruction of justice, and more fraud.  Even after the

23    state bar issued a cease and desist letter against her

24    for the unauthorized practice of law, she continued to

25    practice law.  And that's at complaint affidavit,

 1    paragraph 64, 76, and 106.  And when she was being

 2    investigated by LAPD homicide, regarding the

 3    disappearance of Charles Wilding, she stole and sold

 4    Robert Tascon's property.  I mean, how brazen is that?

 5    And this, of course, led to his demise.  And even while

 6    she was being sued over the fraudulent sale of Robert

 7    Tascon's property, she still hunted for more victims --

 8    and that's at complaint affidavit, paragraph 101, where

 9    she has the heirs index on her computer and has searches

10    for millionaire in obituary and lists promising victims.

11    Her extraordinary brazen and reckless crimes while under

12    investigation and cease and desist warnings, shows she

13    is incapable of conforming her actions to the law.  I

14    thought at first, well, this must be the

15    methamphetamine.  She feels invincible.  But I was

16    wrong.  Even after she was arrested and jailed and no

17    longer had access to methamphetamine, and she was being

18    advised by an attorney, and was pending sentencing

19    before this Court, she still turned to more scams.  She

20    tried to put her house in her parents' names so it could

21    not be seized, and she tried to get her boyfriend to lie

22    to the investigators about a source of the Robert Tascon

23    ID pinning it falsely on Jason Kroth.  She does not

24    stop.  Her answer to everything is more fraud and more

25    lies.

1          The defendant has also written in her papers

2     that she should get leniency, because she has -- she has

3     a drug problem, which the Government completely agrees

4     with.  And never had the benefit of treatment.

5          While she had 26 years to get treatment,

6     Narcotics Anonymous has 500 groups in

7     Southern California that host over a thousand meetings

8     per month.  No one prevented her from joining them.  She

9     chose not to even though the drugs were destroying her

10    health as the Court knows from the illnesses she now

11    reports, which are associated with methamphetamine

12    abuse.

13         Well, when the agents executed a search warrant

14    at her residence, they interviewed her about the drugs

15    and she said that she quote, "did not need drug

16    rehabilitation."  That was complaint affidavit at 91.

17    And the irony, Your Honor, is this defendant who is

18    asking for leniency, because she had a drug problem and

19    needs drug treatment, runs a sober living facility where

20    she keeps a homemade silencer, assault rifles, ghost

21    guns, meth, heroin, and everything else.

22         One other point that I did not make in my

23    paper, Your Honor, is about the advantages this

24    defendant has had.  I'm sure Your Honor has seen many

25    defendants who come from broken homes and poverty and

they reasonably argue that they never really had a
chance, because they grew up in high-crimed areas where
they were pushed into criminality.  But the defendant,
by her own admission, says that she had the best
childhood that anyone could ask for.  She was the last
of her parents' children.  Her siblings went off to
college when she was in kindergarten, her family was
financially secure.  She was the apple of her parents'
eyes and got love and support and stability from them.
She excelled at school.  She is really smart and
organized.  But for whatever reason, she's chosen to use
that to pursue crimes like a professional.

You know, it gets back again to how Mr. Kroth,
who she was pushing out, because she found him
unreliable, talked about how amazed he was at her
abilities and how she was performing so highly.  And I
think he's right.  She's amazing at professionalizing
stealing estates, tracking unkept houses, using
subordinates to search for potential victims who are
unlikely to be able to defend their property, and she
has the intelligence and leadership to run a crew.  And
the poise to work with attorneys and courts to take over
estates.

Your Honor, I'm going to skip over Robert
Tascon based on your comments, and I'll just briefly

1    touch on Mr. Wilding.

2          Obviously, Your Honor has already indicated

3    that she obstructed justice by disposing of the body.

4    First trying to dissolve it in lye, and then hacking it

5    up and dumping it in the ocean.  But she also directed

6    others to rip out the floor boards and -- of the house

7    so that there would be no evidence of where he died.

8    And this has prevented us from determining his manner of

9    death.  But what does it say about her character that

10   she attempted to dissolve him in lye, and then

11   desecrated his body with an axe?  Hardened criminals in

12   the organization flinched in taking part of that.

13          Mr. Kroth, who has 15 felony convictions,

14   wouldn't do it.  And then when she goes to the Bay area

15   to dump it in the ocean, she goes up on a muscle car and

16   turns it into a mini vacation, taking selfies on the

17   boat with her smiling and then flying back on a private

18   jet that she could afford with the fraud proceeds.

19          I think that really says it all about her

20   character.

21          Thank you, Your Honor.

22          THE COURT:  Thank you.

23          And just so that the record is clear, besides

24   Ms. Williams, there were no other victims that wanted to

25   be heard; correct?

1           MR. BROWN:  That's right, Your Honor.

2           THE COURT:  Okay.  And I don't know that I need

3    to hear from Ms. Williams before I rule on the contested

4    issues concerning the guidelines range.  So I will go

5    ahead and do that unless Government has an objection.

6    And then while I take the recess, we can see if -- if we

7    can still get her back.

8           MR. BROWN:  No objection, Your Honor.

9           THE COURT:  Okay.  Thank you.

10           Okay.  So as I listed in the beginning, there

11    were a number of disputes raised concerning the

12    guidelines range calculation, and just so that the

13    record is clear, I do want to advise the parties of the

14    Court's rulings on these -- on these matters.  And I do

15    find that the standard of proof under these

16    circumstances is clear and convincing -- excuse me,

17    preponderance of the evidence for the reasons I stated

18    at the outset, and I find that the evidence that the

19    Government has pointed to, namely, the complaint

20    affidavit, the Versoza declaration, the statements of

21    Ms. Herrling herself, and the recording that

22    Ms. Herrling attached to her documents as well as the

23    other hearsay statements are admissible, because they

24    all have the indicia of reliability.

25           With respect to the Zero-Point Offender, I find

1    Ms. Herrling does not -- is not a Zero-Point Offender

2    and does not qualify.  She does have a criminal history

3    point even if the Court could put aside her criminal

4    history point, the Court is not inclined to and declines

5    to do so.

6         With respect to the position of the trust, the

7    Court finds that reading the guideline together with the

8    Application Note, what Ms. Herrling did, which is

9    undisputed, which is to present herself as an attorney,

10   as somebody with the power of an attorney, and other

11   things of that nature, even if she didn't present

12   herself to, for instance, Tascon and Wilding, does fit

13   within the definition for the position of trust

14   enhancement.  So I find that that does apply.

15        With respect to the Lowenstein Estate, for the

16   reasons I alluded to earlier, it was her intention to

17   unlawfully transfer this, so the estate counts, and the

18   Court finds that the fair market value at the time of

19   the sale, given the period of time between when the

20   intended transfer happened and when the sale was, that's

21   a fair measure of the market value.  It's true that real

22   estate does fluctuate, but the Court doesn't see

23   anything in the record to suggest that it fluctuated so

24   much that the fair market value at sale is not an

25   appropriate measure of the intended loss, which is --

1    the guidelines indicate that much deference is given to

2    the sentencing judge on that determination.

3            With respect to the number of victims:  The

4    Court has considered the arguments of counsel with

5    respect to the number of victims, and for the reasons

6    stated -- primarily the reasons stated by Mr. Brown in

7    his rebuttal today, the Court finds that there is

8    support for over ten victims.  The companies are indeed

9    victims for the reasons Mr. Brown stated.  There is

10   evidence in the record to support victims 9 through 13.

11   And there isn't any contradictory evidence besides the

12   arguments of counsel and no loss is needed for the 5

13   through 8 and 17, because their identities were used.

14   The Court also does find under the circumstances that

15   substantial financial harm was caused to Mr. Tascon so

16   that's an independent reason for that particular

17   enhancement.

18           With respect to the leader/organizer, the Court

19   finds that there were at least five participants and

20   that Ms. Herrling was an organizer or leader.  The Court

21   is inclined to find that she was the organizer and

22   leader, but even if the Court was not, even if she was

23   equal to Kantor and Kroth, that the enhancement, which

24   would still apply, and the Court relies heavily on the

25   exhibit sheet put into the record as well as other

 1    statements that were not in the nature of co-conspirator

 2    statements that the Court would normally be skeptical

 3    of, because they were in like conversations amongst the

 4    co-conspirators.

 5         With respect to the obstruction of justice, the

 6    Government has pointed to a number of possibilities with

 7    respect to obstruction of justice.  The Court does find

 8    the following to be supported by the evidence in the

 9    record and to be -- to constitute obstruction of

10    justice, the -- the disposal of the body, the asking her

11    parents to take her home so that it would not be seized,

12    and then trying to get her boyfriend to lie about where

13    the identity information for Mr. Wilding came from.

14         And then, finally, with respect to acceptance

15    of responsibility, the Court can consider conduct that

16    is inconsistent with the acceptance of responsibility.

17    And in particular, the Court can consider that -- the

18    Application Note Four indicates that the conduct

19    resulting in the obstruction enhancement ordinarily

20    indicates that the defendant has not accepted

21    responsibility, and so the Court finds that that -- that

22    would be appropriate here and, in addition to that, so

23    in addition to the obstruction, the other conduct that

24    the Court noted, which is inconsistent with the

25    acceptance of responsibility, such as trying to get

1    another witness to lie and trying to avoid the

2    forfeiture that was agreed to in the plea agreement.

3    I've already indicated that I do believe that the

4    evidence in the record demonstrates to this Court by a

5    preponderance of the evidence that the death of

6    Mr. Tascon did result in part from the conduct of

7    Mr. Herrling and her co-conspirators, in that it was a

8    suicide, and I think I've already addressed the evidence

9    that's in the record on that.  So I think I've addressed

10   all of the -- do you need a moment?

11        So for that reason, I do find the report to be

12   accurate and correct.  I'll adopt the report and its

13   calculation of the Advisory Sentencing Guidelines.  I

14   will just note to the extent that my comments today

15   depart from the presentence report.  It's my comments

16   today that would govern.  The Advisory Guidelines are

17   the starting point and the initial bench mark in the

18   Court's analysis.  I'm taking into account the

19   November 1st, 2023 edition of the guidelines.  I'm

20   consulting and taking that into account.  The total

21   offense level is therefore 39.  The criminal history

22   category is one and the guidelines range for custody is

23   240 months for the reasons stated by Probation in the --

24   I think it was in the presentence report or perhaps in

25   their recommendation.  The actual guidelines range would

1    be 262 to 327, but this crime has a statutory maximum of

2    240.  And so for that reason, that's what counts as the

3    guidelines range.

4          The guideline range for supervised release is

5    one to three years.  The fine guidelines range is 50,000

6    to 250,000, and the special assessment to the crime

7    victim's fund is $100.

8          I'm making an individualized determination

9    based upon the facts.  I'm also considering the factors

10   described in 18 U.S.C. Section 3553, Subdivision A,

11   especially, but not exclusively, the nature and

12   circumstances of the offense and history and

13   characteristics of the defendant, the need for the

14   sentence to reflect the seriousness of the offense, to

15   promote respect for the law, and provide just

16   punishment, for an adequate deterrence for criminal

17   conduct, protect the public from further crimes of the

18   defendant, and provide the defendant with needed

19   educational or vocational training, medical care, or

20   other correctional treatment in the most effective

21   manner, the kinds of sentences available, the kinds of

22   sentence and sentencing range established for the

23   applicable category of offense committed by the

24   applicable category of defendant as set forth in the

25   guidelines subject to amendments, any pertinent policy

1    statements issued by the sentencing commission, subject

2    to amendments, the need to avoid unwarranted sentence

3    disparities amongst defendants with similar records who

4    have been convicted of similar offenses, and the need to

5    provide restitution to victims of the offense.

6            Do the parties wish to be heard further with

7    respect to the sentence they believe is appropriate?

8    Mr. Kessel?

9            MR. KESSEL:  No, Your Honor.

10           THE COURT:  Mr. Brown.

11           MR. BROWN:  No, Your Honor.

12           THE COURT:  Mr. Kessel, does the defendant

13   waive reading of General Order 20-04?

14           MR. KESSEL:  Yes, Your Honor.

15           THE COURT:  Okay.  Okay.  We will take a

16   15-mintue recess at this time.  I will ask the clerk if

17   she is able to work with Mr. Brown to get Ms. Williams

18   back and when I return, I will either announce the

19   sentence or hear from Ms. Williams first.  Court's in

20   recess.

21                   (Recess.)

22           THE COURT:  Can I see the parties at sidebar on

23   the record, and the sidebar will be sealed.

24                 (Sealed Sidebar.)

25            (Whereupon, the record is unsealed.)

```
 1            THE COURT:  And I understand we have
 2    Ms. Williams on the phone.  Ms. Williams, can you hear
 3    us?
 4            MS. WILLIAMS:  Yes, I can hear you.
 5            THE COURT:  Okay.  Thank you.  And we can hear
 6    you.  And thank you for being willing to come back and
 7    it looks like we're now able to hear you clearly.  I
 8    understand from my colleague, the courtroom deputy
 9    clerk, that you first wanted your father to be heard.
10            THE WITNESS:  Yes, ma'am.  He is also on
11    three-way.  I am sorry he has to connect that way.
12    We're on a three-way as well.  My father is Arthur
13    Maurice Williams, who was actually the one who found
14    Robert when he passed away.
15            THE COURT:  Okay.  And, Ms. Williams, and thank
16    you, Mr. Williams, for being willing to participate.  In
17    a sentencing hearing, there are certain rules concerning
18    who can speak at a sentencing hearing.  And I'm limited
19    by those rules.  So I do acknowledge how devastating it
20    must have been for Mr. Williams to discover his
21    son-in-law in this manner and so I don't want to take
22    away from that, but I have to let you know that,
23    unfortunately, I cannot hear from Mr. Williams in this
24    hearing, because of the rules that apply.  I hope you
25    understand that.
```

1           THE WITNESS:  Okay, yes, ma'am.  Well, I'll

2     only have my dad speak through me.

3           THE COURT:  Okay.  And so I just want to hear

4     from you as a victim of the crimes that we're here for

5     sentencing on, and we did hear much of what you said

6     earlier and you explained how much stress was caused and

7     you explained the nature of your relationship with

8     Mr. Tascon, and the plans that the two of you had for

9     starting afresh, and you explained to us how he was

10    mentally fragile and -- and how much pain he went

11    through once he realized that he had lost his -- his

12    house and -- and you also explained to us quite

13    compellingly how he felt in terms of the paranoia and

14    the other stresses not knowing who had taken his

15    identity and what they were doing with it.

16          THE WITNESS:  Yes, ma'am.

17          THE COURT:  And I think where we started to

18    break up --

19          MS. WILLIAMS:  Continuing off from that, I left

20    off -- I want to continue off from that by saying that

21    [inaudible] and also who was doing this?  You know what

22    I mean, because we didn't know who -- we knew that, you

23    know, I'm not going to -- okay, vender off from the

24    whole situation, but we thank you all for actually

25    finding who was responsible, for being behind -- being

```
 1    the number one person, okay.  And I want this to be
 2    understood that Robert, his dad was the one who designed
 3    in part that, okay.  And his mother was a renowned
 4    heart -- was a renowned artist out of Canada.  He was an
 5    only child, no kids or anything.  You know, his dad, you
 6    know -- his dad wanted him to be like a lawyer or a
 7    doctor or something.  [Inaudible] his plans designed and
 8    stuff like that.  [Inaudible] -- and, you know, what I
 9    mean -- so it was always like, you know, he told me his
10    whole life, it was a back and forth [inaudible] --
11            THE COURT:  I'm sorry.  Ms. Williams.
12    Ms. Williams.  Ms. Williams.  Ms. Williams.
13    Ms. Williams, can you hear us?
14            THE COURT DEPUTY:  Ms. Williams.  Ms. Williams.
15    Ms. Williams.  Hello.  Can you hear the Court?  The
16    Court is trying to speak to you.  Okay.  Stop speaking
17    for a minute, please.
18            THE COURT:  Can you hear us?
19            THE WITNESS:  Yeah.
20            THE COURT:  Okay.  We weren't able to hear what
21    you were saying and then I think you couldn't hear me
22    when I was tying to interrupt.  You explained to his
23    parents, where you explained that he liked plans and
24    designs and then please proceed.
25            THE WITNESS:  What was the last part?
```

```
 1              THE COURT:  Designs.
 2              THE WITNESS:  Yes, Robert's passing.
 3              THE COURT:  And you said -- you said his
 4    parents wanted him to be a doctor or a lawyer and he
 5    liked plans and designs, I thought you said.
 6              THE WITNESS:  Yeah, like landscaping -- like
 7    landscaping and designs.
 8              THE COURT:  Yes.
 9              MS. WILLIAMS:  So his father and [inaudible] --
10              THE COURT:  I'm sorry.  You said the father --
11    you said "father."
12              MS. WILLIAMS:  Yes, when Caroline stole his
13    estate and everything -- [inaudible.]
14              THE COURT:  Yes.
15              MS. WILLIAMS:  -- we were -- we had to use
16    our -- he had to use those rentals [inaudible] that was
17    also used to pay our monthly expenses and handle our
18    business, but because she stole the house, we had to
19    remain in the quarter -- the Court processed thousands
20    and thousands of dollars.  It was taken away from our
21    living expenses and everything, making the situation
22    more stressful, and not knowing who this was who was
23    after us, you know.  And it was just a stressful matter
24    as a whole.  And then once we found out that the house
25    was actually -- we were actually in the process of
```

```
 1   selling the house.  And then once we found out --
 2   [inaudible] because they said was the
 3   house [inaudible -- we said no, we both [inaudible] --
 4            THE COURT:  I'm so sorry.  Ms. Williams,
 5   Ms. Williams, Ms. Williams.
 6            THE WITNESS:  [Inaudible] whoever she was
 7   involved with who owned [inaudible] -- she did whatever
 8   she can do, but me and Robert had big plans.  My dad, he
 9   had retired and everything.  Me and my Robert, once we
10   married and came to Texas, we told my dad, you can go
11   had ahead and retire.  We built a family business
12   [inaudible] --
13            THE COURT:  I'm going to ask her you to
14   interrupt her.
15            MS. WILLIAMS:  My daddy [inaudible] --
16            THE DEPUTY CLERK:  Ms. Williams, Ms. Williams,
17   hello, hello.  Hello, hello, hello.  Yes, stop for a
18   minute.  The judge is trying to speak.  You have to
19   listen, as well as when you speak.  You have to listen,
20   okay.  And you have to slow down.  Okay.  Hold on just
21   speak for a minute.
22            THE COURT:  Okay.  So, Ms. Williams,
23   unfortunately, I -- there -- we are -- this is the
24   difficulty with having somebody appear remotely.  It's
25   so -- our technology does not really allow us to hear
```

```
 1    you clearly.  And then you're not able to hear me when

 2    I'm interrupting you.  And I really don't want us to go

 3    too long without being able to record what you're

 4    saying.  And the court reporter and I are really

 5    struggling to hear what you're saying.  But if I may,

 6    this is what I'm understanding from what you're saying.

 7    You have explained to us the importance of Robert as a

 8    person, to you, and to his family.  And you have

 9    explained how this theft of his property caused him so

10    much stress and caused you so much stress and pain.  And

11    I think you've explained that very, very eloquently what

12    the effects of Ms. Herrling's crime was on you and was

13    on Robert.  And I really appreciate you taking the time

14    and being patient with us and our technology in

15    explaining all of that.  And I also understand from you

16    that you have explained that this caused so much

17    distress that it caused Robert to take his own life,

18    which, obviously, has caused you untold pain.  Is that

19    an accurate summary?

20          MS. WILLIAMS:  I also attempted to commit

21    suicide, as well after Robert committed suicide.  So now

22    I don't -- I'm not even off of my medications, because I

23    was on pills.  And I was on nightly medications and

24    sleep medications.  When I committed -- when I attempted

25    to commit suicide after my husband did so I could
```

1    communicate with him and understand him and just

2    understand what kind of pain he was in and know that no

3    matter what, I had your back, and I'm sorry that we

4    couldn't find these people within your lifetime.  When I

5    committed -- when I attempted, I'm not -- I'm not able

6    to be on my medications now, because now I have bad

7    anxiety and stuff, because now I'm not even comfortable

8    with having medications around me for my own purposes.

9    So this is still affecting me until this day.

10            THE COURT:  Thank you.  Thank you.

11            I really want to thank you for the time that

12   you spent with us.  And I cannot imagine how difficult

13   it is for you to talk about these things.  And the Court

14   greatly appreciates it.  And I am very --

15            MS. WILLIAMS:  Thank you.  And I just want you

16   all to know that this lady had kind of talent to her.

17   You know what I mean?  Like [inaudible] --

18            THE COURT:  I didn't hear what you said.  Just

19   a moment.  I didn't hear what you said.

20            THE COURTROOM DEPUTY:  Hello, hello, hello,

21   hello.  The Court didn't hear what you said.  You keep

22   rambling.  And we can't -- can you hear me?  Okay.  The

23   Court didn't understand what you were saying about the

24   defendant.  So wait, wait, wait.  No, no, no, stop.  I

25   need to put you back on speaker, but you have to speak

```
 1   slowly for the court reporter, Okay?
 2            Okay.  Hold on.
 3            THE COURT:  Okay.  So the last thing you said
 4   about Ms. Herrling that we need to understand?
 5            MS. WILLIAMS:  Yes, ma'am.  I would like the
 6   Court to understand that I honestly feel in reading
 7   everything and seeing how she's (inaudible) and
 8   processing everything, this could have been literally
 9   somebody.  You know, me and my husband, you know, we
10   were financially -- it goes a long way.  You know what
11   I'm saying, knowing how to protect yourself from any
12   kinds of crimes.  (Inaudible) -- it is a long way.
13            THE COURT:  Can I ask you to interrupt her.
14            THE COURTROOM DEPUTY:  Hello, hello, hello,
15   Ms. Williams, hold on.  Hold on.
16            THE COURT:  Thank you.
17            THE COURTROOM DEPUTY:  Hello.  Ms. Williams,
18   hold on.  Hold on.
19            THE COURT:  Okay.  Thank you so much,
20   Ms. Williams.  We are going to have to continue with the
21   hearing.  But I do really thank you for your time and
22   while you were not here, Mr. Brown also did I thought
23   quite a compelling job of explaining the effects.
24            MS. WILLIAMS:  Can I finish the last part of my
25   sentence that I just wanted the Court to know that this
```

1    lady is a big manipulator and a con artist.  And she's

2    gotten away with whatever she can get away with using

3    the dead, and misusing their wishes and taking advantage

4    of people, and that they need to know that she --

5    obviously, she knows how to use her words and

6    everything, and knows how to manipulate people around

7    the authority; that she, obviously, was branded or

8    something.  And those people hold her accountable, and

9    don't let this happen to anybody else.  Thank you.

10             THE COURT:  Thank you.

11             MS. WILLIAMS:  Really really from my family and

12    Robert.  I can provide for my baby brothers, myself, my

13    family.  Don't let her get away with it.

14             THE COURT:  Thank you.  Thank you,

15    Ms. Williams.

16             THE COURTROOM DEPUTY:  Okay.  Thank you.  We're

17    going to hang up now.  Okay.  Bye-bye.

18             THE COURT:  Okay.  The -- the -- do the parties

19    need to be heard further?

20             MR. KESSEL:  No, Your Honor.

21             THE COURT:  No.  Okay.  Thank you.  The factors

22    that the Court -- the Court finds most compelling in

23    this case are the nature and circumstances of the

24    offense and the history and characteristics of the

25    defendant.  We need for the sentence to reflect the

1  seriousness of the offense to promote respect for the

2  law and provide just punishment, afford adequate

3  deterrence for criminal conduct, and protect the public

4  from further crimes of the defendant.

5          Reprehensible and immoral.  These are the words

6  that Ms. Herrling, that you used to describe your

7  conduct.  The Court actually finds it difficult to find

8  words appropriate to describe the seriousness of this

9  offense.

10          The Court finds particularly serious the

11  persistence with which Ms. Herrling engaged in these

12  offenses and the planning and sophistication that it

13  took.  But I think what you may have been referring to,

14  Ms. Herrling, and what this Court finds particularly

15  reprehensible was how Mr. Wilding was treated.  Charles

16  Wilding was a man.  He was a human being.  He may not

17  have had much in the way of family and friends, but his

18  life had meaning and purpose, the way all of our lives

19  do.  But Ms. Herrling apparently did not see that.  She

20  used him as a cash register and when she was done with

21  him, hacked him to pieces with as little fan fair as one

22  would do to an old cash register that no longer worked.

23          Similarly, the tragic death of Mr. Tascon and

24  the emotional anguish that he and his wife suffered is a

25  reminder that even a fraud crime, sometimes you've

1    euphemistically referred to as a white collar crime, can

2    have devastating affects on its victims, even if no

3    enhancement applies for causing a death.  Pain that Mr.

4    Tascon's widow faces due to the loss of her husband and

5    the extreme stress caused by Ms. Herrling's crime, which

6    precipitated his death, and the fact that the last

7    period of time she had with him was overshadowed by the

8    stress that had been caused by this crime, all of that

9    are factors that this Court considers in determining the

10    seriousness of this offense.

11         On the other hand, the Court does consider as

12    mitigation the sealed material that I discussed with

13    counsel at sidebar as well as the health concerns and

14    Ms.  Herrling's experiences while in custody.

15         Do the parties have any legal objections to the

16    Court imposing sentence?

17         MR. BROWN:  No, Your Honor.

18         MR. KESSEL:  No, Your Honor.

19         THE COURT:  Does either counsel know of any

20    reason why sentence should not now be imposed?

21         MR. KESSEL:  No, Your Honor.

22         MR. BROWN:  No, Your Honor.

23         THE COURT:  I will now state the sentence:  I

24    find that the following sentence is reasonable, and is

25    sufficient, does no greater than necessary to comply

1   with the purposes stated in Title 18 of the United

2   States Code, Section 3553, Subdivision A.

3          It is ordered that the defendant shall pay to

4   the United States a special assessment of a hundred

5   dollars, which is due immediately.  Any unpaid balance

6   shall be due during the period of imprisonment at the

7   rate of not less than $25 per quarter and pursuant to

8   the Bureau of Prisons Inmate Financial Responsibility

9   Program.

10         It is ordered that the defendant shall pay

11   restitution in the amount of $3,887,051, pursuant to

12   Title 18 of the United States Code, Section 3663(A).

13   The amount of restitution shall be paid as follows:

14   Charles and June Wilding:  $447,051; Jackie Lowenstein:

15   $1,000,920; Robert Tascon:  $1,500,000.

16         Restitution shall be due during the period of

17   imprisonment at the rate of not less than $25 per

18   quarter pursuant to the Bureau of Prisons Inmate

19   Financial Responsibility Program.

20         If any amount of the restitution remains unpaid

21   after release from custody, nominal monthly payments of

22   at least $100 shall be made during the period of

23   supervised release.

24         These payments shall begin 90 days after the

25   commencement of supervision.

1          Nominal restitution payments are ordered as the

2     Court finds that the defendant's economic circumstances

3     do not allow for either immediate or future payment of

4     the amount ordered.

5          If the defendant makes a partial payment, each

6     payee shall receive approximately proportional payment

7     unless another priority order or percentage payment is

8     specified in the judgment.

9          Pursuant to Title 18 of the United States Code,

10    Section 3612, Subdivision F.3.A., interest on the

11    restitution ordered is waived, because the defendant

12    does not have the ability to pay interest.

13         Payments may be subject to penalties for

14    default and delinquency pursuant to Title 18 of the

15    United States Code, Section 3612, Subdivision G.  The

16    defendant shall comply with Second Amended General Order

17    Number 20-04.  Pursuant to Guideline 5E1.2, Subdivision

18    A, all fines are waived as the Court finds that the

19    defendant has established that she is unable to pay and

20    is not likely to become able to pay any fine.  The Court

21    has found that the property identified -- I understand

22    that the Government has withdrawn the forfeiture.

23         MR. BROWN:  That's right, Your Honor.  There is

24    no equity left in it.

25         THE COURT:  Thank you.  Pursuant to the

1    Sentencing Reform Act of 1984, it is the judgment of the

2    Court that the defendant, Caroline Joanne Herrling, is

3    hereby committed on Count 1 of the information to the

4    custody of the Bureau of Prisons for a term of

5    240 months.

6          The Court recommends that the defendant be

7    considered for participation in the Bureau of Prisons

8    Residential Drug Abuse Program.  The Court recommends

9    that the Bureau of Prisons conduct a mental health

10   evaluation of the defendant and provide all necessary

11   treatment.

12         Upon release from imprisonment, the defendant

13   shall be placed on supervised release for a term of

14   three years under the following terms and conditions:

15   One, the defendant shall comply with the rules and

16   regulations of the United States Probation and Pretrial

17   Services Office and Second Amended General Order 20-04,

18   including the conditions of probation and supervised

19   release set forth in Section 3 of General -- Second

20   General -- excuse me, Section 3 of Second Amended

21   General Order 20-04.

22         During the period of community supervision, the

23   defendant shall pay the special assessment and

24   restitution in accordance with this judgment's orders

25   pertaining to such payment.

UNITED STATES DISTRICT COURT

1          The defendant shall cooperate in the collection

2     of a DNA sample from the defendant.  The defendant shall

3     apply all monies received from income tax refunds,

4     lottery winnings, inheritance, judgments, and any other

5     financial gains to the Court-ordered financial

6     obligation.

7          The defendant shall refrain from any unlawful

8     use of a controlled substance.

9          The defendant shall submit to one drug test

10    within 15 days of release from custody and at least two

11    periodic drug tests thereafter, not to exceed eight

12    tests per month as directed by the probation officer.

13         The defendant shall participate in an

14    out-patient substance abuse and treatment and counseling

15    program.  That includes urinalysis, breath or sweat

16    patch testing as directed by the probation officer.  The

17    defendant shall abstain from using alcohol and illicit

18    drugs and from abusing prescription medications during

19    the period of supervision.

20         During the course of supervision, the probation

21    officer, with the agreement of the defendant and Defense

22    counsel, may place the defendant in a residential drug

23    treatment program approved by the probation, U.S.

24    Probation and Pretrial Services Office for treatment of

25    narcotic addiction or drug dependency, which may include

1    counseling and testing to determine if the defendant has

2    reverted to the use of drugs.  The defendant shall

3    reside in the treatment program until discharged by the

4    program director and probation officer.

5            As directed by the probation officer, the

6    defendant shall pay all or part of the cost of the

7    Court-ordered treatment to the aftercare contractors

8    during the period of community supervision.

9            The defendant shall provide payment and proof

10   of payment as directed by the probation officer.  If the

11   defendant has no ability to pay, no payment shall be

12   required.

13           Sorry, Counsel, did you need a moment with your

14   client?

15           MR. KESSEL:  No, I'm fine.  Thank you.

16           THE COURT:  Okay.  When not employed or excused

17   by the probation officer for schooling, training, or

18   other acceptable reasons, the defendant shall perform

19   20 hours of community service per week as directed by

20   the Probation and Pretrial Services Office.

21           The defendant shall not be self-employed nor be

22   employed in a position that does not provide regular pay

23   stubs with the appropriate deductions for taxes unless

24   approved by the probation officer.

25           The defendant shall not obtain or possess any

1    driver's license, social security number, birth

2    certificate, passport, or any other form of

3    identification in any name other than the defendant's

4    true, legal name nor shall the defendant use any name

5    other than the defendant's true, legal name without the

6    prior written approval of the probation officer.

7            The defendant shall not be employed in any

8    position that requires licensing or certification by any

9    local, state, or federal agency without the prior

10   written approval of the probation officer.

11           Defendant shall submit defendant's person, and

12   any property, residence, vehicle, papers, computer,

13   other electronic communication or data storage devices

14   or media or effects to search and seizure at any time of

15   the day or night by any law enforcement officer or

16   probation officer with or without a warrant and with or

17   without cause.

18           If stopped or questioned by a law enforcement

19   officer for any reason, defendant shall notify that

20   officer that defendant is on federal supervised release

21   and subject to search with or without cause.

22           The defendant shall participate in mental

23   health treatment, which may include evaluation and

24   counseling until discharged from the program by the

25   treatment provider with the approval of the probation

1    officer.

2           The Court authorizes the Probation and Pretrial

3    Services Office to disclose the presentence report to

4    the substance abuse treatment provider to facilitate the

5    defendant's treatment for narcotic addiction or drug

6    dependency.

7           Further redisclosure of the presentence report

8    by the treatment provider is prohibited without the

9    consent of the sentencing judge.

10          The Court authorizes the probation officer to

11   disclose the presentence report and any previous mental

12   health evaluations or reports to the treatment provider.

13   The treatment provider may provide information,

14   excluding the presentence report, to state or local

15   social service agencies such as the state of California,

16   Department of Social Service for the purpose of the

17   client's rehabilitation.

18          Counsel, as you heard, the Court has already

19   recommended that Ms. Herrling be placed in the

20   residential treatment program.  Did you have a

21   recommendation that you wanted the Court to provide

22   concerning the location of Ms. Herrling's incarceration?

23          MR. KESSEL:  Just that it's somewhere in

24   Southern California, Your Honor.

25          THE COURT:  I'm sorry.  In Southern California,

```
 1   okay.  And I assume that's because that's closest to her
 2   means of support?
 3          Okay.  The defendant is remanded to the custody
 4   of the United States Marshal.  I trust there are no
 5   remaining counts to be dismissed.
 6          MR. BROWN:  No, Your Honor.  The Government
 7   moves to dismiss the remaining counts of the indictment.
 8          THE COURT:  Thank you.
 9          MR. BROWN:  The information, Your Honor.
10          THE COURT:  Thank you.  The remaining counts
11   are dismissed.  Does either counsel have anything
12   further before I address the issue of appeals or provide
13   my final comments to Ms. Herrling?
14          MR. KESSEL:  No, Your Honor.
15          MR. BROWN:  No, Your Honor.
16          THE COURT:  The Statement of Reason shall be
17   included in the Commitment Order and Judgment and shall
18   be provided to the probation officer.  The probation
19   office, the United States Sentencing Commission, and the
20   Bureau of Prisons.  A complete copy of the presentence
21   report shall be provided to the Bureau of Prisons and
22   the sentencing commission.  Any other copies of the
23   report and related materials shall remain confidential.
24   If an appeal is taken, counsel on appeal shall have
25   access to the report.
```

1          Ms. Herrling, you do have a right to appeal

2    your conviction, if you believe that your guilty plea

3    was somehow unlawful or involuntary, or if there was

4    some other fundamental defect in the proceedings that

5    was not waived by your guilty plea.  You also have a

6    right to appeal your sentence under some circumstances,

7    particularly if you think your sentence is contrary to

8    law.  However, a defendant may waive those rights as

9    part of a plea agreement and you have entered into a

10   plea agreement that waives some or all of your right to

11   appeal your conviction and your sentence.  Such waivers

12   are generally enforceable.  And the plea agreement

13   controls your right to appeal.  If you believe the

14   waiver is unenforceable, you can present that theory to

15   the Court of Appeals.

16          If you retained any right to appeal with few

17   exceptions, a Notice of Appeal must be filed within

18   14 days of judgment being entered.  Do you understand

19   that?

20              THE DEFENDANT:  Yes.

21              THE COURT:  And I'll just need you to speak

22   into the microphone.

23              THE DEFENDANT:  Yes, I do.

24              THE COURT:  Okay.  Thank you.  If you are

25   unable to provide -- to afford a transcript of the

1    record in this case, one will be provided at the

2    Government expense.  If you are unable to pay the cost

3    of an appeal or the filing fee, you may apply for leave

4    to file an appeal in forma pauperis.  If you do not have

5    counsel to act on your behalf and if you request it, the

6    Clerk of the Court will prepare and file a Notice of

7    Appeal on your behalf.  You must make the request within

8    14 days.  The Notice of Appeal must designate the

9    judgment or order appealed from and the fact that you

10   are appealing to the Court of Appeals.

11          It should designate the portion of the

12   proceedings not already on file that you deem necessary

13   for the reporter to include.

14          Anything further from counsel before I address

15   Ms. Herrling for the final time?

16          MR. BROWN:  No, Your Honor.  Thank you, Your

17   Honor.

18          MR. KESSEL:  The defendant would like the clerk

19   to file a Notice of Appeal and, obviously, I'm not her

20   counsel on appeal.  She would like appointment of

21   counsel.

22          THE COURT:  Thank you.

23          I'm not exactly sure about the mechanics with

24   respect to the request for the -- both the request for

25   counsel and the request for the filing of the Notice of

1    Appeal.  So I will advise the courtroom deputy clerk to

2    handle the filing of the notice of the appeal to the

3    extent that there is anything further that I need to do

4    in order to authorize counsel to be appointed to

5    Ms. Herrling for purposes of appeal, then we can handle

6    that perhaps in a separate proceeding or by separate

7    filing.

8             Just a moment.

9             Counsel, is it possible, even though you're not

10   going to be her counsel on appeal, is it possible for

11   you to at least file the Notice of Appeal and then once

12   that process has started, I think at that point, that's

13   when the Court of Appeals, when you step out, that's

14   when the Court of Appeals would appoint counsel, or is

15   it your understanding it operates differently?

16            MR. KESSEL:  Well, Your Honor, I've seen it --

17   I don't mind filing a Notice of Appeal.  I just don't

18   want to -- then the Ninth Circuit will look to me to see

19   if I'm counsel.  I ask that you relieve me for appeal

20   purposes, but I'd be happy to file a Notice of Appeal

21   for her.

22            THE COURT:  And were you appointed in this

23   matter?

24            MR. KESSEL:  No.

25            THE COURT:  You're retained, but you're asking

1    to be released?

2            MR. KESSEL:  For trial level only.

3            THE COURT:  I understand.

4            Mr. Brown?

5            MR. BROWN:  I just think it's ordinarily done,

6    the Defense counsel files the notice and I would

7    actually like to talk to him before he does, and I don't

8    think there's any reason for Your Honor to intervene in

9    the normal process and do it immediately.  It should go

10    the normal way by filing out of court.

11            THE COURT:  Okay.  Well, Mr. Kessel has

12    indicated that he doesn't have an objection to filing

13    the Notice of Appeal so we'll proceed with that,

14    meaning, obviously, if something comes up, and for some

15    reason that is not appropriate, then you can advise the

16    Court.

17            Anything further, Mr. Kessel?

18            MR. KESSEL:  No, Your Honor.

19            THE COURT:  Okay.  Thank you.

20            Thank you very much for that.  And I guess I

21    would just end with this --

22            MR. KESSEL:  One second.

23            THE COURT:  Yes.

24            MR. KESSEL:  Your Honor, I'm sorry.  Excuse me,

25    Your Honor.  Thank you.

1          THE COURT:  Let me just end with this:  As I

2     stated earlier, all of our lives have meaning and

3     purpose.  And this is true for you no less than anyone

4     else who's here.  You indicated here that you're a new

5     woman, and that your sobriety has given you a clarity of

6     purpose that you never had before.  And I think you are

7     to be commended for the sobriety that you've

8     experienced.  As you described for us, this is probably

9     the longest period of sobriety that you've had, and I

10    can only imagine that it's been very hard fought, and so

11    you are to be commended for that, and it's something

12    that you should be proud of.

13         I acknowledge that the road ahead completing

14    your time in custody will not be easy, but I genuinely

15    wish you all of the best in completing your sentence and

16    discovering your true purpose.  With that, I do want to

17    thank everybody for their patience today.  I

18    particularly want to thank the court staff and the

19    marshals for their patience, because the Court went very

20    late today, and I appreciate everyone understands the

21    seriousness of the matter today.  And, with that, the

22    Court is adjourned.  Thank you.

23              (Whereupon, proceeding adjourned.)

24                        - - -

25

UNITED STATES DISTRICT COURT

**C E R T I F I C A T E**

UNITED STATES OF AMERICA              :

              vs.                    :   No. CR 23-00059-MEMF

CAROLINE JOANNE HERRLING           :

I, MARIA BUSTILLOS, OFFICIAL COURT REPORTER, IN AND FOR THE

UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF

CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753,

TITLE 28, UNITED STATES CODE, THE FOREGOING IS A TRUE AND

CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED

PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE

TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS

OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

FEES CHARGED FOR THIS TRANSCRIPT, LESS ANY CIRCUIT FEE

REDUCTION AND/OR DEPOSIT, ARE IN CONFORMANCE WITH THE

REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.


_____/S/_____          //____

MARIA R. BUSTILLOS                  DATE
OFFICIAL REPORTER

**$**

**$1,000,920** [1] - 72:15
**$1,500,000** [1] - 72:15
**$100** [2] - 59:7, 72:22
**$150,000** [3] - 47:24, 48:5, 48:22
**$155,000** [1] - 48:20
**$25** [2] - 72:7, 72:17
**$3,887,051** [1] - 72:11
**$447,051** [1] - 72:14
**$613,000** [1] - 40:1
**$64,000** [1] - 42:14
**$9,000,000** [1] - 19:7

**/**

**/S** [1] - 85:22

**1**

**1** [3] - 35:10, 36:15, 74:3
**1.1** [1] - 36:21
**10** [3] - 5:15, 37:18, 40:18
**101** [1] - 50:8
**1030** [1] - 2:12
**106** [1] - 50:1
**12254** [1] - 1:22
**13** [4] - 37:9, 38:16, 42:21, 56:10
**14** [3] - 39:11, 80:18, 81:8
**149** [1] - 48:2
**15** [3] - 4:1, 53:13, 75:10
**15,2024** [1] - 1:18
**15-mintue** [1] - 60:16
**15-minute** [1] - 5:15
**15910** [1] - 2:11
**16** [1] - 39:12
**17** [3] - 37:21, 40:3, 56:13
**18** [8] - 42:20, 47:16, 47:18, 59:10, 72:1, 72:12, 73:9, 73:14
**1984** [1] - 74:1
**1ST** [1] - 1:23
**1st** [1] - 58:19

**2**

**20** [1] - 76:19
**20-04** [4] - 60:13, 73:17, 74:17, 74:21
**2014** [1] - 47:25
**2015** [2] - 48:17, 48:21
**2016** [1] - 48:19
**2022** [3] - 48:1, 48:17, 48:19
**2023** [1] - 58:19
**2024** [2] - 4:1, 18:2

**21** [1] - 41:14
**213** [1] - 1:24
**213)894-6269** [1] - 2:7
**217** [1] - 10:21
**23-00059-MEMF** [3] - 1:10, 4:5, 85:6
**240** [3] - 58:23, 59:2, 74:5
**250,000** [1] - 59:6
**26** [2] - 49:13, 51:5
**262** [1] - 59:1
**28** [1] - 85:13
**2:07** [1] - 4:3
**2B** [1] - 36:20
**2B1.1** [2] - 36:15, 36:19

**3**

**3** [4] - 22:4, 35:10, 74:19, 74:20
**312** [1] - 2:6
**327** [1] - 59:1
**350** [1] - 1:23
**3553** [2] - 59:10, 72:2
**36** [1] - 6:6
**3612** [2] - 73:10, 73:15
**3663(A)** [1] - 72:12
**37** [1] - 6:4
**39** [1] - 58:21
**3B1.3** [1] - 22:4

**4**

**4** [2] - 3:2, 36:21
**4455** [1] - 1:23
**47** [4] - 37:12, 41:14, 42:20, 45:13
**4C1.1** [2] - 34:7, 34:22
**4E** [1] - 36:19

**5**

**5** [3] - 36:9, 37:18, 56:12
**50,000** [1] - 59:5
**500** [1] - 51:6
**55** [1] - 6:5
**56** [1] - 6:6
**5E1.2** [1] - 73:17

**6**

**62** [1] - 45:17
**638** [1] - 10:21
**64** [1] - 50:1

**7**

**72** [1] - 18:23
**753** [1] - 85:12
**76** [2] - 49:3, 50:1

**77** [2] - 47:23, 48:18
**79** [2] - 1:16, 3:2
**7th** [1] - 18:2

**8**

**8** [2] - 37:19, 56:13
**818)994-1422** [1] - 2:13
**894-2739** [1] - 1:24

**9**

**9** [5] - 20:9, 20:17, 37:9, 38:16, 56:10
**90** [1] - 72:24
**90012** [2] - 1:24, 2:7
**91** [1] - 51:16
**91436** [1] - 2:12
**97** [1] - 45:14

**A**

**abilities** [1] - 52:16
**ability** [4] - 7:9, 12:21, 73:12, 76:11
**able** [6] - 33:3, 52:20, 60:17, 61:7, 63:20, 66:1, 66:3, 67:5, 73:20
**ABOVE** [1] - 85:15
**ABOVE-ENTITLED** [1] - 85:15
**absolutely** [2] - 41:13, 44:5
**abstain** [1] - 75:17
**abuse** [3] - 51:12, 75:14, 78:4
**Abuse** [1] - 74:8
**abused** [1] - 23:7
**abusing** [1] - 75:18
**acceptable** [2] - 18:17, 76:18
**acceptance** [6] - 44:15, 44:17, 44:24, 57:14, 57:16, 57:25
**accepted** [1] - 57:20
**access** [2] - 50:17, 79:25
**accordance** [1] - 74:24
**according** [2] - 17:16, 42:13
**account** [4] - 9:8, 19:21, 58:18, 58:20
**accountable** [1] - 69:8
**accounts** [1] - 19:20
**accurate** [4] - 10:25, 16:20, 58:12, 66:19
**acknowledge** [2] - 61:19, 84:13
**acknowledged** [1] - 47:15
**acknowledges** [1] -

42:24
**Act** [1] - 74:1
**act** [1] - 81:5
**acted** [1] - 49:8
**action** [1] - 21:14
**actions** [1] - 50:13
**actual** [10] - 22:18, 23:2, 23:3, 23:5, 23:11, 23:24, 34:8, 36:15, 44:4, 58:25
**add** [1] - 41:7
**added** [1] - 11:6
**addendum** [1] - 6:5
**addiction** [4] - 49:5, 49:13, 75:25, 78:5
**addition** [3] - 13:15, 57:22, 57:23
**address** [11] - 9:12, 12:21, 12:22, 14:12, 15:12, 21:3, 21:7, 46:15, 47:7, 79:12, 81:14
**addressed** [3] - 33:21, 58:8, 58:9
**addresses** [2] - 22:4, 22:5
**addressing** [1] - 13:11
**adequate** [2] - 59:16, 70:2
**adjourned** [2] - 84:22, 84:23
**adjustment** [3] - 10:9, 22:6, 22:16
**adjustments** [4] - 10:6, 10:10, 10:15, 25:19
**administer** [1] - 42:7
**admissible** [2] - 11:25, 54:23
**admission** [2] - 47:22, 52:4
**admissions** [1] - 16:18
**admitted** [1] - 25:2
**adopt** [2] - 35:21, 58:12
**adopted** [1] - 10:14
**adult** [1] - 47:23
**advantage** [1] - 69:3
**advantages** [1] - 51:23
**advice** [1] - 22:22
**advise** [6] - 4:25, 26:10, 34:1, 54:13, 82:1, 83:15
**advised** [1] - 50:18
**Advisory** [2] - 58:13, 58:16
**affect** [1] - 11:9
**affected** [1] - 28:25
**affecting** [1] - 67:9
**affects** [2] - 29:10, 71:2
**affidavit** [4] - 48:18, 49:3, 49:25, 50:8,

51:16, 54:20
**affirmed** [1] - 37:15
**afford** [3] - 53:18, 70:2, 80:25
**afresh** [1] - 62:9
**aftercare** [1] - 76:7
**afternoon** [9] - 4:9, 4:13, 4:16, 4:17, 4:18, 5:17, 27:17, 27:22, 27:23
**agencies** [1] - 78:15
**agency** [1] - 77:9
**agents** [3] - 4:11, 4:18, 51:13
**aggravating** [3] - 14:6, 16:10, 49:16
**ago** [1] - 13:22
**agree** [9] - 10:1, 10:8, 11:23, 11:24, 11:25, 14:1, 24:25, 36:3, 41:24
**agreed** [1] - 58:2
**agreement** [5] - 58:2, 75:21, 80:9, 80:10, 80:12
**agrees** [1] - 51:3
**ahead** [9] - 28:3, 28:15, 28:20, 28:23, 31:15, 37:8, 54:5, 65:11, 84:13
**AKA** [1] - 48:9
**albeit** [1] - 24:11
**alcohol** [1] - 75:17
**ALEX** [2] - 2:10, 2:11
**Alex** [1] - 4:14
**alias** [1] - 48:9
**allegation** [1] - 14:18
**allegations** [1] - 15:25
**allocuting** [1] - 27:12
**allow** [2] - 65:25, 73:3
**alluded** [1] - 55:16
**almost** [2] - 47:11, 49:12
**amazed** [1] - 43:10, 52:15
**amazing** [1] - 52:17
**ambiguous** [1] - 24:2
**Amended** [3] - 73:16, 74:17, 74:20
**amendment** [1] - 14:2
**amendments** [2] - 59:25, 60:2
**America** [1] - 4:5
**AMERICA** [3] - 1:7, 2:4, 85:5
**amount** [8] - 23:19, 24:5, 25:4, 25:18, 72:11, 72:13, 72:20, 73:4
**analysis** [1] - 58:18
**AND** [3] - 85:10, 85:13, 85:15
**AND/OR** [1] - 85:19
**Andrew** [2] - 4:10, 28:2

**ANDREW** [1] - 2:5
**ANGELES** [4] - 1:17, 1:24, 2:7, 4:1
**anguish** [1] - 70:24
**announce** [2] - 5:18, 60:18
**Anonymous** [1] - 51:6
**another's** [1] - 20:3
**answer** [1] - 50:24
**anticipated** [1] - 12:14
**anxiety** [1] - 67:7
**ANY** [1] - 85:18
**apologize** [1] - 33:8
**appeal** [14] - 79:24, 80:1, 80:6, 80:11, 80:13, 80:16, 81:3, 81:4, 81:20, 82:2, 82:5, 82:10, 82:19
**Appeal** [9] - 80:17, 81:7, 81:8, 81:19, 82:1, 82:11, 82:17, 82:20, 83:13
**appealed** [1] - 81:9
**appealing** [1] - 81:10
**appeals** [1] - 79:12
**Appeals** [4] - 80:15, 81:10, 82:13, 82:14
**appear** [3] - 9:22, 11:12, 65:24
**appearances** [1] - 4:8
**appeared** [1] - 13:23
**apple** [1] - 52:8
**applicable** [3] - 10:7, 59:23, 59:24
**Application** [10] - 22:3, 22:10, 22:11, 23:13, 23:14, 36:15, 36:19, 36:21, 55:8, 57:18
**application** [1] - 10:25
**applies** [3] - 22:6, 40:17, 71:3
**apply** [13] - 11:13, 13:13, 14:23, 21:24, 23:16, 40:5, 41:12, 44:14, 55:14, 56:24, 61:24, 75:3, 81:3
**appoint** [1] - 82:14
**appointed** [2] - 82:4, 82:22
**appointment** [1] - 81:20
**appreciate** [3] - 5:3, 66:13, 84:20
**appreciated** [1] - 28:5
**appreciates** [1] - 67:14
**apprised** [1] - 15:4
**appropriate** [10] - 8:25, 13:10, 14:17, 15:18, 55:25, 57:22, 60:7, 70:8, 76:23, 83:15
**approval** [3] - 77:6, 77:10, 77:25
**approved** [2] - 75:23,

76:24
**ARE** [1] - 85:19
**area** [1] - 53:14
**areas** [1] - 52:2
**argue** [3] - 12:20, 15:3, 52:1
**argued** [1] - 37:14
**argues** [1] - 47:10
**arguing** [1] - 20:8
**argument** [9] - 10:12, 20:11, 20:12, 21:21, 26:1, 26:3, 38:2, 40:24, 44:22
**arguments** [5] - 24:18, 35:21, 35:24, 56:4, 56:12
**arrest** [1] - 48:1
**arrested** [1] - 50:16
**Arthur** [1] - 61:12
**artist** [2] - 63:4, 69:1
**aside** [5] - 13:23, 17:2, 20:9, 48:15, 55:3
**asleep** [1] - 30:19
**assault** [1] - 51:20
**asserts** [1] - 44:3
**assessment** [3] - 59:6, 72:4, 74:23
**asset** [1] - 40:12
**associated** [1] - 51:11
**assume** [2] - 40:9, 79:1
**AT** [1] - 4:3
**attached** [3] - 17:23, 39:25, 54:22
**attempted** [5] - 17:15, 53:10, 66:20, 66:24, 67:5
**attempts** [1] - 45:2
**ATTORNEY** [1] - 2:5
**attorney** [7] - 4:14, 7:22, 29:15, 49:9, 50:18, 55:9, 55:10
**attorney's** [1] - 19:20
**attorneys** [2] - 42:6, 52:22
**attributed** [1] - 23:25
**authorities** [1] - 16:13
**authority** [2] - 37:3, 69:7
**authorize** [1] - 82:4
**authorizes** [1] - 78:2, 78:10
**available** [1] - 59:21
**avoid** [2] - 58:1, 60:2
**aware** [2] - 23:23, 39:3
**axe** [1] - 53:11

**B**

**baby** [1] - 69:12
**bad** [3] - 42:22, 42:23, 67:6
**badly** [1] - 33:15
**balance** [1] - 72:5
**Bank** [1] - 39:21

**bank** [1] - 42:17
**bar** [1] - 49:23
**Bar** [1] - 49:2
**based** [4] - 9:22, 42:14, 52:25, 59:9
**basis** [5] - 9:9, 10:13, 13:17, 44:2, 44:19
**Bay** [1] - 53:14
**became** [1] - 42:9
**become** [1] - 73:20
**began** [1] - 40:10
**begging** [1] - 43:15
**begin** [1] - 72:24
**beginning** [2] - 32:6, 54:10
**behalf** [2] - 81:5, 81:7
**BEHALF** [2] - 2:4, 2:9
**behind** [1] - 62:25
**believes** [1] - 35:13
**bench** [1] - 58:17
**beneficiaries** [2] - 37:16, 37:23
**benefit** [1] - 51:4
**berates** [1] - 42:23
**best** [3] - 29:8, 52:4, 84:15
**better** [1] - 33:14
**between** [4] - 19:25, 23:4, 23:12, 55:19
**beyond** [1] - 21:2
**big** [4] - 19:2, 36:10, 65:8, 69:1
**bigger** [2] - 43:7
**birth** [1] - 77:1
**birthday** [1] - 30:12
**bit** [3] - 31:9, 33:5, 33:13
**boards** [1] - 53:6
**boat** [1] - 53:17
**body** [7] - 14:15, 41:25, 43:12, 44:4, 53:3, 53:11, 57:10
**bottom** [1] - 16:14
**BOULEVARD** [1] - 2:11
**boyfriend** [3] - 46:3, 50:21, 57:12
**branded** [1] - 69:7
**brazen** [2] - 50:4, 50:11
**breach** [2] - 22:17
**breached** [1] - 22:25
**break** [5] - 5:19, 12:15, 13:10, 47:2, 62:18
**breaking** [1] - 32:21
**breath** [1] - 75:15
**brief** [3] - 37:12, 42:21, 45:18
**briefly** [4] - 4:19, 21:7, 47:4, 52:25
**bring** [1] - 26:18
**broken** [1] - 51:25
**brothers** [1] - 69:12
**BROWN** [41] - 2:5,

4:9, 9:15, 27:11, 27:14, 34:6, 34:18, 34:22, 34:25, 35:3, 35:6, 35:8, 35:17, 36:10, 36:18, 36:21, 37:4, 37:7, 37:10, 38:5, 38:25, 39:4, 39:13, 41:13, 44:5, 45:4, 45:7, 45:15, 45:17, 47:6, 54:1, 54:8, 60:11, 71:17, 71:22, 73:23, 79:6, 79:9, 79:15, 81:16, 83:5
**brown** [9] - 33:4, 33:9, 33:12, 56:6, 56:9, 60:10, 60:17, 68:22, 83:4
**Brown** [4] - 4:10, 28:2
**built** [1] - 65:11
**bunch** [1] - 30:8
**Bureau** [7] - 72:8, 72:18, 74:4, 74:7, 74:9, 79:20, 79:21
**business** [8] - 47:20, 48:6, 48:7, 48:11, 48:16, 48:21, 64:18, 65:11
**BUSTILLOS** [3] - 1:21, 85:10, 85:23
**buy** [1] - 43:1
**BY** [2] - 2:5, 2:11
**bye** [2] - 69:17
**bye-bye** [1] - 69:17

**C**

**C.S.R** [1] - 1:22
**CA** [2] - 2:7, 2:12
**calculation** [6] - 5:9, 5:10, 5:12, 5:15, 54:12, 58:13
**calculations** [1] - 23:23
**CALIFORNIA** [5] - 1:2, 1:17, 1:24, 4:1, 85:12
**California** [9] - 17:6, 17:12, 19:18, 48:5, 49:2, 51:7, 78:15, 78:24, 78:25
**Canada** [1] - 63:4
**cannot** [4] - 21:24, 39:9, 61:23, 67:12
**car** [1] - 53:15
**card** [2] - 24:4, 39:22
**cards** [2] - 39:14, 39:19
**care** [1] - 59:19
**careful** [1] - 44:1
**Caroline** [4] - 4:6, 28:1, 48:8, 48:25, 64:12, 74:2
**CAROLINE** [3] - 1:12, 2:10, 85:7

**case** [21] - 4:11, 5:7, 9:19, 10:4, 10:17, 10:18, 10:19, 10:20, 10:21, 11:4, 11:7, 11:14, 22:6, 29:17, 39:18, 44:1, 47:10, 49:10, 69:23, 81:1
**cases** [2] - 9:20, 36:13
**cash** [2] - 70:20, 70:22
**categories** [1] - 36:7
**category** [3] - 58:22, 59:23, 59:24
**Category** [1] - 35:10
**caught** [2] - 49:21
**causation** [2] - 16:11, 21:4
**caused** [16] - 13:16, 14:19, 16:1, 20:14, 39:23, 40:19, 46:19, 56:15, 62:6, 66:9, 66:10, 66:16, 66:17, 66:18, 71:5, 71:8
**causing** [2] - 20:3, 21:4, 71:3
**cease** [3] - 49:1, 49:23, 50:12
**Central** [1] - 17:5
**CENTRAL** [2] - 1:2, 85:11
**certain** [3] - 9:7, 11:17, 61:17
**certainly** [4] - 40:13, 41:23, 42:13, 43:17
**certificate** [1] - 77:2
**certification** [1] - 77:8
**CERTIFY** [1] - 85:12
**chance** [2] - 24:24, 52:2
**change** [3] - 8:8, 12:9, 25:7
**changed** [1] - 24:12
**channel** [1] - 24:11
**Chapter** [1] - 34:10
**character** [2] - 53:9, 53:20
**characteristics** [3] - 22:24, 59:13, 69:24
**charge** [1] - 13:24
**charged** [2] - 15:7, 39:20
**CHARGED** [1] - 85:18
**charges** [1] - 39:13
**Charles** [3] - 50:3, 70:15, 72:14
**checked** [1] - 48:5
**cherry** [1] - 29:21
**child** [1] - 63:5
**childhood** [1] - 52:5
**children** [1] - 52:6
**chose** [1] - 51:9
**chosen** [1] - 52:11
**Christine** [1] - 37:23
**CIRCUIT** [1] - 85:18
**Circuit** [3] - 10:4, 37:15, 82:18

**circumstance** [1] - 16:10

**circumstances** [6] - 54:16, 56:14, 59:12, 69:23, 73:2, 80:6

**citation** [1] - 9:20

**cite** [1] - 9:19

**cited** [1] - 10:20

**Citibank** [1] - 39:22

**claim** [2] - 41:21, 48:19

**claimed** [1] - 17:4

**claiming** [1] - 43:13

**claims** [3] - 20:25, 24:11, 48:22

**clarification** [2] - 11:18, 14:20

**clarify** [1] - 41:8

**clarity** [1] - 84:5

**clear** [12] - 8:18, 8:23, 9:9, 9:18, 15:15, 18:15, 27:2, 36:8, 42:8, 53:23, 54:13, 54:16

**clearly** [3] - 49:9, 61:7, 66:1

**Clerk** [2] - 13:2, 81:6

**CLERK** [1] - 65:16

**clerk** [11] - 4:25, 6:9, 12:24, 26:13, 26:18, 33:25, 47:3, 60:16, 61:9, 81:18, 82:1

**client** [12] - 4:14, 6:18, 7:4, 14:14, 14:19, 16:1, 16:15, 19:2, 19:25, 21:3, 21:17, 76:14

**client's** [2] - 16:10, 78:17

**close** [5] - 6:7, 6:9, 26:17, 49:21

**closed** [2] - 33:25, 40:23

**closer** [1] - 32:4

**closest** [1] - 79:1

**co** [3] - 57:1, 57:4, 58:7

**co-conspirator** [1] - 57:1

**co-conspirators** [2] - 57:4, 58:7

**Code** [4] - 72:2, 72:12, 73:9, 73:15

**CODE** [1] - 85:13

**collar** [1] - 71:1

**colleague** [1] - 61:8

**collection** [1] - 75:1

**college** [1] - 52:7

**comfortable** [1] - 67:7

**coming** [1] - 17:19

**commencement** [1] - 72:25

**commended** [2] - 84:7, 84:11

**comment** [1] - 41:21

**comments** [4] - 52:25, 58:14, 58:15, 79:13

**Commission** [1] - 79:19

**commission** [3] - 23:9, 60:1, 79:22

**commit** [2] - 66:20, 66:25

**Commitment** [1] - 79:17

**committed** [5] - 59:23, 66:21, 66:24, 67:5, 74:3

**committing** [1] - 48:9

**common** [1] - 22:24

**communicate** [1] - 67:1

**communication** [1] - 77:13

**community** [3] - 74:22, 76:8, 76:19

**companies** [2] - 39:12, 56:8

**Company** [1] - 39:24

**compelling** [2] - 68:23, 69:22

**compellingly** [1] - 62:13

**compensation** [1] - 42:22

**competent** [1] - 16:20

**complaint** [6] - 48:17, 49:3, 49:25, 50:8, 51:16, 54:19

**complete** [1] - 79:20

**completely** [1] - 51:3

**completing** [2] - 84:13, 84:15

**comply** [3] - 71:25, 73:16, 74:15

**computer** [2] - 50:9, 77:12

**con** [1] - 69:1

**concealment** [1] - 23:9

**concern** [2] - 10:9, 25:13

**concerned** [1] - 36:12

**concerning** [4] - 54:4, 54:11, 61:17, 78:22

**concerns** [3] - 7:8, 15:25, 71:13

**conclusion** [1] - 38:21

**conditions** [2] - 74:14, 74:18

**conduct** [11] - 10:18, 23:25, 44:24, 57:15, 57:18, 57:23, 58:6, 59:17, 70:3, 70:7, 74:9

**CONFERENCE** [2] - 85:17, 85:20

**confidential** [2] - 6:8, 79:23

**confidentiality** [1] - 22:17

**CONFORMANCE** [2] - 85:16, 85:19

**conforming** [1] - 50:13

**Congress'** [2] - 9:4, 9:6

**conjunctive** [1] - 14:10

**connect** [1] - 61:11

**connection** [2] - 19:1, 21:17

**consent** [1] - 78:9

**consider** [5] - 25:23, 28:18, 57:15, 57:17, 71:11

**consideration** [2] - 25:15, 44:10

**considered** [7] - 5:16, 5:25, 6:3, 11:17, 23:21, 56:4, 74:7

**considering** [3] - 8:24, 9:10, 59:9

**considers** [1] - 71:9

**conspiracy** [3] - 24:21, 39:23, 43:23

**conspirator** [1] - 57:1

**conspirators** [2] - 57:4, 58:7

**constitute** [1] - 57:9

**constitutes** [1] - 44:13

**consultant** [1] - 47:25

**consulting** [3] - 47:21, 48:4, 58:20

**Consulting** [3] - 48:4, 48:24, 49:7

**consumers** [1] - 49:8

**contact** [2] - 33:4, 49:19

**contacted** [1] - 16:14

**contention** [3] - 23:1, 23:14, 24:19

**contents** [1] - 6:20

**contest** [3] - 8:8, 14:7, 21:16

**contested** [3] - 38:19, 39:1, 54:3

**context** [1] - 42:18

**continue** [3] - 31:12, 62:20, 68:20

**continued** [1] - 49:24

**continuing** [5] - 14:4, 14:8, 14:21, 15:1, 15:5, 15:10, 15:14, 15:16, 15:19, 33:15, 62:19

**contractors** [1] - 76:7

**contradictory** [1] - 56:11

**contrary** [2] - 48:15, 80:7

**contribution** [2] - 41:25, 42:2

**contributions** [1] - 42:19

**control** [1] - 40:12

**controlled** [1] - 75:8

**controls** [1] - 80:13

**controvert** [1] - 20:17

**conversation** [1] - 20:2

**conversations** [1] - 57:3

**convicted** [2] - 10:24, 60:4

**conviction** [5] - 11:3, 11:10, 11:11, 80:2, 80:11

**convictions** [3] - 47:13, 49:12, 53:13

**convincing** [2] - 9:18, 54:16

**cooperate** [1] - 75:1

**cooperating** [1] - 33:19

**copies** [1] - 79:22

**copy** [1] - 79:20

**correct** [10] - 16:8, 18:9, 23:17, 26:8, 35:3, 35:6, 38:24, 44:2, 53:25, 58:12

**CORRECT** [1] - 85:14

**correctional** [1] - 59:20

**correctly** [1] - 35:13

**cost** [2] - 76:6, 81:2

**counsel** [26] - 4:7, 4:10, 4:16, 4:18, 8:2, 11:16, 28:1, 56:4, 56:12, 71:13, 71:19, 75:22, 78:18, 79:11, 79:24, 81:5, 81:14, 81:20, 81:21, 81:25, 82:4, 82:9, 82:10, 82:14, 82:19, 83:6

**Counsel** [6] - 5:25, 7:11, 17:21, 18:14, 36:17, 76:13

**counsel's** [1] - 36:6

**counseling** [3] - 75:14, 76:1, 77:24

**Count** [1] - 74:3

**counted** [1] - 37:19

**counterfeit** [1] - 46:5

**countering** [1] - 16:15

**counting** [1] - 37:16

**counts** [5] - 55:17, 59:2, 79:5, 79:7, 79:10

**couple** [2] - 16:24, 45:19

**course** [5] - 39:21, 48:23, 49:10, 50:5, 75:20

**COURT** [156] - 1:1, 1:21, 4:3, 4:16, 4:21, 5:24, 6:20, 6:23, 7:2, 7:5, 7:8, 7:11, 7:17, 7:19, 7:22, 7:25, 8:2, 8:16, 9:16, 10:16, 11:22, 12:3, 12:11, 12:23, 13:5, 13:7,

14:20, 14:25, 15:20, 17:21, 18:6, 18:8, 18:11, 18:14, 18:20, 18:22, 20:6, 21:6, 21:11, 21:19, 22:2, 22:13, 23:1, 23:18, 24:17, 25:21, 26:2, 26:9, 26:16, 26:22, 26:24, 27:6, 27:9, 27:13, 27:16, 27:20, 27:22, 27:24, 28:7, 28:10, 28:14, 28:20, 28:23, 29:7, 30:1, 31:8, 31:21, 31:24, 32:1, 32:3, 32:9, 32:12, 32:19, 32:23, 33:3, 33:8, 33:11, 34:13, 34:19, 34:23, 35:1, 35:4, 35:7, 35:16, 35:18, 36:17, 36:20, 36:24, 37:5, 37:8, 38:1, 38:13, 39:2, 39:10, 40:21, 41:3, 43:24, 44:6, 45:6, 45:10, 45:16, 46:13, 53:22, 54:2, 54:9, 60:10, 60:12, 60:15, 60:22, 61:1, 61:5, 61:15, 62:3, 62:17, 63:11, 63:14, 63:18, 63:20, 64:1, 64:3, 64:8, 64:10, 64:14, 65:4, 65:13, 65:22, 67:10, 67:18, 68:3, 68:13, 68:16, 68:19, 69:10, 69:14, 69:18, 69:21, 71:19, 71:23, 73:25, 76:16, 78:25, 79:8, 79:10, 79:16, 80:21, 80:24, 81:22, 82:22, 82:25, 83:3, 83:11, 83:19, 83:23, 84:1, 85:10, 85:11

**court** [7] - 18:17, 24:5, 34:1, 66:4, 68:1, 83:10, 84:18

**Court** [87] - 9:3, 9:5, 9:6, 9:10, 11:12, 12:21, 12:22, 13:19, 14:8, 16:12, 16:24, 22:14, 23:10, 24:13, 24:14, 25:9, 25:14, 25:16, 28:18, 34:11, 34:16, 35:1, 35:13, 35:24, 44:11, 44:12, 45:11, 47:2, 47:17, 50:19, 51:10, 55:3, 55:4, 55:7, 55:18, 55:22, 56:4, 56:7, 56:14, 56:18, 56:20, 56:22, 56:24, 57:2, 57:7, 57:15, 57:17, 57:21, 57:24, 58:4, 63:15, 63:16, 64:19, 67:13, 67:21, 67:23,

68:6, 68:25, 69:22, 70:7, 70:10, 70:14, 71:9, 71:11, 71:16, 73:2, 73:18, 73:20, 74:2, 74:6, 74:8, 75:5, 76:7, 78:2, 78:10, 78:18, 78:21, 80:15, 81:6, 81:10, 82:13, 82:14, 83:16, 84:19, 84:22

**Court's** [10] - 9:2, 10:17, 11:7, 13:11, 32:25, 37:15, 41:4, 54:14, 58:18, 60:19

**Court-ordered** [2] - 75:5, 76:7

**COURTHOUSE** [1] - 1:22

**courtroom** [14] - 6:7, 6:9, 6:11, 6:12, 8:5, 13:1, 26:12, 26:18, 33:24, 34:1, 40:23, 46:11, 61:8, 82:1

**COURTROOM** [12] - 4:4, 12:25, 13:6, 26:19, 26:23, 27:1, 27:4, 27:7, 67:20, 68:14, 68:17, 69:16

**courts** [2] - 42:5, 52:22

**CR** [2] - 4:5, 85:6

**credit** [6] - 9:4, 9:7, 24:4, 39:14, 39:19, 39:22

**creek** [1] - 17:17

**crew** [1] - 52:21

**crime** [12] - 11:5, 13:16, 16:2, 47:14, 49:19, 59:1, 59:6, 66:12, 70:25, 71:1, 71:5, 71:8

**crimed** [1] - 52:2

**crimes** [6] - 50:11, 52:12, 59:17, 62:4, 68:12, 70:4

**criminal** [30] - 13:14, 13:18, 13:20, 13:22, 14:4, 14:9, 14:21, 15:1, 15:5, 15:10, 15:14, 15:17, 15:19, 20:3, 21:14, 34:8, 34:9, 34:16, 34:20, 35:2, 35:10, 35:12, 35:15, 47:8, 47:11, 55:2, 55:3, 58:21, 59:16, 70:3

**criminality** [2] - 35:14, 52:3

**criminals** [1] - 53:11

**cross** [1] - 27:14

**cross-examination** [1] - 27:14

**cupcake** [1] - 29:21

**custody** [7] - 58:22, 71:14, 72:21, 74:4, 75:10, 79:3, 84:14

**cut** [1] - 43:4

## D

**dad** [11] - 31:3, 31:13, 31:18, 32:13, 32:18, 62:2, 63:2, 63:5, 63:6, 65:8, 65:10

**daddy** [1] - 65:15

**daily** [1] - 47:15

**data** [1] - 77:13

**DATE** [1] - 85:23

**days** [5] - 47:23, 72:24, 75:10, 80:18, 81:8

**De** [1] - 10:20

**dead** [2] - 40:9, 69:3

**deal** [4] - 41:23, 42:5, 42:6, 49:11

**death** [20] - 13:16, 14:13, 14:19, 15:21, 15:22, 16:2, 16:6, 16:12, 19:1, 19:25, 20:4, 21:5, 21:17, 46:16, 46:19, 53:9, 58:5, 70:23, 71:3, 71:6

**decedent** [1] - 14:15

**decedent's** [1] - 37:14

**decisions** [1] - 25:22

**declaration** [3] - 38:17, 45:12, 54:20

**declines** [1] - 55:4

**deductions** [1] - 76:23

**deem** [1] - 81:12

**deemed** [1] - 16:6

**default** [1] - 73:14

**defect** [1] - 80:4

**defend** [1] - 52:20

**Defendant** [1] - 1:13

**defendant** [78] - 8:22, 9:5, 14:5, 14:11, 20:3, 22:6, 22:8, 22:9, 22:18, 23:4, 23:7, 23:12, 24:9, 24:21, 25:2, 25:6, 34:9, 37:13, 40:19, 41:15, 42:3, 43:13, 44:18, 45:18, 45:24, 49:8, 49:20, 51:1, 51:17, 51:24, 52:3, 57:20, 59:13, 59:18, 59:24, 60:12, 67:24, 69:25, 70:4, 72:3, 72:10, 73:5, 73:11, 73:16, 73:19, 74:2, 74:6, 74:10, 74:12, 74:15, 74:23, 75:1, 75:2, 75:7, 75:9, 75:13, 75:17, 75:21, 75:22, 76:1, 76:2, 76:6, 76:9, 76:11, 76:18, 76:21, 76:25, 77:4, 77:7, 77:11, 77:19, 77:20, 77:22,

79:3, 80:8, 81:18

**DEFENDANT** [9] - 2:9, 5:23, 7:16, 7:18, 7:21, 7:24, 8:1, 80:20, 80:23

**Defendant's** [1] - 18:3

**defendant's** [12] - 10:24, 23:25, 35:14, 35:24, 37:25, 45:22, 47:7, 73:2, 77:3, 77:5, 77:11, 78:5

**defendants** [4] - 9:7, 42:9, 51:25, 60:3

**Defense** [7] - 8:2, 8:20, 36:5, 36:11, 47:10, 75:21, 83:6

**Defense's** [3] - 15:14, 25:25, 41:21

**deference** [1] - 56:1

**define** [1] - 24:2

**defined** [1] - 15:17

**definitely** [2] - 43:20, 48:12

**definition** [1] - 55:13

**definitive** [1] - 38:3

**degree** [2] - 16:24, 47:22

**delinquency** [1] - 73:14

**Delta** [1] - 26:7

**demise** [1] - 50:5

**demonstrates** [1] - 58:4

**deny** [1] - 44:17

**depart** [1] - 58:15

**Department** [1] - 78:16

**departure** [1] - 35:9

**dependency** [2] - 75:25, 78:6

**DEPOSIT** [1] - 85:19

**DEPUTY** [14] - 4:4, 12:25, 13:6, 26:19, 26:23, 27:1, 27:4, 27:7, 63:14, 65:16, 67:20, 68:14, 68:17, 69:16

**Deputy** [1] - 13:1

**deputy** [2] - 61:8, 82:1

**describe** [2] - 70:6, 70:8

**described** [2] - 59:10, 84:8

**desecrated** [1] - 53:11

**deserve** [1] - 42:22

**deserves** [1] - 43:21

**designate** [2] - 81:8, 81:11

**designed** [1] - 63:2

**designs** [4] - 63:24, 64:1, 64:5, 64:7

**desist** [3] - 49:1, 49:23, 50:12

**despite** [1] - 48:19

**destroying** [1] - 51:9

**Detective** [1] - 4:11

**determination** [2] - 56:2, 59:8

**determinations** [1] - 9:4

**determine** [1] - 76:1

**determined** [1] - 14:7

**determining** [4] - 34:19, 43:18, 53:8, 71:9

**deterrence** [2] - 59:16, 70:3

**devastating** [2] - 61:19, 71:2

**developed** [1] - 17:12

**devices** [1] - 77:13

**died** [1] - 53:7

**different** [2] - 26:5, 36:6

**differently** [2] - 15:11, 82:15

**difficult** [3] - 5:4, 67:12, 70:7

**difficulties** [1] - 13:8

**difficulty** [3] - 31:10, 65:24

**directed** [6] - 53:5, 75:12, 75:16, 76:5, 76:10, 76:19

**directly** [2] - 16:1, 23:25

**director** [1] - 76:4

**disappearance** [1] - 50:3

**discharged** [2] - 76:3, 77:24

**disclose** [2] - 78:3, 78:11

**disconnect** [2] - 19:2, 21:17

**discover** [1] - 61:20

**discovering** [1] - 84:16

**discretion** [4] - 34:16, 35:2, 35:11, 43:16

**discuss** [4] - 6:8, 18:17, 40:23, 46:10

**discussed** [1] - 71:12

**discussing** [1] - 18:15

**discussion** [1] - 8:21

**disinherited** [1] - 39:7

**dismiss** [1] - 79:7

**dismissed** [2] - 79:5, 79:11

**disparities** [1] - 60:3

**disposal** [2] - 44:4, 57:10

**disposing** [1] - 53:3

**disproportionate** [2] - 11:2, 11:8

**disputes** [4] - 5:11, 38:3, 46:21, 54:11

**disrespect** [1] - 17:1

**dissolve** [2] - 53:4,

53:10

**distinction** [1] - 34:24

**distress** [2] - 20:15, 66:17

**District** [2] - 17:5, 37:15

**DISTRICT** [5] - 1:1, 1:2, 1:5, 85:11

**DIVISION** [1] - 1:3

**DNA** [1] - 75:2

**DO** [1] - 85:12

**doctor** [2] - 63:7, 64:4

**Document** [2] - 37:12, 41:14, 45:17

**document** [3] - 16:8, 17:25, 46:5

**documents** [7] - 6:2, 6:17, 6:22, 7:3, 7:15, 46:7, 54:22

**dogs** [1] - 30:15

**dollar** [3] - 24:4, 25:3, 25:18

**dollars** [3] - 42:16, 64:20, 72:5

**done** [5] - 10:2, 41:16, 43:5, 70:20, 83:5

**down** [3] - 25:11, 29:10, 65:20

**downstairs** [1] - 30:21

**downward** [2] - 35:9

**driver's** [1] - 77:1

**drop** [1] - 49:19

**Drug** [1] - 74:8

**drug** [12] - 15:6, 47:12, 49:5, 51:3, 51:15, 51:18, 51:19, 75:9, 75:11, 75:22, 75:25, 78:5

**drugs** [4] - 51:9, 51:14, 75:18, 76:2

**due** [8] - 10:22, 15:3, 15:15, 37:17, 71:4, 72:5, 72:6, 72:16

**dump** [1] - 53:15

**dumping** [1] - 53:5

**during** [10] - 47:18, 48:11, 49:14, 72:6, 72:16, 72:22, 74:22, 75:18, 75:20, 76:8

## E

**earned** [2] - 47:24, 48:20

**earning** [1] - 48:4

**easier** [1] - 36:24

**easy** [2] - 24:3, 84:14

**eat** [1] - 30:21

**ECF** [10] - 6:4, 6:5, 6:6, 18:22, 18:23, 41:14, 42:20, 45:13, 45:17

**Eckert** [1] - 37:22

**economic** [1] - 73:2

**edition** [1] - 58:19

**educational** [1] - 59:19
**Edward** [2] - 36:19, 36:22
**effect** [2] - 10:10, 11:2
**effective** [1] - 59:20
**effects** [3] - 66:12, 68:23, 77:14
**efficiency** [2] - 38:14, 39:11
**eight** [3] - 37:11, 47:17, 75:11
**either** [4] - 60:18, 71:19, 73:3, 79:11
**electronic** [1] - 77:13
**ELEVENTH** [1] - 2:6
**eloquently** [1] - 66:11
**Emmy** [1] - 29:1
**emotional** [1] - 70:24
**employed** [4] - 76:16, 76:21, 76:22, 77:7
**employment** [1] - 49:6
**ENCINO** [1] - 2:12
**end** [4] - 33:11, 35:12, 83:21, 84:1
**enforceable** [1] - 80:12
**enforcement** [3] - 17:20, 77:15, 77:18
**engage** [1] - 14:21
**engaged** [2] - 44:24, 70:11
**English** [1] - 13:1
**enhancement** [15] - 21:20, 21:24, 23:2, 23:3, 23:6, 23:11, 40:17, 41:12, 44:4, 44:13, 55:14, 56:17, 56:23, 57:19, 71:3
**entered** [2] - 80:9, 80:18
**enterprise** [9] - 14:4, 14:9, 14:22, 15:2, 15:5, 15:10, 15:14, 15:17, 15:19
**entitled** [2] - 18:3, 20:22
**ENTITLED** [1] - 85:15
**entrepreneur** [1] - 47:19
**equal** [4] - 40:25, 41:9, 41:22, 56:23
**equals** [1] - 43:13
**equity** [1] - 73:24
**especially** [1] - 59:11
**established** [2] - 59:22, 73:19
**estate** [13] - 19:7, 20:10, 20:16, 21:15, 23:20, 25:7, 25:10, 25:11, 33:22, 37:14, 55:17, 55:22, 64:13
**Estate** [2] - 35:23, 55:15
**estates** [2] - 52:18, 52:23

**euphemistically** [1] - 71:1
**evaluation** [2] - 74:10, 77:23
**evaluations** [1] - 78:12
**events** [1] - 13:25
**evidence** [36] - 9:21, 9:23, 10:3, 10:24, 11:13, 11:16, 11:19, 11:20, 14:3, 14:18, 15:16, 16:1, 19:12, 20:5, 22:12, 24:8, 38:11, 38:20, 38:23, 42:15, 44:8, 44:12, 46:16, 48:14, 49:6, 49:10, 49:14, 53:7, 54:17, 54:18, 56:10, 56:11, 57:8, 58:4, 58:5, 58:8
**EWUSI** [1] - 1:5
**EWUSI-MENSAH** [1] - 1:5
**exactly** [2] - 37:7, 81:23
**examination** [1] - 27:14
**examples** [1] - 46:10
**exceed** [1] - 75:11
**excelled** [1] - 52:10
**exceptions** [1] - 80:17
**excluding** [2] - 14:11, 78:14
**exclusions** [1] - 20:2
**exclusively** [1] - 59:11
**excuse** [5] - 22:4, 54:16, 74:20, 83:24
**excused** [1] - 76:16
**executed** [1] - 51:13
**exhibit** [5] - 18:8, 18:23, 39:7, 39:25, 56:25
**Exhibit** [1] - 18:10
**exhibits** [1] - 38:17
**exit** [1] - 6:11
**expense** [1] - 81:2
**expenses** [3] - 49:4, 64:17, 64:21
**experience** [1] - 42:1
**experienced** [2] - 37:6, 84:8
**experiences** [1] - 71:14
**expertise** [1] - 42:2
**explain** [4] - 5:5, 6:20, 7:22, 9:1
**explained** [13] - 7:5, 43:5, 44:7, 62:6, 62:7, 62:9, 62:12, 63:22, 63:23, 66:7, 66:9, 66:11, 66:16
**explaining** [4] - 39:7, 41:15, 66:15, 68:23
**explanation** [1] - 9:1
**explicitly** [1] - 45:8
**extent** [2] - 58:14,

82:3
**extraordinary** [1] - 50:11
**extreme** [1] - 71:5
**extremely** [2] - 11:2, 11:8
**eyes** [2] - 25:13, 52:9

**F**

**F.3.A** [1] - 73:10
**F.3d** [1] - 10:21
**face** [2] - 29:5, 42:4
**faces** [1] - 71:4
**facilitate** [1] - 78:4
**facilitated** [1] - 23:9
**facility** [1] - 51:19
**fact** [9] - 22:9, 24:3, 25:1, 25:23, 46:23, 48:24, 48:25, 71:6, 81:9
**factor** [2] - 11:1, 47:9
**factors** [6] - 11:8, 11:11, 11:17, 59:9, 69:21, 71:9
**facts** [3] - 11:4, 22:19, 59:9
**factual** [2] - 10:13, 44:19
**fair** [7] - 24:22, 26:4, 35:25, 55:18, 55:21, 55:24, 70:21
**falsely** [2] - 46:4, 50:23
**family** [6] - 52:7, 65:11, 66:8, 69:11, 69:13, 70:17
**fan** [1] - 70:21
**far** [6] - 13:18, 14:1, 24:12, 31:11, 36:11, 43:22
**Fargo** [1] - 39:21
**father** [6] - 32:6, 61:9, 61:12, 64:9, 64:10, 64:11
**fed** [1] - 30:17
**federal** [2] - 77:9, 77:20
**FEE** [1] - 85:18
**fee** [1] - 81:3
**FEES** [1] - 85:18
**felony** [1] - 53:13
**felt** [5] - 29:12, 30:4, 34:11, 43:3, 62:13
**few** [2] - 42:15, 80:16
**Fidelity** [1] - 39:24
**fiduciary** [2] - 22:23, 24:14
**figure** [1] - 33:13
**file** [8] - 48:18, 48:20, 81:4, 81:6, 81:12, 81:19, 82:11, 82:20
**filed** [7] - 6:1, 6:14, 18:1, 18:2, 18:16, 34:1, 80:17

**files** [1] - 83:6
**filing** [7] - 81:3, 81:25, 82:2, 82:7, 82:17, 83:10, 83:12
**filings** [1] - 17:22
**final** [3] - 35:25, 79:13, 81:15
**finally** [1] - 57:14
**Financial** [2] - 72:8, 72:19
**financial** [5] - 40:7, 40:19, 56:15, 75:5
**financially** [2] - 52:8, 68:10
**fine** [6] - 6:25, 7:2, 8:15, 27:16, 39:17, 59:5, 73:20, 76:15
**fines** [1] - 73:18
**finish** [1] - 68:24
**firm** [1] - 48:4
**first** [12] - 12:4, 15:3, 20:24, 28:3, 29:5, 33:18, 34:6, 45:20, 50:14, 53:4, 60:19, 61:9
**fit** [1] - 55:12
**five** [4] - 41:5, 41:19, 43:22, 56:19
**flashbacks** [2] - 29:25, 30:2
**flinched** [1] - 53:12
**FLOOR** [1] - 2:6
**floor** [1] - 53:6
**fluctuate** [1] - 55:22
**fluctuated** [1] - 55:23
**flying** [1] - 53:17
**following** [4] - 5:25, 57:8, 71:24, 74:14
**follows** [1] - 72:13
**FOR** [3] - 85:10, 85:11, 85:18
**FOREGOING** [1] - 85:13
**forfeiture** [3] - 45:3, 58:2, 73:22
**forged** [1] - 37:21
**forget** [1] - 43:11
**form** [1] - 77:2
**forma** [1] - 81:4
**FORMAT** [1] - 85:16
**forth** [5] - 29:22, 29:23, 59:24, 63:10, 74:19
**fought** [1] - 84:10
**four** [4] - 34:10, 41:18, 43:17, 43:22
**Four** [1] - 57:18
**fragile** [4] - 29:2, 46:22, 46:23, 62:10
**fraud** [11] - 24:4, 25:19, 37:17, 37:25, 39:23, 40:10, 48:10, 49:22, 50:24, 53:18, 70:25
**fraudulent** [2] - 48:24,

50:6
**fraudulently** [6] - 17:13, 17:14, 24:19, 24:20, 25:24, 36:1
**FRIDAY** [2] - 1:18, 4:1
**friend** [3] - 29:8, 30:18, 30:20
**friends** [1] - 70:17
**FRIMPONG** [1] - 1:5
**front** [1] - 7:12
**fully** [1] - 40:3
**fund** [1] - 59:7
**fundamental** [1] - 80:4
**funded** [1] - 19:21
**future** [1] - 73:3

**G**

**gains** [1] - 75:5
**general** [1] - 10:22
**General** [6] - 60:13, 73:16, 74:17, 74:19, 74:20, 74:21
**generally** [1] - 80:12
**genuinely** [1] - 84:14
**ghost** [1] - 51:20
**given** [8] - 8:22, 18:15, 19:12, 25:8, 42:19, 55:19, 56:1, 84:5
**gleaned** [1] - 18:13
**govern** [1] - 58:16
**Government** [25] - 4:10, 9:3, 9:13, 9:19, 10:13, 13:11, 16:22, 19:8, 19:16, 19:23, 20:8, 27:9, 28:1, 36:7, 38:22, 41:5, 44:3, 46:4, 51:3, 54:5, 54:19, 57:6, 73:22, 79:6, 81:2
**Government's** [14] - 8:20, 8:21, 15:4, 15:22, 16:9, 18:3, 20:12, 20:20, 35:21, 36:3, 37:12, 40:3, 41:8, 44:22
**granted** [1] - 12:5
**great** [3] - 42:18, 45:16, 49:11
**greater** [2] - 24:15, 71:25
**greatly** [1] - 67:14
**grew** [1] - 52:2
**groups** [1] - 51:6
**guess** [5] - 25:3, 34:14, 36:9, 41:4, 83:20
**Guideline** [1] - 73:17
**guideline** [2] - 55:7, 59:4
**guidelines** [18] - 5:8, 5:10, 5:12, 5:14, 9:20, 10:25, 23:23, 25:9, 36:12, 54:4, 54:12, 56:1, 58:19,

58:22, 58:25, 59:3, 59:5, 59:25
**Guidelines** [2] - 58:13, 58:16
**guilty** [2] - 80:2, 80:5
**guns** [1] - 51:21
**guys** [2] - 45:19, 45:20

## H

**habit** [1] - 7:1
**hacked** [1] - 70:21
**hacking** [1] - 53:4
**Hadley** [1] - 41:17
**half** [1] - 29:23
**hand** [1] - 71:11
**handle** [3] - 64:17, 82:2, 82:5
**hands** [2] - 24:13, 24:14
**hang** [1] - 69:17
**happy** [2] - 30:14, 82:20
**hard** [2] - 25:8, 84:10
**hardened** [1] - 53:11
**harm** [4] - 40:7, 40:8, 40:19, 56:15
**health** [5] - 51:10, 71:13, 74:9, 77:23, 78:12
**hear** [46] - 5:8, 5:13, 12:6, 12:16, 13:1, 13:3, 26:17, 26:22, 27:1, 27:3, 27:4, 27:18, 27:20, 27:21, 30:2, 31:14, 31:25, 32:2, 32:21, 33:3, 33:5, 33:10, 33:17, 35:22, 47:4, 54:3, 60:19, 61:2, 61:4, 61:5, 61:7, 61:23, 62:3, 62:5, 63:13, 63:15, 63:18, 63:20, 63:21, 65:25, 66:1, 66:5, 67:18, 67:19, 67:21, 67:22
**heard** [16] - 5:14, 9:14, 9:24, 11:15, 13:17, 22:10, 28:3, 28:16, 33:18, 36:5, 44:16, 53:25, 60:6, 61:9, 69:19, 78:18
**HEARING** [1] - 3:2
**hearing** [8] - 5:12, 27:25, 28:17, 33:6, 61:17, 61:18, 61:24, 68:21
**hearsay** [3] - 11:24, 16:20, 54:23
**heart** [1] - 63:4
**heavily** [1] - 56:24
**heirs** [2] - 38:23, 50:9
**HELD** [1] - 85:15
**Hello** [5] - 26:21, 63:15, 67:20, 68:14,

68:17
**hello** [13] - 26:22, 27:19, 27:20, 65:17, 67:20, 67:21, 68:14
**help** [2] - 29:11, 34:15
**helpful** [1] - 36:23
**helpless** [3] - 29:13, 30:4, 30:5
**hereby** [1] - 74:3
**HEREBY** [1] - 85:12
**heroin** [1] - 51:21
**Herrling** [35] - 4:6, 4:15, 4:17, 5:3, 7:13, 7:14, 12:5, 13:14, 21:7, 21:22, 22:20, 22:21, 28:1, 28:18, 40:25, 41:22, 44:23, 48:3, 54:21, 54:22, 55:1, 55:8, 56:20, 58:7, 68:4, 70:6, 70:11, 70:14, 70:19, 74:2, 78:19, 79:13, 80:1, 81:15, 82:5
**HERRLING** [3] - 1:12, 2:10, 85:7
**Herrling's** [5] - 21:4, 66:12, 71:5, 71:14, 78:22
**herself** [6] - 23:15, 41:19, 49:13, 54:21, 55:9, 55:12
**high** [4] - 47:18, 47:21, 48:11, 52:2
**high-crimed** [1] - 52:2
**higher** [5] - 10:5, 10:23, 11:3, 43:19, 43:20
**highly** [1] - 52:16
**himself** [2] - 19:17, 31:1
**hire** [2] - 29:14, 29:15
**history** [22] - 13:14, 13:19, 13:20, 13:23, 16:17, 20:3, 34:8, 34:10, 34:17, 34:20, 35:2, 35:10, 35:12, 35:15, 47:8, 47:11, 49:17, 55:2, 55:4, 58:21, 59:12, 69:24
**hold** [7] - 65:20, 68:2, 68:15, 68:18, 69:8
**holds** [1] - 22:8
**home** [7] - 31:5, 32:18, 39:16, 39:19, 46:20, 47:20, 57:11
**homemade** [1] - 51:20
**homes** [1] - 51:25
**homicide** [2] - 16:3, 50:2
**honest** [2] - 43:10, 47:19
**honestly** [2] - 48:13, 68:6
**Honor** [86] - 4:9, 4:13, 6:19, 7:1, 8:15, 9:15, 10:1, 10:11, 11:21,

13:19, 13:22, 14:10, 15:9, 15:13, 16:3, 16:8, 16:19, 16:25, 17:19, 17:24, 18:1, 18:5, 18:10, 18:21, 18:24, 19:3, 20:5, 21:1, 21:10, 22:12, 22:19, 23:17, 23:22, 25:7, 25:20, 26:8, 27:8, 27:11, 34:6, 34:7, 36:10, 36:22, 37:7, 37:10, 38:6, 38:9, 39:8, 39:13, 41:13, 41:20, 42:7, 42:10, 43:17, 45:4, 45:15, 46:1, 47:6, 51:17, 51:23, 51:24, 52:24, 53:2, 53:21, 54:1, 54:8, 60:9, 60:11, 60:14, 69:20, 71:17, 71:18, 71:21, 71:22, 73:23, 78:24, 79:6, 79:9, 79:14, 79:15, 81:16, 81:17, 82:16, 83:8, 83:18, 83:24, 83:25
**HONORABLE** [1] - 1:5
**hope** [2] - 18:4, 61:24
**host** [1] - 51:7
**hours** [1] - 76:19
**house** [25] - 17:12, 19:18, 20:14, 20:18, 20:22, 21:13, 21:14, 29:18, 30:15, 31:6, 32:14, 40:11, 40:15, 43:1, 45:2, 45:8, 45:20, 45:25, 50:20, 53:6, 62:12, 64:18, 64:24, 65:1, 65:3
**houses** [1] - 52:18
**human** [1] - 70:16
**hundred** [1] - 72:4
**hungry** [1] - 40:14
**hunted** [1] - 50:7
**husband** [3] - 66:25, 68:9, 71:4

## I

**ID** [1] - 50:23
**idea** [4] - 16:15, 20:18, 35:1, 40:24
**identification** [1] - 37:2, 77:3
**identified** [4] - 8:18, 9:3, 36:7, 73:21
**identities** [1] - 37:19, 56:13
**identity** [5] - 46:5, 49:11, 57:13, 62:15
**ignore** [1] - 34:8, 38:11
**ignored** [1] - 36:12
**illicit** [1] - 75:17
**illness** [2] - 16:17,

17:11
**illnesses** [1] - 51:10
**imagine** [2] - 67:12, 84:10
**immediate** [1] - 73:3
**immediately** [2] - 72:5, 83:9
**immoral** [1] - 70:5
**importance** [1] - 66:7
**importantly** [2] - 15:12, 17:15
**impose** [1] - 43:17
**imposed** [1] - 71:20
**imposing** [1] - 71:16
**imprisonment** [3] - 72:6, 72:17, 74:12
**IN** [5] - 4:3, 85:10, 85:15, 85:16, 85:19
**inaccurate** [1] - 16:23
**inactive** [2] - 48:7, 48:16
**inappropriate** [1] - 9:6
**Inaudible** [4] - 26:25, 31:23, 63:7, 68:12
**inaudible** [18] - 31:18, 32:22, 33:2, 62:21, 63:8, 63:10, 64:9, 64:13, 64:16, 65:2, 65:3, 65:6, 65:7, 65:12, 65:15, 67:17, 68:7
**incapable** [1] - 50:13
**incarceration** [1] - 78:22
**inclined** [5] - 25:15, 35:21, 36:3, 55:4, 56:21
**include** [3] - 75:25, 77:23, 81:13
**included** [3] - 34:20, 34:21, 79:17
**includes** [4] - 6:1, 36:14, 37:1, 75:15
**including** [2] - 14:17, 74:18
**income** [3] - 49:6, 49:14, 75:3
**inconsistent** [3] - 44:24, 57:16, 57:24
**incorrigible** [1] - 49:17
**increase** [1] - 10:6
**increased** [1] - 23:10
**increasing** [1] - 9:8
**indeed** [1] - 56:8
**independent** [2] - 44:8, 56:16
**index** [1] - 50:9
**indicate** [5] - 9:18, 20:16, 22:19, 37:5, 56:1
**indicated** [17] - 8:10, 10:4, 13:12, 16:7, 19:8, 20:23, 28:2, 31:13, 32:5, 33:22, 44:20, 46:21, 53:2,

58:3, 83:12, 84:4
**indicates** [4] - 9:19, 25:5, 57:18, 57:20
**indicating** [7] - 20:17, 21:2, 22:15, 24:6, 24:8, 38:18, 39:25
**indication** [1] - 14:8
**indications** [1] - 42:11
**indicative** [1] - 35:14
**indicia** [4] - 11:24, 16:21, 22:7, 54:24
**indictment** [1] - 79:7
**indictments** [1] - 15:8
**individual** [3] - 4:23, 37:1, 40:7
**individualized** [1] - 59:8
**individuals** [4] - 16:14, 38:15, 38:19, 41:11
**infer** [2] - 19:16, 48:23
**information** [8] - 9:10, 28:17, 30:7, 38:12, 57:13, 74:3, 78:13, 79:9
**inherit** [1] - 21:16
**inheritance** [2] - 37:24, 75:4
**initial** [2] - 20:2, 58:17
**Inmate** [2] - 72:8, 72:18
**inquire** [1] - 27:9
**inquiring** [1] - 12:18
**Inspector** [1] - 4:12
**instance** [3] - 21:23, 45:1, 55:12
**insufficient** [1] - 11:20
**Insurance** [1] - 39:24
**intelligence** [2] - 42:3, 52:21
**intended** [9] - 24:1, 24:7, 24:22, 25:1, 25:16, 26:5, 36:2, 55:20, 55:25
**Intended** [1] - 24:1
**intent** [2] - 9:6, 19:15
**intention** [2] - 24:20, 55:16
**interaction** [1] - 43:3
**interest** [3] - 10:25, 73:10, 73:12
**interrupt** [10] - 5:21, 24:18, 31:9, 32:20, 33:15, 34:13, 63:22, 65:14, 68:13
**interrupting** [1] - 66:2
**intervene** [1] - 83:8
**interviewed** [2] - 17:20, 51:14
**interviews** [1] - 19:5
**investigated** [1] - 50:2
**investigation** [1] - 50:12
**investigations** [1] - 15:8

investigators [1] - 50:22
invincible [1] - 50:15
involuntary [1] - 80:3
involved [4] - 11:5, 14:16, 47:14, 65:7
involvement [1] - 25:2
involves [1] - 33:23
irony [1] - 51:17
IS [2] - 85:13, 85:16
issue [12] - 9:11, 9:14, 9:16, 14:13, 14:14, 19:24, 21:3, 21:12, 22:5, 33:21, 33:23, 79:12
issued [2] - 49:23, 60:1
issues [4] - 8:12, 8:17, 14:16, 54:4
item [1] - 9:4
items [1] - 9:2
itself [2] - 11:20, 41:20

**J**

Jackie [1] - 72:14
jail [1] - 45:23
jailed [1] - 50:16
James [1] - 41:17
Jason [1] - 50:23
Jesus [1] - 10:21
jet [1] - 53:18
JOANNE [1] - 85:7
Joanne [3] - 4:6, 28:1, 74:2
job [1] - 68:23
joining [3] - 4:24, 27:24, 51:8
Jonathan [1] - 41:18
JUDGE [1] - 1:5
judge [3] - 56:2, 65:18, 78:9
judgment [4] - 73:8, 74:1, 80:18, 81:9
Judgment [1] - 79:17
judgment's [1] - 74:24
judgments [1] - 75:4
JUDICIAL [2] - 85:17, 85:20
jumped [1] - 31:1
jumping [1] - 17:17
June [1] - 72:14
jurisdiction [1] - 17:11
justice [8] - 43:25, 44:3, 46:8, 49:22, 53:3, 57:5, 57:7, 57:10

**K**

Kantor [9] - 41:2, 41:3, 41:10, 41:22, 42:1, 42:12, 43:1, 43:19, 56:23

keep [1] - 67:21
keeps [2] - 32:21, 51:20
kept [2] - 29:16, 39:20
KESSEL [54] - 2:10, 2:11, 4:13, 6:19, 6:22, 7:1, 7:3, 7:7, 7:10, 8:15, 10:1, 11:21, 12:2, 12:8, 12:18, 13:18, 14:24, 15:1, 15:24, 17:24, 18:7, 18:9, 18:12, 18:18, 18:21, 18:24, 20:19, 21:8, 21:12, 21:25, 22:10, 22:15, 23:17, 23:22, 24:25, 25:25, 26:8, 26:15, 41:2, 60:9, 60:14, 69:20, 71:18, 71:21, 76:15, 78:23, 79:14, 81:18, 82:16, 82:24, 83:2, 83:18, 83:22, 83:24
Kessel [22] - 4:14, 4:17, 5:20, 5:21, 6:16, 8:7, 9:17, 12:11, 12:13, 13:9, 24:17, 33:20, 34:14, 38:17, 39:15, 40:24, 44:7, 44:16, 60:8, 60:12, 83:11, 83:17
Kessel's [3] - 33:15, 38:2, 38:9
kidnapping [1] - 11:6
kids [1] - 63:5
killed [2] - 19:17, 30:25
kills [1] - 19:11
kind [2] - 67:2, 67:16
kindergarten [1] - 52:7
kinds [3] - 59:21, 68:12
knowing [4] - 30:6, 62:14, 64:22, 68:11
knowledge [1] - 38:18
knows [3] - 51:10, 69:5, 69:6
Kroth [11] - 41:1, 41:10, 41:15, 41:22, 41:25, 43:19, 46:6, 50:23, 52:13, 53:13, 56:23
kroth [1] - 43:2

**L**

LA [1] - 4:5
lack [5] - 10:12, 11:16, 15:11, 15:15, 47:7
lady [2] - 67:16, 69:1
laid [1] - 19:13
landscaping [2] - 64:6, 64:7
language [2] - 10:19,

14:5
LAPD [2] - 4:11, 50:2
larger [1] - 42:12
last [8] - 20:24, 25:12, 47:16, 52:5, 63:25, 68:3, 68:24, 71:6
late [1] - 84:20
latter [1] - 11:21
laundering [1] - 42:14
LAW [1] - 2:10
law [15] - 10:17, 10:18, 15:17, 17:19, 24:4, 49:3, 49:24, 49:25, 50:13, 59:15, 61:21, 70:2, 77:15, 77:18, 80:8
lawfully [1] - 24:23
Lawrence [1] - 37:22
lawsuit [1] - 40:1
lawyer [2] - 63:6, 64:4
lawyer's [1] - 16:18
lawyers [1] - 19:6
leader [11] - 13:15, 14:6, 40:22, 42:10, 42:11, 42:23, 42:25, 43:18, 43:21, 56:20, 56:22
leader/organizer [1] - 56:18
leadership [2] - 14:3, 52:21
leads [1] - 25:18
learned [1] - 17:2
least [12] - 13:22, 14:16, 16:20, 16:21, 18:13, 19:7, 24:8, 46:19, 56:19, 72:22, 75:10, 82:11
leave [4] - 12:16, 20:13, 20:18, 81:3
leaving [1] - 20:8
led [2] - 41:11, 50:5
left [4] - 17:10, 20:21, 62:19, 73:24
legal [4] - 24:11, 71:15, 77:4, 77:5
legitimate [1] - 49:14
legitimately [2] - 22:8, 47:25
lenders [1] - 39:16
length [1] - 9:1
leniency [3] - 47:11, 51:2, 51:18
LESS [1] - 85:18
less [5] - 24:2, 26:7, 72:7, 72:17, 84:3
letter [2] - 49:1, 49:23
level [3] - 43:19, 58:21, 83:2
levels [1] - 23:10
liberty [1] - 10:24
license [1] - 77:1
licensing [1] - 77:8
lie [3] - 50:21, 57:12, 58:1

lies [2] - 49:21, 50:25
life [5] - 19:14, 19:22, 63:10, 66:17, 70:18
lifetime [1] - 67:4
likely [2] - 8:23, 73:20
limited [1] - 61:18
line [2] - 12:24, 16:14
list [2] - 8:11, 8:13
listed [2] - 16:18, 54:10
listen [1] - 65:19
listening [2] - 28:21, 28:23
listing [1] - 41:18
lists [1] - 50:10
literally [2] - 38:6, 68:8
litigation [3] - 47:20, 47:25, 48:3
litter [1] - 30:16
lived [2] - 17:4, 19:21
lives [3] - 29:19, 70:18, 84:2
living [4] - 20:11, 49:4, 51:19, 64:21
local [2] - 77:9, 78:14
location [1] - 78:22
longest [1] - 84:9
look [5] - 14:2, 25:10, 25:16, 39:4, 82:18
looked [1] - 14:9
looks [1] - 61:7
looted [1] - 39:18
LOS [4] - 1:17, 1:24, 2:7, 4:1
loss [17] - 23:19, 23:23, 24:1, 24:7, 24:22, 25:1, 25:16, 25:19, 26:6, 36:2, 36:15, 37:6, 46:20, 48:22, 55:25, 56:12, 71:4
losses [1] - 23:24
lost [6] - 13:4, 13:6, 19:17, 40:11, 40:17, 62:11
lottery [1] - 75:4
love [1] - 52:9
loved [1] - 29:3
Lowenstein [7] - 23:20, 24:6, 25:3, 33:22, 35:23, 55:15, 72:14
lowenstein [1] - 24:12
lye [2] - 53:4, 53:10
Lyndon [1] - 4:12

**M**

M-A-R-K-E-S-H-A [1] - 28:12
M-I-R-A-C-L-E [1] - 28:12
ma'am [5] - 28:19, 61:10, 62:1, 62:16, 68:5

MAAME [1] - 1:5
main [3] - 10:9, 25:13, 42:10
man [1] - 70:16
manipulate [1] - 69:6
manipulator [1] - 69:1
manner [4] - 23:8, 53:8, 59:21, 61:21
March [1] - 18:2
MARCH [2] - 1:18, 4:1
MARIA [3] - 1:21, 85:10, 85:23
mark [1] - 58:17
Mark [1] - 4:12
Markesha [1] - 28:11
market [8] - 24:22, 25:5, 25:8, 26:4, 35:25, 55:18, 55:21, 55:24
married [2] - 20:24, 65:10
Marshal [1] - 79:4
marshals [1] - 84:19
material [5] - 5:7, 6:8, 33:24, 44:25, 71:12
materials [1] - 79:23
MATTER [1] - 85:15
matter [6] - 4:22, 18:18, 64:23, 67:3, 82:23, 84:21
matters [1] - 54:14
Maurice [1] - 61:13
maximum [1] - 59:1
mean [8] - 30:8, 31:2, 46:9, 46:23, 50:4, 62:22, 63:9, 67:17
meaning [5] - 15:2, 19:15, 70:18, 83:14, 84:2
means [2] - 37:2, 79:2
measure [1] - 55:21, 55:25
mechanics [1] - 81:23
media [1] - 77:14
medical [1] - 59:19
medications [6] - 66:22, 66:23, 66:24, 67:6, 67:8, 75:18
meetings [1] - 51:7
members [2] - 6:10, 24:21
MENSAH [1] - 1:5
mental [7] - 16:17, 17:11, 19:13, 29:16, 74:9, 77:22, 78:11
mentally [6] - 29:2, 29:10, 30:5, 46:22, 46:23, 62:10
mentioned [3] - 7:15, 20:9, 20:10
meritorious [1] - 34:11
meth [1] - 51:21
methamphetamine [4] - 47:16, 50:15,

50:17, 51:11
**Meza** [1] - 38:16
**Mezas** [1] - 10:20
**MEZAS** [1] - 10:20
**microphone** [3] -
6:24, 7:12, 80:22
**might** [2] - 20:23,
42:15
**million** [2] - 20:9,
20:17
**millionaire** [1] - 50:10
**mind** [3] - 19:13,
33:20, 82:17
**mini** [1] - 53:16
**minor** [2] - 11:5, 13:24
**minute** [3] - 63:17,
65:18, 65:21
**Miracle** [5] - 4:24,
28:11, 30:23, 31:4,
37:22
**missed** [1] - 32:9
**misspoke** [1] - 36:18
**misused** [1] - 37:20
**misusing** [1] - 69:3
**mitigating** [2] - 47:9,
48:12
**mitigation** [1] - 71:12
**moment** [10] - 6:2, 6:7,
12:12, 23:6, 36:17,
36:25, 58:10, 67:19,
76:13, 82:8
**money** [5] - 29:17,
39:17, 40:15, 42:14,
42:19, 42:25, 43:15,
49:8, 49:11
**monies** [1] - 75:3
**month** [2] - 51:8,
75:12
**monthly** [3] - 40:13,
64:17, 72:21
**months** [2] - 58:23,
74:5
**mood** [1] - 30:13
**most** [6] - 9:2, 29:2,
47:9, 49:16, 59:20,
69:22
**mostly** [1] - 30:19
**mother** [4] - 45:7,
45:19, 45:22, 63:3
**move** [2] - 9:13, 35:10
**moves** [1] - 79:7
**moving** [3] - 15:12,
22:1, 37:10
**MR** [92] - 4:9, 4:13,
6:19, 6:22, 7:1, 7:3,
7:7, 7:10, 8:15, 9:15,
10:1, 11:21, 12:2,
12:8, 12:18, 13:18,
14:24, 15:1, 15:24,
17:24, 18:7, 18:9,
18:12, 18:18, 18:21,
18:24, 20:19, 21:8,
21:12, 21:25, 22:10,
22:15, 23:17, 23:22,
24:25, 25:25, 26:8,
26:15, 27:11, 27:14,

34:6, 34:18, 34:22,
34:25, 35:3, 35:6,
35:8, 35:17, 36:10,
36:18, 36:21, 37:4,
37:7, 37:10, 38:5,
38:25, 39:4, 39:13,
41:2, 41:13, 44:5,
45:4, 45:7, 45:15,
45:17, 47:6, 54:1,
54:8, 60:9, 60:11,
60:14, 69:20, 71:17,
71:18, 71:21, 71:22,
72:23, 76:15, 78:23,
79:6, 79:9, 79:14,
79:15, 81:16, 81:18,
82:16, 82:24, 83:2,
83:5, 83:18, 83:22,
83:24
**MS** [34] - 26:21, 27:3,
27:19, 27:21, 27:23,
28:6, 28:8, 28:11,
28:19, 28:22, 28:24,
29:8, 31:16, 31:22,
31:25, 32:2, 32:8,
32:11, 32:13, 32:22,
33:2, 33:7, 33:10,
61:4, 62:19, 64:9,
64:12, 64:15, 65:15,
66:20, 67:15, 68:5,
68:24, 69:11
**multiple** [1] - 15:6
**murder** [1] - 16:2
**muscle** [1] - 53:15
**must** [5] - 50:14,
61:20, 80:17, 81:7,
81:8

## N

**name** [13] - 20:24,
28:4, 28:6, 28:10,
28:11, 37:21, 48:7,
48:25, 77:3, 77:4,
77:5
**namely** [1] - 54:19
**names** [1] - 50:20
**narcotic** [2] - 75:25,
78:5
**Narcotics** [1] - 51:6
**National** [1] - 39:24
**naturally** [1] - 22:24
**nature** [6] - 11:10,
55:11, 57:1, 59:11,
62:7, 69:23
**Nealy** [1] - 37:23
**necessarily** [2] -
19:19, 23:3, 23:4
**necessary** [3] - 71:25,
74:10, 81:12
**need** [30] - 5:19, 6:7,
7:19, 9:12, 9:13,
11:15, 12:10, 13:2,
26:12, 30:24, 35:18,
35:19, 35:22, 44:1,
44:9, 51:15, 54:2,

58:10, 59:13, 60:2,
60:4, 67:25, 68:4,
69:4, 69:19, 69:25,
76:13, 80:21, 82:3
**needed** [4] - 30:18,
46:15, 56:12, 59:18
**needs** [2] - 40:23,
51:19
**never** [13] - 14:17,
15:3, 15:8, 19:10,
19:22, 20:20, 23:15,
24:19, 25:24, 51:4,
52:1, 84:6
**new** [4] - 12:8, 12:9,
30:16, 84:4
**next** [2] - 9:11, 21:19
**nexus** [2] - 19:25,
25:18
**Nexus** [3] - 48:4,
48:23, 49:7
**nieces** [1] - 30:21
**night** [1] - 77:15
**nightly** [1] - 66:23
**nine** [2] - 47:17, 48:1
**Ninth** [2] - 10:4, 82:18
**nobody** [1] - 39:21
**nominal** [2] - 72:21,
73:1
**none** [1] - 7:10
**normal** [4] - 10:3,
49:17, 83:9, 83:10
**normally** [2] - 8:7,
57:2
**NORTH** [1] - 2:6
**note** [3] - 19:13, 21:9,
58:14
**Note** [11] - 22:3, 22:4,
22:10, 22:11, 23:13,
23:14, 36:15, 36:19,
36:21, 55:8, 57:18
**noted** [2] - 42:10,
57:24
**nothing** [4] - 17:19,
27:15, 34:7, 37:17
**notice** [4] - 15:11,
15:16, 82:2, 83:6
**Notice** [9] - 80:17,
81:6, 81:8, 81:19,
81:25, 82:11, 82:17,
82:20, 83:13
**notify** [1] - 77:19
**notwithstanding** [1] -
47:21
**November** [1] - 58:19
**nowhere** [1] - 47:21
**number** [12] - 5:11,
8:10, 18:2, 32:25,
36:9, 36:11, 54:11,
56:3, 56:5, 57:6,
63:1, 77:1
**Number** [1] - 73:17
**numbered** [2] - 37:18

## O

**O'Donald** [1] - 4:12
**oath** [1] - 27:10
**obituary** [1] - 50:10
**objection** [9] - 11:19,
12:4, 12:19, 12:21,
12:22, 21:20, 54:5,
54:8, 83:12
**objections** [6] - 8:10,
8:11, 8:20, 15:15,
18:19, 71:15
**objects** [1] - 25:10
**obligation** [1] - 75:6
**obstruct** [1] - 46:8
**obstructed** [1] - 53:3
**obstruction** [9] -
43:25, 44:3, 44:13,
49:22, 57:5, 57:7,
57:9, 57:19, 57:23
**obtain** [2] - 25:6,
76:25
**obviously** [17] - 10:14,
11:5, 12:9, 12:19,
16:9, 22:16, 22:22,
24:1, 25:4, 25:10,
25:17, 53:2, 66:18,
69:5, 69:7, 81:19,
83:14
**ocean** [2] - 53:5, 53:15
**OF** [15] - 1:2, 1:7,
1:15, 2:4, 2:4, 2:9,
2:10, 85:5, 85:11,
85:14, 85:17, 85:20
**Offender** [1] - 12:6,
13:13, 35:5, 54:25,
55:1
**offense** [13] - 11:3,
11:9, 11:10, 23:9,
58:21, 59:12, 59:14,
59:23, 60:5, 69:24,
70:1, 70:9, 71:10
**offenses** [3] - 15:6,
60:4, 70:12
**offered** [1] - 43:4
**Office** [4] - 74:17,
75:24, 76:20, 78:3
**OFFICE** [1] - 2:4
**office** [1] - 79:19
**officer** [17] - 75:12,
75:16, 75:21, 76:4,
76:5, 76:10, 76:17,
76:24, 77:6, 77:10,
77:15, 77:16, 77:19,
77:20, 78:1, 78:10,
79:18
**OFFICES** [1] - 2:10
**OFFICIAL** [3] - 1:21,
85:10, 85:23
**officially** [1] - 36:1
**old** [1] - 70:22
**Olivia** [1] - 20:24
**ON** [2] - 2:4, 2:9
**once** [6] - 29:20,
62:11, 64:24, 65:1,

65:9, 82:11
**one** [36] - 4:23, 8:17,
8:18, 8:19, 12:11,
13:21, 15:2, 16:8,
17:11, 17:16, 23:6,
25:13, 31:3, 35:13,
40:11, 40:16, 41:9,
41:24, 42:10, 43:11,
44:2, 45:21, 47:13,
49:16, 51:8, 51:22,
58:22, 59:5, 61:13,
63:1, 63:2, 70:21,
74:15, 75:9, 81:1,
83:22
**one-third** [1] - 41:24
**open** [5] - 18:17, 44:8,
45:5, 46:7, 46:11
**opened** [1] - 48:8
**operates** [1] - 82:15
**opportunity** [4] - 9:24,
20:7, 22:3, 36:4
**option** [1] - 13:20
**order** [7] - 8:14, 13:3,
17:3, 17:6, 73:7,
81:9, 82:4
**Order** [5] - 60:13,
73:16, 74:17, 74:21,
79:17
**ordered** [7] - 72:3,
72:10, 73:1, 73:4,
73:11, 75:5, 76:7
**orders** [1] - 74:24
**ordinarily** [2] - 57:19,
83:5
**organization** [2] -
42:5, 53:12
**organized** [2] - 42:3,
52:11
**organizer** [5] - 14:6,
40:22, 43:21, 56:20,
56:21
**organizers** [1] - 41:11
**ostrich** [1] - 38:10
**otherwise** [1] - 47:19
**out-of-pocket** [3] -
23:24, 39:22, 40:1
**out-patient** [1] - 75:14
**outset** [2] - 11:23,
54:18
**overall** [2] - 10:9, 41:5
**overarching** [2] - 8:17,
9:11
**overshadowed** [1] -
71:7
**owed** [1] - 39:17
**own** [12] - 16:17, 19:5,
19:20, 41:17, 42:24,
43:6, 43:14, 47:22,
48:3, 52:4, 66:17,
67:8
**owned** [1] - 65:7
**owner** [2] - 48:3, 48:8

## P

**P.M** [1] - 4:3
**Pacer** [3] - 37:11, 42:20, 45:17
**PAGE** [2] - 3:2, 85:16
**page** [7] - 37:11, 41:14, 42:20, 42:21, 45:17, 45:18
**paid** [2] - 39:21, 72:13
**Pain** [1] - 71:3
**pain** [4] - 62:10, 66:10, 66:18, 67:2
**Pamela** [1] - 37:22
**paper** [2] - 8:21, 51:23
**papers** [7] - 6:1, 9:17, 15:13, 16:9, 22:1, 51:1, 77:12
**paragraph** [6] - 45:14, 48:2, 48:18, 49:3, 50:1, 50:8
**paranoia** [2] - 30:9, 62:13
**parents** [3] - 57:11, 63:23, 64:4
**parents'** [3] - 50:20, 52:6, 52:8
**part** [13] - 21:15, 34:10, 36:14, 44:25, 45:1, 46:20, 53:12, 58:6, 63:3, 63:25, 68:24, 76:6, 80:9
**partial** [1] - 73:5
**participant** [1] - 40:25
**participants** [4] - 41:10, 41:19, 43:23, 56:19
**participate** [3] - 61:16, 75:13, 77:22
**participation** [1] - 74:7
**particular** [7] - 10:9, 15:2, 18:18, 23:14, 35:13, 56:16, 57:17
**particularly** [4] - 70:10, 70:14, 80:7, 84:18
**parties** [14] - 5:8, 5:11, 5:13, 6:1, 8:19, 8:24, 11:15, 11:23, 38:12, 54:13, 60:6, 60:22, 69:18, 71:15
**partner** [1] - 42:23
**parts** [1] - 49:16
**party** [1] - 30:12
**passed** [2] - 30:11, 61:14
**passing** [1] - 64:2
**passport** [1] - 77:2
**past** [1] - 47:14
**patch** [1] - 75:16
**patience** [3] - 13:8, 84:17, 84:19
**patient** [2] - 66:14, 75:14

**pauperis** [1] - 81:4
**pay** [11] - 64:17, 72:3, 72:10, 73:12, 73:19, 73:20, 74:23, 76:6, 76:11, 76:22, 81:2
**payee** [1] - 73:6
**paying** [2] - 48:14, 49:4
**payment** [8] - 73:3, 73:5, 73:6, 73:7, 74:25, 76:9, 76:10, 76:11
**payments** [4] - 72:21, 72:24, 73:1, 73:13
**penalties** [1] - 73:13
**pending** [1] - 50:18
**people** [7] - 38:8, 41:5, 43:13, 67:4, 69:4, 69:6, 69:8
**per** [8] - 47:17, 47:24, 48:20, 51:8, 72:7, 72:17, 75:12, 76:19
**percentage** [1] - 73:7
**perform** [1] - 76:18
**performing** [3] - 47:19, 48:11, 52:16
**perhaps** [5] - 26:16, 32:24, 40:8, 58:24, 82:6
**period** [10] - 48:11, 55:19, 71:7, 72:6, 72:16, 72:22, 74:22, 75:19, 76:8, 84:9
**periodic** [1] - 75:11
**perjury** [1] - 27:15
**persistence** [1] - 70:11
**person** [8] - 22:18, 31:13, 36:14, 48:11, 49:17, 63:1, 66:8, 77:11
**person's** [1] - 14:13
**personal** [2] - 19:22, 30:6
**persons** [2] - 15:6, 41:18
**pertaining** [1] - 74:25
**pertinent** [2] - 21:3, 59:25
**Phoenix** [3] - 48:8, 48:25, 49:1
**phone** [6] - 13:2, 13:3, 26:20, 31:12, 32:5, 61:2
**pieces** [1] - 70:21
**pills** [1] - 66:23
**pinning** [1] - 50:23
**place** [2] - 27:10, 75:22
**placed** [2] - 74:13, 78:19
**places** [1] - 24:3
**Plaintiffs** [1] - 1:8
**PLAINTIFFS** [1] - 2:4
**planning** [1] - 70:12
**plans** [5] - 62:8, 63:7,

63:23, 64:5, 65:8
**plate** [1] - 43:9
**play** [3] - 10:7, 12:10, 38:10
**plea** [6] - 58:2, 80:2, 80:5, 80:9, 80:10, 80:12
**pleading** [1] - 40:3
**plus** [2] - 43:17, 43:22
**Plus** [2] - 40:4, 40:6
**pocket** [3] - 23:24, 39:22, 40:1
**podium** [1] - 8:3
**Point** [5] - 12:6, 13:12, 35:5, 54:25, 55:1
**point** [18] - 5:19, 13:21, 17:7, 17:9, 17:17, 17:22, 19:16, 33:12, 34:8, 35:15, 39:11, 45:11, 47:2, 51:22, 55:3, 55:4, 58:17, 82:12
**pointed** [2] - 41:6, 54:19, 57:6
**points** [5] - 11:16, 13:14, 13:15, 34:10
**poise** [1] - 52:22
**poised** [1] - 42:4
**police** [10] - 16:12, 16:18, 16:19, 16:21, 17:16, 17:18, 17:23, 18:9, 19:5, 49:18
**policy** [1] - 59:25
**portion** [5] - 8:4, 18:16, 34:2, 44:2, 81:11
**position** [15] - 6:1, 8:21, 15:22, 21:20, 21:24, 22:8, 22:20, 23:7, 35:20, 36:3, 41:8, 55:6, 55:13, 76:22, 77:8
**Position** [1] - 18:4
**possess** [1] - 76:25
**possession** [2] - 19:18, 20:13
**possibilities** [1] - 57:6
**possible** [2] - 82:9, 82:10
**Postal** [1] - 4:12
**potential** [1] - 52:19
**poverty** [1] - 51:25
**power** [1] - 55:10
**practice** [3] - 49:2, 49:24, 49:25
**precipitated** [1] - 71:6
**prefer** [2] - 8:13, 8:14
**preliminary** [2] - 6:25, 8:17
**prepare** [1] - 81:6
**preponderance** [9] - 9:21, 9:23, 10:3, 10:23, 11:12, 38:23, 44:12, 54:17, 58:5
**prerequisites** [2] - 12:9, 14:11

**prescription** [1] - 75:18
**present** [5] - 4:14, 6:11, 55:9, 55:11, 80:14
**presentation** [1] - 33:16
**presentence** [12] - 6:3, 6:4, 6:5, 8:9, 38:12, 58:15, 58:24, 78:3, 78:7, 78:11, 78:14, 79:20
**PRESIDING** [1] - 1:5
**Pretrial** [4] - 74:16, 75:24, 76:20, 78:2
**prevented** [2] - 51:8, 53:8
**previous** [1] - 78:11
**previously** [2] - 17:15, 43:4
**pride** [1] - 19:17
**primarily** [1] - 56:6
**priority** [1] - 73:7
**prison** [1] - 46:8
**Prisons** [7] - 72:8, 72:18, 74:4, 74:7, 74:9, 79:20, 79:21
**private** [2] - 23:8, 23:7, 53:17
**privately** [1] - 5:20
**probate** [1] - 42:6
**Probation** [10] - 10:14, 11:17, 13:12, 34:20, 47:24, 58:23, 74:16, 75:24, 76:20, 78:2
**probation** [17] - 74:18, 75:12, 75:16, 75:20, 75:23, 76:4, 76:5, 76:10, 76:17, 76:24, 77:6, 77:10, 77:16, 77:25, 78:10, 79:18
**probation's** [1] - 6:6
**problem** [3] - 36:11, 51:3, 51:18
**proceed** [4] - 12:15, 18:20, 63:24, 83:13
**proceeding** [6] - 6:13, 6:14, 34:4, 44:9, 82:6, 84:23
**PROCEEDINGS** [2] - 1:15, 85:15
**proceedings** [2] - 80:4, 81:12
**proceeds** [3] - 24:10, 42:12, 53:18
**process** [8] - 10:22, 15:3, 15:15, 28:25, 39:5, 64:25, 82:12, 83:9
**processed** [1] - 64:19
**processing** [1] - 68:8
**professional** [1] - 52:12
**professionalizing** [1] - 52:17
**Program** [3] - 72:9,

72:19, 74:8
**program** [6] - 75:15, 75:23, 76:3, 76:4, 77:24, 78:20
**prohibited** [1] - 78:8
**promising** [1] - 50:10
**promote** [2] - 59:15, 70:1
**proof** [9] - 9:12, 9:17, 10:5, 10:11, 10:12, 10:23, 11:4, 54:15, 76:9
**proper** [2] - 24:11, 24:14
**property** [17] - 21:1, 24:7, 24:10, 24:13, 24:15, 25:3, 25:6, 25:14, 25:23, 40:2, 40:11, 50:4, 50:7, 52:20, 66:9, 73:21, 77:12
**proportional** [1] - 73:6
**protect** [4] - 10:24, 59:17, 68:11, 70:3
**proud** [1] - 84:12
**proven** [1] - 14:11
**provide** [12] - 59:15, 59:18, 60:5, 69:12, 70:2, 74:10, 76:9, 76:22, 78:13, 78:21, 79:12, 80:25
**provided** [7] - 6:2, 10:17, 16:22, 47:20, 79:18, 79:21, 81:1
**provider** [5] - 77:25, 78:4, 78:8, 78:12, 78:13
**provides** [2] - 22:7, 24:4
**providing** [1] - 42:2
**provision** [1] - 15:19
**PSR** [4] - 11:19, 45:14, 46:2, 48:12
**public** [5] - 6:10, 22:9, 23:7, 59:17, 70:3
**puffing** [1] - 42:18
**pull** [3] - 7:12, 7:13, 7:14
**punishment** [2] - 59:16, 70:2
**pups** [1] - 30:17
**purported** [3] - 16:10, 17:1, 17:8
**purportedly** [1] - 13:16
**purpose** [5] - 70:18, 78:16, 84:3, 84:6, 84:16
**purposes** [5] - 35:2, 67:8, 72:1, 82:5, 82:20
**pursuant** [6] - 72:7, 72:11, 72:18, 73:14, 73:17, 73:25
**PURSUANT** [1] - 85:12

**Pursuant** [1] - 73:9
**pursue** [1] - 52:12
**pushed** [1] - 52:3
**pushing** [1] - 52:14
**put** [11] - 20:25, 29:5, 37:21, 38:20, 39:14, 41:9, 48:24, 50:20, 55:3, 56:25, 67:25
**putting** [1] - 48:15

## Q

**qualify** [1] - 55:2
**quarter** [3] - 64:19, 72:7, 72:18
**questioned** [1] - 77:18
**questions** [4] - 6:25, 8:17, 46:14, 47:1
**quite** [5] - 21:15, 23:23, 42:8, 62:12, 68:23
**quote** [3] - 34:9, 43:4, 51:15
**quotes** [2] - 37:12, 41:14

## R

**raised** [3] - 16:9, 19:24, 54:11
**rambling** [1] - 67:22
**ran** [1] - 47:19
**Randy** [1] - 41:17
**range** [8] - 54:4, 54:12, 58:22, 58:25, 59:3, 59:4, 59:5, 59:22
**rate** [2] - 72:7, 72:17
**rather** [1] - 41:21
**read** [9] - 5:25, 6:17, 7:17, 7:19, 22:5, 22:11, 23:5, 36:22, 36:25
**reading** [5] - 10:18, 10:21, 55:7, 60:13, 68:6
**reads** [2] - 23:6, 23:10
**real** [5] - 25:7, 25:10, 25:11, 38:8, 55:21
**realized** [1] - 62:11
**really** [17] - 29:10, 30:15, 32:20, 44:21, 46:11, 48:10, 52:1, 52:10, 53:19, 65:25, 66:2, 66:4, 66:13, 67:11, 68:21, 69:11
**Reason** [1] - 79:16
**reason** [10] - 10:8, 16:23, 52:11, 56:16, 58:11, 59:2, 71:20, 77:19, 83:8, 83:15
**reasonable** [1] - 71:24
**reasonably** [1] - 52:1
**reasons** [11] - 8:25,

**20:1, 34:3, 40:16, 54:17, 55:16, 56:5, 56:6, 56:9, 58:23, 76:18
**rebuttal** [1] - 56:7
**recanted** [1] - 44:19
**receive** [6] - 7:14, 9:5, 34:9, 35:15, 43:16, 73:6
**received** [4] - 16:5, 37:17, 49:1, 75:3
**recent** [1] - 34:12
**recess** [5] - 5:16, 33:13, 54:6, 60:16, 60:20
**Recess** [1] - 60:21
**reckless** [1] - 50:11
**recommendation** [3] - 6:6, 58:25, 78:21
**Recommendations** [1] - 18:4
**recommended** [1] - 78:19
**recommends** [2] - 74:6, 74:8
**record** [26] - 4:19, 4:20, 4:21, 6:15, 17:22, 18:15, 20:25, 34:5, 36:8, 38:21, 45:5, 46:17, 49:7, 49:20, 53:23, 54:13, 55:23, 56:10, 56:25, 57:9, 58:4, 58:9, 60:23, 60:25, 66:3, 81:1
**recording** [1] - 54:21
**records** [3] - 42:17, 48:16, 60:3
**redisclosure** [1] - 78:7
**reduction** [2] - 12:6, 13:13
**REDUCTION** [1] - 85:19
**refer** [1] - 11:19
**reference** [2] - 18:5, 45:13
**referenced** [1] - 10:8
**referred** [1] - 71:1
**referring** [2] - 34:14, 70:13
**reflect** [3] - 25:4, 59:14, 69:25
**Reform** [1] - 74:1
**refrain** [1] - 75:7
**refunds** [1] - 75:3
**regard** [2] - 20:19, 37:6
**regarding** [7] - 5:8, 5:9, 28:17, 38:3, 40:24, 45:2, 50:2
**register** [2] - 70:20, 70:22
**regular** [1] - 76:22
**regulations** [1] - 74:16
**REGULATIONS** [2] - 85:16, 85:20**

**rehabilitation** [2] - 51:16, 78:17
**related** [1] - 79:23
**relationship** [5] - 21:22, 22:18, 23:4, 23:11, 62:7
**relationships** [1] - 22:23
**relative** [2] - 11:3, 11:9
**relatively** [2] - 11:5, 13:24, 34:11
**release** [8] - 59:4, 72:21, 72:23, 74:12, 74:13, 74:19, 75:10, 77:20
**released** [1] - 83:1
**relevant** [1] - 14:15
**reliability** [3] - 11:25, 16:21, 54:24
**reliable** [1] - 41:16
**relied** [1] - 22:21
**relies** [1] - 56:24
**relieve** [1] - 82:19
**rely** [1] - 16:24
**relying** [1] - 38:16
**remain** [3] - 6:24, 64:19, 79:23
**remaining** [3] - 79:5, 79:7, 79:10
**remains** [1] - 72:20
**remanded** [1] - 79:3
**reminder** [1] - 70:25
**remote** [1] - 13:25
**remotely** [1] - 65:24
**renowned** [2] - 63:3, 63:4
**rentals** [1] - 64:16
**reopen** [1] - 6:11
**reopened** [1] - 8:5
**Reply** [1] - 18:3
**reply** [1] - 16:8
**report** [21] - 6:3, 6:4, 6:5, 8:9, 16:19, 17:23, 18:10, 38:12, 39:25, 48:2, 58:11, 58:12, 58:15, 58:24, 78:3, 78:7, 78:11, 78:14, 79:21, 79:23, 79:25
**REPORTED** [1] - 85:14
**reported** [2] - 13:21, 48:4
**reporter** [4] - 34:2, 66:4, 68:1, 81:13
**REPORTER** [1] - 1:21, 85:10, 85:23
**REPORTER'S** [1] - 1:15
**reports** [9] - 16:5, 16:12, 16:22, 17:16, 17:18, 18:12, 19:5, 51:11, 78:12
**reprehensible** [2] - 70:5, 70:15

**represent** [1] - 22:20
**representatives** [1] - 19:6
**represented** [1] - 23:15
**request** [5] - 81:5, 81:7, 81:24, 81:25
**require** [3] - 10:23, 23:4, 23:11
**required** [2] - 11:4, 76:12
**requires** [2] - 14:5, 77:8
**reside** [1] - 76:3
**residence** [3] - 17:5, 51:14, 77:12
**Residential** [1] - 74:8
**residential** [2] - 75:22, 78:20
**resolve** [2] - 5:10, 39:8
**respect** [26] - 5:17, 14:21, 16:15, 20:1, 24:6, 34:16, 36:5, 36:6, 38:15, 40:21, 41:8, 44:15, 46:15, 54:25, 55:6, 55:15, 56:3, 56:5, 56:18, 57:5, 57:7, 57:14, 59:15, 60:7, 70:1, 81:24
**respects** [1] - 37:9
**respond** [4] - 20:7, 22:3, 24:24, 36:4
**responds** [1] - 49:21
**response** [2] - 36:9, 38:1
**responses** [1] - 36:6
**Responsibility** [2] - 72:8, 72:19
**responsibility** [8] - 43:9, 44:16, 44:17, 44:25, 57:15, 57:16, 57:21, 57:25
**responsible** [1] - 62:25
**rest** [1] - 48:14
**restitution** [8] - 60:5, 72:11, 72:13, 72:16, 72:20, 73:1, 73:11, 74:24
**restraining** [2] - 17:3, 17:6
**result** [1] - 58:6
**resulting** [1] - 57:19
**resume** [1] - 13:9
**retained** [2] - 80:16, 82:25
**retire** [1] - 65:11
**retired** [1] - 65:9
**return** [5] - 5:18, 33:21, 48:13, 48:21, 60:18
**returns** [1] - 48:19
**reverted** [1] - 76:2
**review** [2] - 6:17, 9:22
**reviewed** [4] - 5:6, 5:7,

7:3, 8:19
**revised** [1] - 6:4
**RICO** [2] - 15:7
**rifles** [1] - 51:20
**rightfully** [1] - 19:24
**rights** [1] - 80:8
**rip** [1] - 53:6
**river** [1] - 17:17
**road** [1] - 84:13
**rob** [1] - 30:15
**Robert** [24] - 29:1, 29:4, 29:5, 30:25, 40:2, 40:10, 46:6, 48:10, 50:4, 50:6, 50:22, 52:24, 61:14, 63:2, 65:8, 65:9, 66:7, 66:13, 66:17, 66:21, 69:12, 72:15
**Robert's** [1] - 64:2
**role** [6] - 14:3, 14:6, 43:7, 43:8, 43:18, 43:20
**room** [3] - 30:19, 30:20, 30:22
**rule** [2] - 10:22, 54:3
**rules** [4] - 61:17, 61:19, 61:24, 74:15
**rulings** [1] - 54:14
**run** [1] - 52:21
**running** [1] - 43:14
**runs** [1] - 51:19

## S

**sake** [2] - 38:14, 39:10
**sale** [8] - 24:10, 26:3, 35:24, 35:25, 50:6, 55:19, 55:20, 55:24
**Salinas** [1] - 41:6
**sample** [1] - 75:2
**Samuel** [1] - 46:3
**Santarelli** [1] - 37:13
**satisfaction** [1] - 38:10
**saw** [1] - 48:6
**scammed** [1] - 49:8
**scams** [2] - 49:7, 50:19
**scared** [1] - 49:18
**school** [2] - 47:22, 52:10
**schooling** [1] - 76:17
**seal** [4] - 18:1, 18:16, 26:12, 34:1
**sealed** [10] - 6:12, 6:14, 33:24, 34:3, 44:1, 44:25, 45:8, 46:7, 60:23, 71:12
**Sealed** [2] - 34:4, 60:24
**search** [4] - 51:13, 52:19, 77:14, 77:21
**searches** [1] - 50:9
**seated** [1] - 6:24
**Second** [4] - 73:16,

74:17, 74:19, 74:20
**second** [1] - 83:22
**Secretary** [1] - 48:6
**section** - 25:19
**SECTION** [1] - 85:12
**Section** [7] - 59:10, 72:2, 72:12, 73:10, 73:15, 74:19, 74:20
**secure** [1] - 52:8
**security** - 77:1
**see** [20] - 4:17, 4:18, 15:5, 15:7, 15:10, 18:22, 22:25, 23:13, 26:2, 31:19, 39:5, 44:10, 47:3, 47:8, 54:6, 55:22, 60:22, 70:19, 82:18
**seeing** - 68:7
**seized** [3] - 45:25, 50:21, 57:11
**seizure** [1] - 77:14
**self** [1] - 76:21
**self-employed** [1] - 76:21
**selfies** [1] - 53:16
**sell** [1] - 29:19
**selling** [1] - 65:1
**send** [1] - 21:8
**sense** [2] - 10:1, 15:9
**sentence** [19] - 5:9, 5:17, 5:18, 8:22, 9:8, 10:10, 11:2, 11:9, 14:17, 59:14, 59:22, 60:2, 60:7, 60:19, 68:25, 69:25, 71:16, 71:20, 71:23, 71:24, 80:6, 80:7, 80:11, 84:15
**sentenced** [1] - 8:22
**sentences** [1] - 59:21
**SENTENCING** [2] - 1:16, 3:2
**Sentencing** [4] - 18:3, 58:13, 74:1, 79:19
**sentencing** [23] - 4:22, 5:10, 5:14, 9:20, 10:22, 11:1, 11:8, 11:11, 11:24, 27:25, 28:17, 28:18, 39:5, 44:20, 50:18, 56:2, 59:22, 60:1, 61:17, 61:18, 62:5, 78:9, 79:22
**sentencings** [1] - 10:2
**separate** [3] - 15:19, 82:6
**separately** [2] - 6:14, 34:4
**series** [1] - 18:12
**serious** [1] - 70:10
**seriousness** [5] - 59:14, 70:1, 70:8, 71:10, 84:21
**serve** [1] - 8:23
**served** [1] - 9:14
**service** [2] - 76:19,

78:15
**Service** [1] - 78:16
**Services** [4] - 74:17, 75:24, 76:20, 78:3
**SESSION** [1] - 4:3
**set** [3] - 13:23, 59:24, 74:19
**shall** [35] - 72:3, 72:6, 72:10, 72:13, 72:16, 72:22, 72:24, 73:6, 73:16, 74:13, 74:15, 74:23, 75:1, 75:2, 75:7, 75:9, 75:13, 75:17, 76:2, 76:6, 76:9, 76:11, 76:18, 76:21, 76:25, 77:4, 77:7, 77:11, 77:19, 77:22, 79:16, 79:17, 79:21, 79:23, 79:24
**share** [2] - 42:12, 47:1
**sheet** [1] - 56:25
**Sheila** [1] - 13:1
**shot** [1] - 17:9
**show** [2] - 43:14, 48:13
**showed** [1] - 48:21
**shown** [2] - 38:22, 47:10
**shows** [2] - 49:10, 50:12
**Shtolzberg** [2] - 41:6, 46:3
**siblings** [1] - 52:6
**side** [1] - 41:9
**sidebar** [5] - 4:19, 8:10, 60:22, 60:23, 71:13
**Sidebar** [2] - 4:20, 60:24
**sight** [1] - 17:10
**significantly** [1] - 23:8
**silencer** [1] - 51:20
**similar** [3] - 43:3, 60:3, 60:4
**similarly** [3] - 39:23, 43:2, 70:23
**simplest** [1] - 9:1
**simply** [2] - 34:8, 38:10
**situation** [8] - 29:22, 30:4, 44:23, 49:18, 62:24, 64:21
**skeptical** [1] - 57:2
**skill** [1] - 23:8
**skip** [1] - 52:24
**sleep** [1] - 66:24
**slide** [1] - 41:21
**slow** [1] - 65:20
**slowly** [1] - 68:1
**smart** [1] - 52:10
**smiling** [1] - 53:17
**Smith** [1] - 37:23
**smoking** [1] - 47:16
**sober** [1] - 51:19
**sobriety** [4] - 47:23,

84:5, 84:7, 84:9
**social** [2] - 77:1, 78:15
**Social** [1] - 78:16
**Sockel** [1] - 37:22
**soft** [1] - 25:12
**sold** [11] - 17:13, 17:14, 24:15, 24:19, 24:23, 25:5, 25:24, 26:5, 29:24, 36:2, 50:3
**someone** [1] - 32:15
**sometimes** [1] - 70:25
**somewhere** [1] - 78:23
**son** [1] - 61:21
**son-in-law** [1] - 61:21
**soon** [1] - 4:25
**sophistication** [1] - 70:12
**sorry** [19] - 12:11, 17:21, 17:25, 29:25, 30:1, 31:8, 31:21, 32:19, 32:20, 36:20, 45:10, 61:11, 63:11, 64:10, 65:4, 67:3, 76:13, 78:25, 83:24
**sort** [3] - 9:11, 31:11, 32:9
**sought** [1] - 17:6
**sounds** [1] - 25:14
**source** [1] - 50:22
**Southern** [3] - 51:7, 78:24, 78:25
**speaker** [1] - 67:25
**speaking** [2] - 23:24, 63:16
**special** [4] - 23:8, 59:6, 72:4, 74:23
**specified** [1] - 73:8
**speculated** [1] - 19:9
**speculation** [1] - 19:9
**spell** [2] - 28:9, 28:10
**spelling** [1] - 28:4
**spent** [1] - 67:12
**split** [1] - 41:24
**SPRING** [1] - 2:6
**stability** [1] - 52:9
**staff** [1] - 84:18
**stand** [1] - 4:7
**standard** [12] - 9:12, 9:17, 9:18, 9:22, 9:23, 10:3, 10:5, 10:11, 10:23, 11:3, 11:13, 54:15
**start** [8] - 8:16, 28:4, 29:3, 29:19, 32:5, 32:11, 40:15
**started** [2] - 62:17, 82:12
**starting** [3] - 36:9, 58:17, 62:9
**State** [3] - 28:8, 48:6, 49:2
**state** [11] - 4:7, 11:14, 16:5, 19:13, 19:14,

21:25, 49:23, 71:23, 77:9, 78:14, 78:15
**Statement** [1] - 79:16
**statement** [2] - 27:10, 46:17
**statements** [5] - 54:20, 54:23, 57:1, 57:2, 60:1
**STATES** [10] - 1:1, 1:7, 1:22, 2:4, 85:5, 85:11, 85:13, 85:17, 85:20
**States** [10] - 4:5, 37:13, 72:2, 72:4, 72:12, 73:9, 73:15, 74:16, 79:4, 79:19
**stating** [1] - 28:4
**status** [1] - 17:8
**statute** [2] - 14:2, 15:18
**statutory** [1] - 59:1
**stay** [4] - 29:17, 31:7, 32:4, 32:16
**stayed** [1] - 30:15
**stealing** [1] - 52:18
**STENOGRAPHICAL LY** [1] - 85:14
**step** [1] - 82:13
**stepped** [1] - 43:9
**still** [7] - 40:5, 41:12, 50:7, 50:19, 54:7, 56:24, 67:9
**stipend** [1] - 40:13
**stole** [4] - 29:18, 50:3, 64:12, 64:18
**stop** [4] - 38:13, 50:24, 65:17, 67:24
**Stop** [1] - 63:16
**stopped** [1] - 77:18
**storage** [1] - 77:13
**storm** [1] - 39:20
**straight** [2] - 31:6, 49:19
**STREET** [2] - 1:23, 2:6
**street** [1] - 40:14
**stress** [3] - 62:6, 66:10, 71:5, 71:8
**stresses** [1] - 62:14
**stressful** [2] - 64:22, 64:23
**strong** [1] - 25:11
**struck** [1] - 41:23
**struggling** [2] - 32:20, 66:5
**stubs** [1] - 76:23
**stuff** [7] - 29:9, 29:15, 29:16, 30:7, 30:22, 63:8, 67:7
**Subdivision** [5] - 59:10, 72:2, 73:10, 73:15, 73:17
**subject** [8] - 13:15, 17:3, 18:18, 21:14, 59:25, 60:1, 73:13, 77:21

**submit** [2] - 75:9, 77:11
**submits** [1] - 38:12
**submitted** [1] - 39:24
**subordinates** [1] - 52:19
**subpoenaed** [1] - 48:16
**substance** [3] - 75:8, 75:14, 78:4
**substantial** [4] - 10:6, 40:7, 40:19, 56:15
**substantiate** [1] - 10:12
**substantive** [1] - 12:4
**subvert** [1] - 9:6
**sued** [1] - 50:6
**suffered** [1] - 70:24
**sufficient** [3] - 18:5, 22:7, 71:25
**suggest** [4] - 14:18, 16:1, 16:23, 55:23
**suicide** [6] - 16:7, 17:15, 19:10, 19:12, 46:19, 46:24, 58:8, 66:21, 66:25
**SUITE** [2] - 1:23, 2:12
**summary** - 66:19
**supervised** [5] - 59:4, 72:23, 74:13, 74:18, 77:20
**supervision** [5] - 72:25, 74:22, 75:19, 75:20, 76:8
**supplied** [1] - 16:12
**support** [8] - 10:13, 10:14, 15:16, 22:12, 52:9, 56:8, 56:10, 79:2
**supported** [2] - 20:4, 49:12, 57:8
**supposed** [2] - 26:6, 39:6
**surround** [1] - 16:6
**Susan** [1] - 37:23
**sustained** [1] - 36:14
**swear** [1] - 27:7
**sweat** [1] - 75:15

## T

**table** [1] - 4:11
**takers** [2] - 38:3, 38:8
**talent** [1] - 67:16
**talks** [1] - 10:5
**tascon** [2] - 58:6, 70:23
**Tascon** [33] - 15:23, 16:4, 16:16, 17:3, 17:5, 17:7, 17:9, 17:15, 19:20, 20:4, 20:10, 20:21, 20:23, 21:14, 21:18, 21:23, 22:21, 23:16, 24:9, 31:14, 40:2, 40:10,

40:2, 46:6, 46:16, 46:21, 48:10, 50:22, 52:25, 55:12, 56:15, 62:8, 72:15
**Tascon's** [11] - 16:11, 19:1, 19:5, 19:22, 19:25, 21:1, 21:5, 21:15, 50:4, 50:7, 71:4
**tax** [4] - 48:16, 48:18, 48:20, 75:3
**taxes** [2] - 48:14, 76:23
**team** [2] - 41:17, 43:6
**tease** [1] - 22:14
**technical** [1] - 13:8
**technology** [3] - 33:19, 65:25, 66:14
**ten** [2] - 36:5, 56:8
**tend** [1] - 48:12
**term** [3] - 36:13, 74:4, 74:13
**terms** [5] - 34:22, 46:14, 46:25, 62:13, 74:14
**test** [1] - 75:9
**testing** [2] - 75:16, 76:1
**tests** [2] - 75:11, 75:12
**Texas** [6] - 16:5, 16:13, 19:6, 29:14, 29:20, 65:10
**THAT** [2] - 85:12, 85:15
**THE** [196] - 2:4, 2:4, 2:9, 4:4, 4:16, 4:21, 5:23, 5:24, 6:20, 6:23, 7:2, 7:5, 7:8, 7:11, 7:16, 7:17, 7:18, 7:19, 7:21, 7:22, 7:24, 7:25, 8:1, 8:2, 8:16, 9:16, 10:16, 11:22, 12:3, 12:11, 12:23, 12:25, 13:5, 13:6, 13:7, 14:20, 14:25, 15:20, 17:21, 18:6, 18:8, 18:11, 18:14, 18:20, 18:22, 20:6, 21:6, 21:11, 21:19, 22:2, 22:13, 23:1, 23:18, 24:17, 25:21, 26:2, 26:9, 26:16, 26:19, 26:22, 26:23, 26:24, 26:25, 27:1, 27:4, 27:6, 27:7, 27:9, 27:13, 27:16, 27:20, 27:22, 27:24, 28:7, 28:10, 28:14, 28:20, 28:23, 29:7, 30:1, 30:3, 31:8, 31:21, 31:24, 32:1, 32:3, 32:9, 32:12, 32:19, 32:23, 33:3, 33:8, 33:11, 34:13, 34:19, 34:23, 35:1, 35:4,

35:7, 35:16, 35:18, 36:17, 36:24, 37:5, 37:8, 38:1, 38:13, 39:2, 39:10, 40:21, 41:3, 43:24, 44:6, 45:6, 45:10, 45:16, 46:13, 53:22, 54:2, 54:9, 60:10, 60:12, 60:15, 60:22, 61:1, 61:5, 61:10, 61:15, 62:1, 62:3, 62:16, 62:17, 63:11, 63:14, 63:18, 63:19, 63:20, 63:25, 64:1, 64:2, 64:3, 64:6, 64:8, 64:10, 64:14, 65:4, 65:6, 65:13, 65:16, 65:22, 67:10, 67:18, 67:20, 68:3, 68:13, 68:14, 68:16, 68:17, 68:19, 69:10, 69:14, 69:16, 69:18, 69:21, 71:19, 71:23, 73:25, 76:16, 78:25, 79:8, 79:10, 79:16, 80:20, 80:21, 80:23, 80:24, 81:22, 82:22, 82:25, 83:3, 83:11, 83:19, 83:23, 84:1, 85:10, 85:11, 85:13, 85:14, 85:15, 85:16, 85:17, 85:19, 85:20
**theft** [2] - 49:11, 66:9
**themselves** [2] - 19:11, 42:9
**theory** [2] - 15:4, 80:14
**thereafter** [1] - 75:11
**therefore** [1] - 58:21
**Third** [1] - 37:15
**third** [2] - 41:24, 43:12
**THIS** [1] - 85:18
**thousand** [2] - 42:16, 51:7
**thousands** [2] - 64:19, 64:20
**three** [5] - 37:11, 59:5, 61:11, 61:12, 74:14
**three-way** [2] - 61:11, 61:12
**throw** [1] - 45:22
**time..** [1] - 8:3
**Title** [5] - 39:24, 72:1, 72:12, 73:9, 73:14
**TITLE** [1] - 85:13
**TO** [1] - 85:12
**today** [6] - 56:7, 58:14, 58:16, 84:17, 84:20, 84:21
**together** [1] - 55:7
**took** [3] - 19:14, 30:20, 70:13
**top** [2] - 29:21, 46:1
**total** [1] - 58:20
**touch** [1] - 53:1
**towards** [1] - 7:13

**town** [4] - 31:5, 31:17, 31:19, 32:17
**tracing** [1] - 42:14
**tracking** [1] - 52:18
**tragic** [1] - 70:23
**training** [2] - 59:19, 76:17
**TRANSCRIPT** [4] - 1:15, 85:14, 85:16, 85:18
**transcript** [3] - 8:4, 34:2, 80:25
**transfer** [3] - 24:20, 55:17, 55:20
**travis** [1] - 31:17
**Travis** [2] - 32:7, 32:14
**treat** [1] - 35:25
**treated** [2] - 36:2, 70:15
**treatment** [19] - 47:12, 51:4, 51:5, 51:19, 59:20, 74:11, 75:14, 75:23, 75:24, 76:3, 76:7, 77:23, 77:25, 78:4, 78:5, 78:8, 78:12, 78:13, 78:20
**trespass** [1] - 13:21
**trial** [1] - 83:2
**tried** [4] - 19:16, 46:8, 50:20, 50:21
**tries** [1] - 42:24
**troubled** [1] - 38:5
**TRUE** [1] - 85:13
**true** [10] - 19:19, 35:4, 36:13, 37:20, 40:13, 55:21, 77:4, 77:5, 84:3, 84:16
**trust** [11] - 9:13, 19:21, 20:11, 21:21, 21:24, 22:9, 23:7, 35:20, 55:6, 55:13, 79:4
**trusted** [1] - 22:22
**trusts** [1] - 42:1
**try** [1] - 32:24
**trying** [10] - 21:3, 21:16, 29:11, 29:18, 53:4, 57:12, 57:25, 58:1, 63:16, 65:18
**turn** [2] - 12:3, 42:8
**turned** [1] - 50:19
**turning** [7] - 8:2, 9:16, 11:14, 23:19, 26:10, 39:11, 43:25
**turns** [1] - 53:16
**twice** [1] - 46:7
**two** [8] - 4:4, 4:11, 23:10, 45:18, 46:8, 62:8, 75:10
**Two** [2] - 40:4, 40:6
**tying** [1] - 63:22
**type** [1] - 22:24
**typically** [2] - 15:5, 44:18

**U**

**U.S** [2] - 10:20, 75:23
**U.S.C** [1] - 59:10
**ultimate** [1] - 10:10
**ultimately** [1] - 24:15
**unable** [3] - 73:19, 80:25, 81:2
**unauthorized** [2] - 49:2, 49:24
**uncharged** [1] - 11:6
**uncontested** [1] - 17:14
**under** [13] - 15:18, 18:1, 18:16, 23:23, 25:19, 27:10, 34:20, 48:25, 50:11, 54:15, 56:14, 74:14, 80:6
**undermined** [1] - 44:19
**understood** [15] - 5:22, 10:16, 20:8, 20:11, 20:15, 20:23, 21:6, 21:19, 21:21, 23:18, 24:18, 27:16, 28:16, 43:24, 63:2
**undisputed** [1] - 55:9
**unenforceable** [1] - 80:14
**unfortunate** [2] - 16:11, 19:3
**unfortunately** [2] - 61:23, 65:23
**UNITED** [10] - 1:1, 1:7, 1:22, 2:4, 85:5, 85:11, 85:13, 85:17, 85:20
**United** [10] - 4:5, 37:13, 72:1, 72:4, 72:12, 73:9, 73:15, 74:16, 79:4, 79:19
**unkept** [1] - 52:18
**unlawful** [2] - 75:7, 80:3
**unlawfully** [2] - 37:2, 55:17
**unless** [5] - 8:13, 19:11, 54:5, 73:7, 76:23
**unlike** [1] - 24:9
**unlikely** [1] - 52:20
**unmute** [3] - 13:2, 26:20
**unpaid** [2] - 72:5, 72:20
**unreliable** [1] - 52:15
**unsealed** [4] - 6:15, 8:5, 34:5, 60:25
**unsuccessful** [1] - 17:18
**untold** [1] - 66:18
**unusual** [1] - 44:17
**unwarranted** [1] - 60:2
**up** [18] - 12:17, 19:1,

19:23, 25:11, 30:23, 30:24, 31:1, 32:21, 77:3, 35:12, 38:9, 39:20, 43:9, 52:2, 53:5, 53:15, 62:18, 69:17, 83:14
**upset** [3] - 40:16, 42:13, 42:17
**upshot** [1] - 18:25
**urinalysis** [1] - 75:15
**user** [1] - 47:16
**uses** [2] - 10:13, 43:1

**V**

**vacation** [1] - 53:16
**value** [12] - 24:15, 24:22, 25:5, 25:17, 26:3, 26:4, 35:25, 36:1, 55:18, 55:21, 55:24
**values** [2] - 25:7, 25:10
**variance** [1] - 35:9
**various** [4] - 8:11, 9:20, 11:15, 38:19
**vehicle** [1] - 77:12
**vender** [1] - 62:23
**VENTURA** [1] - 2:11
**verifiable** [1] - 49:6
**verify** [1] - 21:13
**Versoza** [2] - 4:12, 54:20
**Versoza's** [1] - 42:13
**via** [2] - 4:24, 27:25
**victim** [10] - 22:7, 23:5, 23:12, 27:12, 36:9, 36:14, 37:1, 37:14, 37:20, 62:4
**victim's** [1] - 59:7
**victims** [17] - 36:5, 36:11, 37:16, 37:18, 40:3, 40:18, 50:7, 50:10, 52:19, 53:24, 56:3, 56:5, 56:8, 56:9, 56:10, 60:5, 71:2
**video** [1] - 26:20
**view** [2] - 11:7, 41:4
**viewed** [1] - 16:2
**vocational** [1] - 59:19
**vs** [2] - 1:10, 85:6

**W**

**W-I-L-L-I-A-M-S** [1] - 28:13
**wait** [4] - 13:9, 67:24
**waive** [2] - 60:13, 80:8
**waived** [3] - 73:11, 73:18, 80:5
**waiver** [1] - 80:14
**waivers** [1] - 80:11
**waives** [1] - 80:10

**wake** [2] - 30:23, 30:24
**walk** [1] - 8:12
**walked** [2] - 30:19, 30:20
**wants** [1] - 47:17
**warnings** [1] - 50:12
**warrant** [2] - 51:13, 77:16
**warrants** [1] - 40:4
**website** [1] - 48:6
**week** [1] - 76:19
**weight** [1] - 12:20
**weird** [1] - 30:13
**well-deserves** [1] - 43:21
**well-funded** [1] - 19:21
**Wells** [1] - 39:21
**WEST** [1] - 1:23
**WESTERN** [1] - 1:3
**whatsoever** [1] - 7:10
**white** [1] - 71:1
**whole** [11] - 28:25, 29:9, 29:21, 30:8, 30:13, 33:9, 40:11, 49:5, 62:24, 63:10, 64:24
**Wichita** [1] - 30:12
**widow** [1] - 71:4
**wife** [5] - 17:2, 17:4, 20:13, 46:21, 70:24
**wilding** [7] - 14:19, 21:23, 23:16, 40:9, 53:1, 57:13, 70:15
**Wilding** [4] - 50:3, 55:12, 70:16, 72:14
**wilding's** [3] - 14:15, 39:14, 39:19
**Wilkins** [1] - 41:6
**Williams** [34] - 4:24, 17:1, 20:14, 20:21, 26:19, 27:17, 28:12, 31:8, 31:24, 32:19, 37:22, 46:17, 47:4, 53:24, 54:3, 60:17, 60:19, 61:13, 61:15, 61:16, 61:20, 61:23, 63:12, 63:13, 63:14, 63:15, 65:5, 65:16, 68:15
**WILLIAMS** [34] - 26:21, 27:3, 27:19, 27:21, 27:23, 28:6, 28:8, 28:11, 28:19, 28:22, 28:24, 29:8, 31:16, 31:22, 31:25, 32:2, 32:8, 32:11, 32:13, 32:22, 33:2, 33:7, 33:10, 61:4, 62:19, 64:9, 64:12, 64:15, 65:15, 66:20, 67:15, 68:5, 68:24, 69:11
**williams** [17] - 12:25, 26:13, 26:17, 26:18,

26:24, 28:15, 31:21, 31:24, 61:2, 63:11, 65:4, 65:16, 65:22, 68:17, 68:20, 69:15
**Williams'** [1] - 17:8
**willing** [2] - 61:6, 61:16
**wills** [1] - 37:24
**Wills** [3] - 38:4, 38:19, 42:1
**winnings** [1] - 75:4
**wish** [4] - 5:13, 28:2, 60:6, 84:15
**wishes** [1] - 69:3
**WITH** [2] - 85:16, 85:19
**withdrawn** [1] - 73:22
**WITNESS** [10] - 26:25, 30:3, 61:10, 62:1, 62:16, 63:19, 63:25, 64:2, 64:6, 65:6
**witness** [2] - 12:14, 58:1
**woman** [3] - 17:4, 20:24, 84:5
**wonder** [1] - 32:23
**wonderful** [1] - 27:22
**wondering** [1] - 32:4
**word** [1] - 17:13
**words** [5] - 42:25, 43:14, 69:5, 70:5, 70:8
**works** [1] - 38:11
**worth** [3] - 19:7, 24:16, 26:7
**written** [3] - 51:1, 77:6, 77:10

## Y

**y'all** [1] - 28:25
**year** [5] - 25:12, 29:23, 47:25, 48:5, 48:20
**years** [8] - 25:12, 47:16, 47:18, 48:1, 49:13, 51:5, 59:5, 74:14
**yesterday** [1] - 14:9
**yourself** [2] - 31:7, 68:11

## Z

**Zero** [5] - 12:6, 13:12, 35:5, 54:25, 55:1
**zero** [1] - 20:2
**Zero-Point** [5] - 12:6, 13:12, 35:5, 54:25, 55:1
**Zoom** [11] - 4:24, 4:25, 5:1, 6:9, 12:14, 12:16, 27:25, 32:24, 33:12, 33:14, 33:25